No. 24-1359

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

RANI ALLAN,

*Plaintiff-Appellant*,

v.

ARLINGTON COUNTY, CARLY WHISNER,
AND ROBERT STANLEY,

*Defendants-Appellees*.

_____

## INFORMAL OPENING BRIEF OF APPELLANT RANI ALLAN

_____

## JURISDICTIONAL STATEMENT

This appeal is taken from the district court's order granting Appellees' 12(b)(6) motions for dismissal based on the complaint. The district court had jurisdiction over Plaintiff-Appellant Rani Allan's ("Allan") claims under 28 U.S.C. §§ 1331 and 1343. Allan filed a timely notice of appeal on April 17, 2024.[1] This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in finding, based on the complaint, that Whisner and Stanley had sufficient grounds to arrest Allan without a warrant, while noteworthy that Daniel Gigi's credibility was questionable because he was trespassing and disobeyed the police's instructions. Were Whisner and Stanley acting within constitutional limits when they also maliciously prevented Allan from presenting his testimony and evidence to a neutral magistrate based on the totality of the facts and circumstances present at the time of their actions?

2.      Whether the district court erred in finding, based on the complaint, that Whisner did not violate the Fourth Amendment by maliciously filing an affidavit at the magistrate with intentionally misleading information for a serious felony charge under Fourth Amendment prohibitions against unlawful seizure and malicious prosecution.

3.      Whether the district court erred in determining that permanent injury is a prerequisite to bringing an excessive force claim for extremely tight handcuffing under Fed. R. Civ. P. 12(b)(6).

4.      Whether the district court erred in determining that the use of a small can of pepper spray at one's own home to fend off an assault and battery by a White trespasser

---

[1] Allan was barred from filing his notice of appeal before March 27, 2024, because Rule 54(b) of the Federal Rules of Civil Procedure prevents filing an appeal until all claims against all parties are disposed of.

precludes any equal protection analysis at the Fed. R. Civ. P. 12(b)(6) stage, considering the existence of multiple other clearly contrary factors.

5.    Whether the district court erred in determining that explicit racial derogatory animus is a prerequisite to brining equal protection claims against police officers on a Fed. R. Civ. P. 12(b)(6).

6.    Whether the district court erred in determining, on a Fed. R. Civ. P. 12(b)(6), that Arab males cannot be prone to racial discrimination by White police officers.

7.    Whether the district court erred in precluding a class of one equal protection violation complaint against Appellee Arlington County on a Fed. R. Civ. P. 12(b)(6).

8.    Whether the district court applied the proper test in determining whether Allan brought a plausible claim against Appellee Arlington County for deliberate indifference for failure to train and/or supervise its police officers at the Fed. R. Civ. P. 12(b)(6) stage.

## STATEMENT OF THE CASE

On July 5, 2022, Allan, an Arab-American male in his 20s, trusted the Arlington County Police and called 911 for a second time for help while he was bleeding after Defendant Daniel Gigi ("Gigi") – despite having been already warned by an Arlington County Police Officer to not physically evict Allan from Allan's residence by self-help – physically jumped over him, shoved him onto a couch, scratched Allan's arms, and attempted to cause further physical injuries to Allan while yelling at Allan. Allan did not give anyone any reasonable belief that he pepper-sprayed Gigi for any reason other than preventing further physical injuries to himself.

This appeal presents important questions of law regarding the constitutionality of reckless and discriminatory police conduct in the context of the Fourth and Fourteenth Amendments, and the appropriate pleading threshed for a wrongfully incarcerated victim to make plausible claims. This appeal also presents important issues involving a municipality's liability for failure to take sufficient action to prevent constitutional violations, which holds significant implications for establishing community trust and eliminating racial bias throughout the County. Allan challenged the unreasonable seizure, malicious procurement of arrest warrants, excessive force, and malicious indifference to an assault victim's constitutional rights that deprived him of equal protection by intentional differentiation between an aggressor and victim due to racial identity.

Allan's allegations demonstrate that the Arlington County Police Department (ACPD), aside from its equal protection violation here, had a long-standing practice of arresting persons of color at a significantly higher rate than White persons, despite persons of color comprising a significantly low proportion of the county's population. The facts demonstrate that the County was on notice of this significant disparity but failed to take sufficient action to address the inequity. Moreover, the County inaccurately categorized Latinx and Arabs as "white" in an effort

to narrow the above-mentioned disproportionate statistics and relied on that categorization to shield against claims of racial discrimination. Further, the County has long concealed information about complaints against its officers and has hindered efforts to make those records more transparent, including the records concerning Allan's arrest.

Accordingly, and for the reasons set forth below, Allan respectfully requests that the Court reverse the district court's order and remand the case with directions to the district court to deny the Defendants' Motions to Dismiss under Fed. R. Civ. P. 12(b)(6).

### A. Relevant Facts

#### 1. Allan's efforts to seek help from the ACPD

Before Gigi's assault and battery, Allan had received several threats of physical harm from Defendants Daniel and Shlomo Gigi. At the day of Daniel Gigi's ("Daniel") assault, Allan had called the ACPD to report threats of harm made by Gigi. Appellee Robert Stanley ("Stanley"), a public servant and officer with the ACPD, was with the same officer who responded to Allan's first 911 call and who witnessed the other officer ("Officer A") from the first 911 call inform Allan of his legal right to remain in Allan's apartment.[2] Officer A also informed Gigi not to physically evict Allan by self-help or assault.[3]

When Officer A instructed Gigi, accompanied by Stanley, Gigi had already left Allan's apartment. But undeterred, after Officer A and Stanley departed, Gigi aggressively re-entered Allan's apartment, and within seconds, physically injured Allan.[4] Even after Allan pepper-sprayed Gigi to stop Gigi's battery (the recording shows Gigi had already seen the pepper spray

---

[2] The ACPD has refused to disclose Officer A's name and badge number.
[3] Stanley did not talk during this visit.
[4] In Virginia, entering a house or a dwelling with intent to commit assault and battery is a class 3 felony. Va. Code § 18.2-91.

before injuring Allan), Gigi had the physical ability to take several pictures of Allan while shouting, and to call his father—all while remaining in Allan's apartment. During that time, Allan did not approach Gigi and as Gigi himself acknowledged, Allan remained "seated nonchalantly on the couch" on which Gigi jumped over him on. This further illustrates that Allan used his pepper spray for the sole purpose of repelling Gigi's physical attack and to prevent further injuries, much so inconsistent with both Whisner's and Gigi's statements to the magistrate that he sprayed "relentlessly" and with malicious intent.[5] Remarkably, unlike Allan, Gigi did not have any scratches nor was he bleeding, illustrating that Allan was not the initial or "primary" aggressor.

### 2. *Whisner and Stanley's racially discriminatory warrantless arrest*

Upon Carly Whisner ("Whisner") and Stanley's arrival after Allan's second 911 call, Whisner immediately  proceeded to go attend to Gigi.[6] Stanley briefly questioned Allan about Allan's injuries, including blood spatter in Allan's apartment from Allan's injuries, before Whisner called him through the police radio to come downstairs. Whisner and Stanley remained speaking to Gigi for an extended period of time. The ACPD and the County have to this date refused to release the bodycam footage from that day despite several weeks of email correspondence during which they agreed to show it, and despite Whisner and Stanley downplaying the extent to which an Arab male can be victimized by calling into question his two 911 calls throughout their filings at the district court.[7]

---

[5] *See* discussion below about "malicious" intent.
[6] Whisner did not report to the first 911 call. Whisner was effectively Officer A's replacement.
[7] During the hearing at the Court, Whisner and Stanley falsely stated that the "Freedom of Information Act is used very successfully[,]" notwithstanding the unconcealed withholding of material relating to this action. Transcript of Oral Argument at 8 (2023) (hereafter "Transcript").

Once Whisner and Stanley returned upstairs, Stanley requested Allan to step out of his apartment, likely because they knew they had no authority to arrest Allan inside his own apartment. Allan immediately complied, during which Whisner and Stanley arrested Allan. When Allan asked why he was being arrested, Whisner stated for "assault and battery." Allan corrected Whisner that he was the one assaulted, and that a recording clearly shows that. Whisner replied that Allan "looked like the primary aggressor," and that Allan "shouldn't have recorded" Gigi. Allan repeatedly asked Whisner and Stanley to listen to his testimony, view the recording, view Allan's injuries, and to consider Officer A's instructions, but Whisner and Stanley repeatedly refused.

### 3. Whisner and Stanley's malicious prosecution and preferential treatment to Allan's White aggressor

Upon arresting Allan, Whisner and Stanley dragged Allan outside of his apartment building. Whisner directed Stanley to "make sure to throw him outside the building." For the next two hours, Stanley stood next to Allan while Allan was in extremely tight handcuffs next to Stanley's patrol car. Whisner went to the local courthouse with Gigi to file charges against Allan. As Gigi himself acknowledged, Whisner did not bring up with Gigi filing charges against Allan *until after* Whisner and Stanley evicted Allan outside of his apartment by arresting him, "threw" Allan outside of his apartment building, and took Gigi to the inside of Whisner's patrol car.

Allan repeatedly asked Whisner and Stanley why they were preventing him from going to the magistrate too, and from presenting his testimony, recording, and injuries. Whisner and Stanley ignored Allan or gave false explanations for the discriminatory treatment, such as saying that Allan will immediately see a magistrate after separating Gigi from him.

Despite closing her eyes by refusing to listen to Allan's testimony and evidence, Whisner swore an affidavit in support of procuring a warrant for a class 3 felony offense of "malicious

bodily injury by means of any caustic substance or agent," charging a violation of Va. Code § 18.2-312. Allan was also wrongfully charged with a class 1 misdemeanor of assault and battery, in violation of Va. Code § 18.2-57.

It is noteworthy that the racial identity of, and racial difference between, both Allan and Gigi were abundantly clear during this time. Allan's Arab identity was unclouded through his physical and vocal characteristics, including, but not limited to, Allan's thick accent, evident beard and facial hair, Arab-shaped nose, and two easily noticeable Arabic tattoos that Allan had on his forearm and upper arm.

### 4. *Stanley's unreasonable use of force and failure to intervene*

For two hours, Stanley simply watched and ignored Allan as Allan complained that the handcuffs arounds his wrists were extremely tight and painful. Allan endured severe browsing around his writs and significant pain for the next several days.

It is noteworthy that Allan did not present a danger to Whisner and Stanley or anyone else, was calm, and collaborated fully with the officers ever-since his first 911 call earlier that evening. And it was Gigi, not Allan, who disobeyed the instructions given by Officer A and re-entered Allan's apartment to commit assault and battery.

While handcuffed, Allan requested to place a phone call. Stanley refused Allan's request, grabbed Allan's phone, and turned it on airplane mode.[8]

During the two-hours, Allan kept requesting Stanley to listen to the recording of Gigi's assault. After ignoring Allan many times, Stanley later agreed to listen to the recording and acknowledged that Gigi was the aggressor but refused Allan's request to take any action to stop

---

[8] It is unclear what authority Stanley had to exercise that during a warrantless arrest while detaining someone for two hours, considering also Gigi was seen talking on his phone while being escorted by Whisner.

Whisner from recklessly swearing an affidavit or procuring arrest warrants, or to reconsider the handcuffs on Allan's wrists, or to present Allan to the magistrate. Stanley failed to intervene to stop unconstitutional violations he knew were in the making, and he acted with malice.

###### 5. *Allan's incarceration and post-incarceration events*

Upon being served with the two arrest warrants, Stanley and another officer transported Allan to the Arlington County Detention Center ("ACDC") after conducting an invasive body search on Allan. As a result of the warrants, Allan was taken into custody at the ACDC, where he was photographed, and fingerprinted. After Allan indicated at the ACDC that he had just been assaulted and feared further assault, he was isolated into solitary confinement, and stayed incarcerated in isolation for two nights. Allan was only allowed to leave his isolated cell 1 hour a day. During his time at the ACDC, Allan was questioned multiple times about his immigration status.

During Allan's pretrial release/bond hearing on July 7, 2022, Assistant Commonwealth Attorney ("ACA") Katherine Lee Milane, assigned temporarily for the bond hearing, stated that the police records mentioned Allan suffered no injuries. This further indicates Whisner intentionally omitted material facts from her affidavit to the magistrate.

In accordance with the conditions set forth in the pretrial release, Allan was barred from returning to his apartment building complex.

Allan was ordered to appear at the General District Court of Arlington County on four different occasions. At the first scheduled preliminary hearing on August 18, 2022, the ACA assigned to Allan's case moved to reschedule the appearance to November 1, 2022, citing he had received insufficient evidence by the ACPD to support probable cause for a preliminary hearing.

Both charges were ultimately dismissed but remain as the only criminal incidents on Allan's record.

In addition to the false imprisonment and malicious prosecution, Allan suffered substantial harm due to the actions taken by Whisner, Stanley, and Arlington County, including mental and emotional harm, reputational damage, and financial damages.

### 6. *Arlington County Police Department's notice of racial profiling*

In a letter dated June 16, 2020, the Arlington Branch of the National Association for the Advancement of Colored People ("NAACP") flagged the need for Arlington County to increase transparency in policing by making each officer's misconduct and disciplinary history publicly available to promote procedural justice and legitimacy. The NAACP letter was accompanied by 1,765 on a petition initiated by an Arlington County high school student and 7,919 signatures on a petition by the NAACP. Attached is **Exhibit 1** as a true and correct copy of the NAACP letter.

According to the 2020 census performed by the United States Census Bureau, Arlington County is comprised of 60% (excluding Latinx), 10% Blacks, and 16% Latinx. But according to the ACPD's own statistics, 51% of arrestees are Black and only 45% are White. The ACPD statistics count members of both the Latinx and Arab communities as "White," effectively misrepresenting and overrepresenting the data for White arrestees. Black people in Arlington County are 15.3x more likely to be arrested in Arlington County for low-level, non-violent offenses than a white person.[9] According to the Virginia Department of Criminal Justice Services report, last reporting in 2023, at traffic stops, considered to be the "epicenter of police-citizen interactions," Black resident drivers are 1.6x likely to be stopped than their White resident

---

[9] Arlington County, Police Scoreboard, https://policescorecard.org/va/police-department/arlington-county.

counterparts despite their significantly low proportion to the resident population, and American Indian or Alaskan Native resident drivers are 10.2x likely to be stopped than their White counterparts.[10]

According to Arlington County's own records, between 2016 and 2021, Arlington County received 152 civilian complaints of police misconduct. Only nine percent, however, were adjudicated in favor of civilians. Moreover, 12 complaints alleged excessive use of force, but only eight percent were ruled in favor of civilians by the ACPD, or the equivalent of just one complaint.

Fourteen complaints to the ACPD between 2016 and 2021 reported racial discrimination. However, none were adjudicated in favor of civilians by the ACPD. From 2015 through 2019, the ACPD saw a 25% increase in the submission of racially biased policing complaints from civilians.

In just the years 2021 and 2022, the U.S. Department of Justice 's Office of Civil Rights received at least five complaints from people of color alleging they were racially discriminated against by ACPD officers. Those complaints include similar fact-patterns to Allan's case, involving discrimination based on race, including being Arab, possessing a heavy accent, false accusations of the victim persecuted as the aggressor, and an ACPD officer misleading the magistrate—factors all present here. In one of these complaints, the complainant's alleged aggressor threatened the complainant's family with a German shepherd before the ACPD officer misled the magistrate, hence making questionable the premise that non-human items, such as a small can of pepper spray or in the aforementioned complaint, a large German Shepperd, are a

---

[10] Commonwealth of Va. Dep't of Crim. Justices Sevrs., Community Policing Reporting Database Annual Report, Appendix C. 11 (2023).

substantial larger concern for the ACPD than human physical strike, as advanced in the

Defendants' motions to dismiss. A copy of these redacted complaints is attached hereto as

**Exhibit 2**; *see also* Drew Wilder, *Black Photographer Says Arlington Police Racially Profiled*

*Him After Suspicious Activity Report*, NBC Washington (Dec. 28, 2020) (describing how, 18

months before Allan's incident, ACPD unreasonably seized a Black real estate agent and

photographer on the street, and "[t]he president of the Arlington branch of the NAACP . . . said

officers should not have questioned Crutchfield based on the report" received by a White man

who was hostile to the photographer).[11]

Aside from the transparency-deserving 158 complaints mentioned above, Arlington

County has had to deal with multiple lawsuits alleging serious violations of Fourth and

Fourteenth Amendment constitutional rights for incidents immediately preceding Allan's racial

profiling incident. In a 2020 case, an African American alleged ACPD officers detained him in

handcuffs for a prolonged period of time as a result of a phone call by a White driver, but

ignored plaintiff's earlier phone call and also did not arrest the White driver, even though both

were involved in the same incident. *Emesowum v. Arlington Cnty.*, No. 1:20-cv-113, 2020 WL

3050377, at *1 (E.D. Va. June 5, 2020). The district court held that the plaintiff stated an

actionable claim for equal protection violations against Arlington County, as well as malicious

prosecution, unreasonable seizure, and excessive force claims against the ACPD officer

involved. *Id.* at *13; *see also* Olivia Diaz, *Charged with trespassing at airport, she died in*

*custody 2 days later*, Washington Post (Aug. 28, 2023, attached hereto as **Exhibit 3**) (discussing

---

[11] https://www.nbcwashington.com/news/local/black-photographer-says-arlington-police-racially-profiled-him-after-report-of-suspicious-activity/2522836/

how Arlington County police arrested a homeless, elderly, Black 73-year-old lady with trespassing, only for her to die two days later at the ACDC).

In 2023, a complaint in the same court described how a Black father called 911 when his son, Mr. Franklin, was suffering from a mental health episode and posed no threat to anyone. Instead of helping Mr. Franklin, the White officers assaulted Franklin, pointed a taser at Mr. Franklin, arrested Mr. Franklin, threw Mr. Franklin into the back of a squad car, and instead of taking responsibility for their assault, charged Mr. Franklin with three felony counts of assaulting the ACPD officers, thereby incarcerating him too for several days. *See* Am. Compl. at 5-8, Franklin II v. Arlington County, No. 1:23-cv-00601-RDA-WEF (E.D. Va. Aug. 9, 2023), ECF No. 42 (attached as **Exhibit 4**). These three felony charges were filed with affidavits by officers despite bodycam video showing them, at the time they arrested Mr. Franklin, stating that they were not injured by Mr. Franklin. The Washington Post reached out to three different use of force experts and asked them to watch the video of Mr. Franklin's arrest. According to the Washington Post's article:

> The three experts who reviewed the dashboard-camera video and documents in the case told The Post the encounter was an example of *how not to respond to a mental health crisis*. Although all five officers who tackled Franklin had crisis intervention training that called for them to deescalate the situation, they decided within minutes to forcibly take him into custody, the experts noted . . . "Taking him down was not the answer," said T.T. Williams Jr., a use of force expert who worked at the Los Angeles Police Department for 29 years. "The man needed help."

Salvador Rizzo and Nilo Tabrizy, *Video shows 5 officers tackling mentally ill man. Experts question why*, Washington Post (July 26, 2023) (emphasis added) (attached hereto as **Exhibit 5**). It is not surprising why Arlington County stopped releasing bodycam footage of ACPD officers wrongfully arresting people of color shortly afterwards.

Furthermore, one year before Allan's arrest, an ACPD officer violated written policy and failed to take any action, including failing to verbally intervene, while watching deputies physically tackle a man ("Mr. Jones") who posed no physical threat, and strike the man's head to the floor. Second Am. Compl. at 11, Jones v. Arthur, No. 1:23-cv-00620-TSE-WEF (E.D. Va. Sep. 23, 2023) (attached hereto as **Exhibit 6**). As a result, Mr. Jones lost consciousness and became disabled, in need of being hospitalized, and requiring the use of a wheelchair. *Id*. at 12.

Another matter pending before this Circuit concerns an African American man ("Mr. Wells") who two years before Allan's incarceration was sitting in his legally parked car in a parking lot. After a civilian employee of the Department of Justice initiated an allegedly unconstitutional search and seizure of Mr. Wells, several ACPD officers unconstitutionally seized Mr. Wells's property, and the ACPD officers made false assertions to a magistrate that Mr. Wells possessed illegal chemical compounds and stole a Rifle Plate. Brief of Petitioner-Appellant at 12-17, Wells v. Fuentes, No. 23-1638 (4th Cir. Oct. 30, 2023). This includes, improperly increasing the value of Mr. Wells's Rifle Plate in order to mislead the magistrate that the Rifle Plate's value was in excess of the felony threshold at that time of $500.00. *Id*. at 4. Mr. Wells was wrongfully incarcerated for a period of approximately seven months.. Here, Whisner and Stanley violated Allan's constitutional rights because Arlington County failed to discipline its officers for wrongfully incarcerating people of color, as well discipline for making material misrepresentations to the magistrate when instituting frivolous felony charges.[12]

---

[12] Significantly noteworthy is the County's withholding of any information concerning its officers' disciplinary history, as well as information concerning its own police records. Despite the NAACP letter in 2020, referenced above, and a Police Practices Work Group recommendations urging such transparency, among various recommendations, Arlington County does not meet what the National Association for Civilian Oversight of Law Enforcement says is necessary for police accountability. *See Thirteen Principles for Effective Oversight*, National Association for Civilian Oversight of Law Enforcement, https://www.nacole.org/principles.

## SUMMARY OF ARGUMENT

The district court erred as a matter of law in granting Whisner, Stanley, and Arlington County's motions to dismiss. Allan's Complaint contained well-plead allegations to make a strong plausible case for civil rights violations under the Fourth and Fourteenth Amendments. The district court did not address some important facts present in Allan's allegations. Furthermore, the district court applied the wrong standard in addressing the alleged violations. For example, the district court determined that Allan did not possess any characteristics to show he is Arab; at most, the mater should be resolved by a jury.

Section 1983 was enacted by Congress to ensure that the courts can commit themselves to the new guarantees of liberty and equality, established through the Fourteenth Amendment. The act contained jurisdictional provisions conferring on the federal courts the indispensable duty of ensuring state officers and municipalities do not receive a carte blanche for depriving equity-deserving communities of freedoms and liberties. When a civil rights plaintiff brings on claims against public servants for Constitutional violations, the initial burden is to provide-plausible, well-pled allegations. When a defendant files a motion to dismiss under Rule 12(b)(6), the district court should grant the motion only when it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory that might plausibly suggested.

## I.   THE DISTRICT COURT ERRED IN BARRING ALL OF APPELLANT'S FOURTH AMENDMENT CLAIMS AGAINST WHISNER AND STANLEY

Whisner and Stanley argued, and the district court held, that they established probable cause to arrest Allan without a warrant after Gigi's attack. Equally important, the district court did not address Whisner and Stanley's malicious procurement of the serious felony and misdemeanor warrants. The district court also held they did not use excessive force.

### A.  Probable Cause Standard

Under the Fourth Amendment, no officer may arrest an assault victim without probable cause. *See, e.g., McAfee v. Boczar*, 738 F.3d 81, 87 (4th Cir. 2013). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense." *Quarles v. C.W. Weeks*, 815 Fed. Appx. 735, 737 (4th Cir. 2020) (citation omitted). This Circuit evaluates probable cause "under an objective standard, considering the totality of the circumstances known to the officers at the time of the seizure and without consideration of the subjective beliefs of the officers involved." *Id.*

Importantly, officers may find probable cause based on information provided by an eyewitness "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *U.S. v. Beckham*, 325 F. Supp. 2d 678, 687 (E.D. Va. 2004) (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). A mere allegation by an eyewitness, that he was the alleged victim of an assault "does not mean," that his "report of crime is always sufficient, in and of itself, to establish probable cause." *Id.* at 688. "To the contrary, 'independent exculpatory evidence or substantial evidence of the witness's own unreliability could outweigh the identification such that probable cause would not exist.'" *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 790 (3rd Cir. 2000)). "[A] police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest." *Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988) (citation omitted).

Furthermore, a probable cause determination depends on the elements of the applicable criminal statute. *United States v. Bullock*, 632 F.2d 1004, 1022 (7th Cir. 2011) (citation omitted). An officer cannot have a probable cause where the acts on which the officer relies are not

15

prohibited by law. *United States v. Williams*, 740 3.d 308, 312 (4th Cir. 2014) (abrogated on other grounds).

### 1. *The applicable Virginia criminal statutes.*

Va. Code § 18.2-312, or "Illegal use of tear gas, phosgene and other gases[,]" states:

> If any person maliciously release or cause or procure to be released in any private home, place of business or place of public gathering any tear gas, mustard gas, phosgene gas or other noxious or nauseating gases or mixtures of chemicals designed to, and capable of, producing vile or injurious or nauseating odors or gases, and bodily injury results to any person from such gas or odor, the offending person shall be guilty of a Class 3 felony.

Importantly, the statute directs "Nothing herein shall prevent the use of tear gas or other gases . . . by any person or persons in the protection of person, life, or property." *Id*.

Va. Code § 18.2-57, or "Assault and battery[,]" states, in relevant part, "any person who commits a simple assault or assault and battery is guilty of a Class 1 misdemeanor." *Id*.

Arresting someone for assault and battery not in an officer's presence is not legally authorized. In Virginia, officers are only allowed to arrest for assault and battery not committed in their presence in domestic violence situations. Va. Code. § 19.2-81.3. But even in those situations, the arresting officers are required to follow statutory criteria:

> (i) who was the first aggressor, (ii) the protection of the health and safety of family and household members, (iii) prior complaints of family abuse by the allegedly abusing person involving the family or household members, (iv) the relative severity of the injuries inflicted on persons involved in the incident, (v) whether any injuries were inflicted in self-defense, (vi) witness statements, and (vii) other observations.

*Id*. at B and C.

###### i.    *malice as a required element of Va. Code § 18.2-312.*

In Virginia, class 3 felonious assaults (oftentimes referred to as "malicious wounding" offenses) are specific intent crimes that require an "intent to maim, disfigure, disable, or kill." *Johnson v. Commonwealth*, 709 S.E.2d 175, 182 (2011). "Malice inheres in the doing of a

wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen v. Commonwealth*, 749 S.E.2d 172, 174 (2013); Virginia Model Jury Instructions-Criminal, No. G37.100 (2016).

### 2. The District Court Erroneously Found Whisner and Stanley had Probable Cause at the time of Allan's Warrantless Arrest

The district court, in applying the probable cause standard, incorrectly determined that mere deployment of pepper spray "at another person is a sufficient basis for both criminal charges under Section 18.3-312" and also the "other statute he was charged with" (referring to Va. Code § 18.2-57). Transcript at 59. The Eleventh Circuit has previously determined that pepper spray, "is a very reasonable alternative to escalating a physical struggle[,]" because it "is generally of limited intrusiveness . . . designed to disable a[n aggressor] without causing permanent physical injury." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (citations omitted). Here, neither Va. Code § 18.3-312 nor § 18.2-57 criminalized the mere deployment of pepper spray at another person, more so concerning repelling a physical tackling at one's own home.

Further, the district court incorrectly determined that "spraying them in the face . . . would constitute malicious use as opposed to spraying it on the floor or something." Transcript at 36.[13] Spraying on the floor clearly would not have deterred Gigi from continuing his physical aggression on top of Allan's body. To the contrary, it could have empowered Gigi to grab the pepper spray and deploy it against Allan. And the exigency of the circumstance would have not allowed an assault victim's mind to process such less likely successful alternatives, information that any reasonably prudent officer would know. The district court erroneously held that Whisner

---

[13] For much of the hearing, the district court was not aware of the malice requirement of the statute, as it appears it relied on an incomplete version. Transcript at 30-31.

and Stanley had sufficient reasonable grounds to establish probable cause for malice as defined in the Commonwealth.

Whisner and Stanley similarly did not have probable cause to arrest Allan for violation of Va. Code § 18.2-57. First, as explained above, the officers did not have statutory authority to make a warrantless arrest for an alleged misdemeanor not committed in their presence. But second, assuming they possessed such authority, there were no sufficient grounds to establish that Allan was the primary aggressor, especially considering Allan had injuries showing he struggled to stop Gigi's attack, Gigi's prior threats, and Gigi had disobeyed Officer A's instructions. In light of these facts and circumstances and the factors statutorily required in Va. Code. § 19.2-81.3, Whisner and Stanley, at the minimum, had a duty to view Allan's recording, which was readily accessible and only took a few seconds to help in the determination.

### 3. Gigi Was Not a Credible Eyewitness.

Particularly relevant here is Whisner and Stanley relied on Gigi as the sole eyewitness testimony to establish probable cause for Allan's warrantless arrest. It is clear to any reasonable prudent person that (1) a trespasser trying to evict a lawful tenant, (2) who had two 911 calls made against him, (3) who disobeyed an officer's instructions, and (4) who would want to escape arrest or criminal prosecution for assault and battery, would give an eyewitness statement that is untrue, or at the very least inaccurate. That Whisner and Stanley relied on a suspicious testimony as the sole basis here, and declined to make any other considerations, demonstrates that they intentionally closed their eyes to all the facts and circumstances that negated any probable cause against Allan.

### B. Malicious Prosecution Standard

Under *Malley v. Briggs*, 475 U.S. 335, 342 (1986), an officer who seeks a warrant on the basis of an affidavit that a reasonably well-trained officer would have known failed to demonstrate probable cause—even if the magistrate erroneously issues the warrant—does not become absolved of responsibility.[14] Public servants such as police officers seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause. An officer cannot deliberately or with a reckless disregard for the truth make material false statements in her affidavit, or omit from that affidavit "material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir. 2006).

To state a claim for malicious prosecution under the Fourth Amendment, "a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2002).

### 1. The District Court Erroneously Found that a Malicious Procurement of Warrants with Material Misrepresentations to the Magistrate Was Within Constitutional Limits.

To be specific, both Whisner and Stanley maliciously procured warrants for Allan's rights in violation of Fourth and Fourteenth Amendment jurisprudence. Stanley actively participated by arresting Allan without probable cause, as explained above, preventing Allan from seeing a magistrate, and actively aiding Whisner's procurement of both warrants.[15]

---

[14] In Virginia, the standard for officers is even higher because magistrates are not required to be attorneys. *Graham v. Gagnon*, 831 F.3d 176, 183 n.3 (4th Cir. 2016).

[15] It is also unclear what reports and statements Stanley made.

But based on the known facts as of now, Whisner, the one who deliberately refused to speak to Allan at all and made malicious comments about "mak[ing] sure to throw him outside" the building, swore an affidavit that caused a magistrate to issue class 3 felony warrant for malicious wounding. The district court made little to no comment about this significant issue, and it is unclear why it did so.[16]

Whisner did address this issue at the hearing by commenting "the misdemeanor warrant in particular would be facially valid if that were the case. Misdemeanors can be sworn on the statements of civilians." Transcript at 48. But the felony warrant is particularly important in Allan's situation. First, the misdemeanor warrant would have been facially invalid, because Whisner and Stanley had no legal authority to arrest Allan for the misdemeanor without a warrant. The only reason the misdemeanor warrant and charge could arguably be sustained is because the magistrate issued a warrant for felonious assault. Second, Allan would not have been incarcerated, nor would have Allan suffered the subsequent damages, if it weren't to the felony charge.[17] *Cf. Patton v. Przybylski*, 822 F.2d 697, 700-01 (7th Cir. 1987) ("An innocent person was allowed to languish in jail . . . [to] keep him in jail without either investigating the case or bringing him before a magistrate raises serious constitutional questions).

Assuming, but not conceding, that Whisner and Stanley had probable cause to arrest Allan for misdemeanor assault and battery, such initial probable cause does not justify submitting material misrepresentations in an affidavit to the magistrate, nor does it establish

---

[16] The district court briefly mentioned that the Gigi had submitted statements to the magistrate. Transcript at 59. But that analysis missed a significant part of the allegation: had Allan been brought before the magistrate, the magistrate would have never determined there was probable cause to arrest Allan.

[17] Noteworthy is that as a result of Whisner's conduct, Allan's record includes an arrest and charge for class 3 felony, which is far more damaging than a record for a misdemeanor.

probable cause for the warrant itself. *Cf. Graham*, 831 F.3d at 183 ("if the officers' decision to request a warrant . . . was outside the range of professional competence expected of an officer . . . then the officers are not immune from suit").

### C. Excessive Force Standard

There is no requirement that a plaintiff sustain a permanent injury to recover for excessive force under the Fourth Amendment. While the extent of injury is relevant for the factfinder, it is not determinative in the excessive force inquiry. *See, e.g., Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) ("[A] plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries"); *Chambers v. Pennycock*, 641 F.3d 898, 906-07 (8th Cir. 2011) ("We are not convinced, however, that evidence of only *de minimis* injury necessarily forecloses a claim of excessive force under the Fourth Amendment . . . The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted") (citations omitted).

Under *Graham v. Connor*, 490 U.S. 386, 396 (1989), the amount of force that can be used depends upon (1) the seriousness of the offense, (2) the physical threat to the officer or others, (3) and whether the subject is actively resisting or attempting to flee. The analysis requires "careful attention to the facts and circumstances of each particular case." *Id.*

For injury from handcuffing, the Eastern District of Virginia has previously adopted the test articulated by the Sixth Circuit: "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Hales v. City of Newport News*, No. 4:11-cv-28, 2011 WL 4621182, at *11 (E.D. Va. Sep. 30, 2011) (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

### *1. The District Court Erroneously Found that Whisner and Stanley Did Not Use Excessive Force.*

Whisner and Stanley had no legal authority to detain Allan in handcuffs because such handcuffing was unsupported by lack of probable cause. Assuming they were, "[a] lawful arrest does not categorically legitimize binding a person's wrists in chains." *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018). Particularly relevant here is that Whisner and Stanley kept Allan in extremely tight handcuffs for two hours in front of his apartment building for the purpose of humiliating Allan, as they could have otherwise escorted Allan to a more private location, and for the purpose of preventing him from presenting his testimony and evidence to a Virginia magistrate, ignoring Allan's requests to do so, and ignoring the statutory requirements of Va. Code § 19.2-80 (establishing an officer who makes a warrantless arrest must bring "the arrested person without unnecessary delay before a judicial officer").

Additionally, Allan complained to Stanley that he experienced extreme pain arounds his wrists because the handcuffs were too tight, Stanley ignored Allan's complaint, and Allan sustained severe bruising around his wrists, alongside significant wrist pain, for several days.

None of the *Graham* factors weigh against Allan here. Assuming, but not conceding, the officers had probable cause to arrest Allan for misdemeanor assault and battery, this Circuit has held that a misdemeanor arrest for assault weighs only slightly against the plaintiff. *Dolgos*, 884 F.3d at 180. The second factor is "the most important of three *Graham* factors." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). It would be plainly contradictory for the second and third factors to weigh against Allan because Allan was the one who called 911 twice, sought

Whisner and Stanley's help, entrusted them, and cooperated with them. Allan made a well-pled complaint for a significant injury.[18]

## II.   THE DISTRICT COURT ERRED IN BARRING APPELLANT'S EQUAL PROTECTION CLAIM AGAINST WHISNER AND STANLEY

The district court incorrectly held Allan and Gigi were not similarly situated. The district court erred by requiring explicit racial animus to be a prerequisite to pleading an equal protection claim on a 12(b)(6). The district court incorrectly construed material case law by effectively holding that Arab males cannot be subject to racial profiling by White officers.

### A. Equal Protection Standard

To successfully plead a racially selective law enforcement claim, a plaintiff must show "that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Johnson v. Holmes*, 204 F. Supp. 3d 880, 890 (W.D. Va. 2016) (quoting *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003)).[19] A litigant in a protected class may introduce statistics to show a discriminatory effect, even without naming a "similarly situated individual." *Chavez v. Illinois State Police*, 251 F.3d 612, 635-38 (7th Cir. 2001).

### 1. The similarly situated analysis.

There is no "magic formula" for determining who is similarly situated for purposes of selective enforcement cases. *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001). The inquiry is a common sense one and the class should not be defined too narrowly. *Id*. A court "must look at all relevant factors" depending on "the context of the case." *Id*. This Circuit has

---

[18] It is unclear which case law in the Fourth Circuit, or in any Circuit, requires the pleading of a permanent injury for an excessive force claim to survive a 12(b)(6).

[19] Importantly, "[t]he right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." *Johnson*, 204 F. Supp. 3d at 890 (quoting *Marshal* 345 F.3d at 1157).

previously discussed the similarly situated analysis requirement, during which the Circuit articulated nine different factors to consider. *United States v. Venable*, 666 F.3d 893, 900-01 (4th Cir. 2012). *Venable* was limited to prosecutorial conduct during a criminal trial, but most importantly, the Circuit made clear that "Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors[,]" while emphasizing a district court cannot only consider one factor as entirely dispositive. *Id.* at 901.

### 2. The discriminatory purpose requirement.

Similarly, in *Venable*, this Circuit held that discriminatory purpose is shown by an invidious or bad faith. *Id.* at 900. Typically, a showing of discriminatory purpose is established through circumstantial evidence. *See United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).[20]

A plaintiff survives a 12(b)(6) motion when he pleads "specific factual allegations that are probative of an improper motive." *Id.* at 564. A plaintiff can sufficiently plead that "a discriminatory purpose has been *a* motivating factor[.]" *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (emphasis added).

### 3. Arab males can be considerably prone to racial profiling

In *Al-Kharazaji v. Saint Francis College*, 784 F.2d 505, 517 (3rd Cir. 1986) *affirmed sub nom. Saint Francis College v. Al-Kharazji*, 481 U.S. 604 (1987), the plaintiff plausibly alleged racial discrimination even though racial classifications listed Arabs as White. *Id.* Congress, when it passed § 1983, had not limited its protections to what the Census classifies. Rather, the legislative history of the statute indicated that Congress intended to embrace "at the least,

---

[20] Moreover, a plaintiff is not required to show that discrimination was the defendants' "sole motive," so long as he shows "the requisite discriminatory intent with more than mere conclusionary assertions." *Williams v. Hansen*, 326 F.3d 568, 584 (4th Cir. 2003).

membership in a group that is ethnically and physiognomically distinctive." *Id.* 42 U.S.C. §

1983, "at a minimum," reaches "discrimination directed against an individual because he or she

is genetically part of an ethnically and physiognomically distinctive grouping of *homo sapiens*."

*Saint Francis College*, 784 F.2d at 517.

    *St. Francis College* and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) make

clear that § 1983 extends to protect Arab-Americans. *See id.* at 617-18 ("Arabs were among the

peoples then considered to be distinct [a] race[] and hence within the protection of" a § 1982

claim). In *St. Francis College*, the Supreme Court unanimously held that the guarantees

established by 42 U.S.C. §§ 1981, 1982, and 1985 applied to an Arab. 481 U.S. at 610-12. In

reaching so, the Supreme Court conducted an extensive investigation of mid-to-late nineteenth

century dictionary and encyclopedia accounts of race, which revealed that Arabs were

considered a distinct race at the time the Thirteenth Amendment was adopted. *See id.*

### B. The District Court Erroneously Found that Appellant Did Not Sufficiently Plead an Equal Protection Claim

    The district court incorrectly construed case law by holding that Allan's use of pepper

spray alone displaces an equal protection claim for purposes of a 12(b)(6). This Circuit has

previously recognized that "the use of mace or tear gas might prove a more humane and effective

form of force than actual physical force." *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir.

1993). Importantly, Allan was only 130 pounds, as indicated on the warrants attached to the

complaint, and could not have stopped Gigi's physical attack otherwise. *Chavez* and *Venable*

clearly establish that a district court must consider all relevant factors. Here, it is noteworthy

that: (1) Gigi had disobeyed Officer A's instructions, (2) Gigi physically attacked Allan in

Allan's own apartment, (3) Allan had injuries, (4) Gigi was the initial aggressor, and (5) Whisner

and Stanley violated state law by preventing Allan from seeing a magistrate. The district erred in narrowing the similarly situated analysis to just one factor.[21]

Next, there is no case law that states or otherwise suggests that officers must "comment[] on [someone's] race or appearance." Transcript at 57. Simply said, no officer making a discriminatory arrest would explicitly state she or he is arresting someone because of his race. To establish this extremely limited threshold would make the Fourteenth Amendment superfluous. More dangerously, it would allow police officers to racially discriminate all the time by simply avoiding making explicitly racist comments. This threshold directly contravenes what federal courts across the country have recognized as an "anathema to our criminal justice system." *See Martinez v. Vill. of Mount Prospect*, 92 F. Supp. 2d 780, 782 (N.D. Ill. 2000); *accord Illinois v. Wardlow*, 528 U.S. 119 n.10 (2000) (discussing how "minority motorists have been treated differently than non-minority motorists during the course of traffic stops").[22]

Finally, the Supreme Court has specifically held that Arabs are a distinct race. *Shaare Tefila Congregation*, 481 U.S. at 617-18. Just like *Shaare Tefila Congregation* and *St. Francis College* rejected the idea that the official U.S. census classification displaces racial discrimination claims pertaining to Arab-Americans, a police report misclassifying Arab-Americans as White is not supported by any case law. Allan was not required to give a detailed biological analysis of his physical characteristics for purposes of a 12(b)(6). His identity,

---

[21] Assuming, but not conceding, that Allan fails the similarly situated analysis, his statistics and history of prior complaints are sufficient for purposes of 12(b)(6). *See Emesowum*, 2020 WL 3050377, at *3 ("The well-settled motion to dismiss standard applicable here does not require extensive elaboration") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaints filed with the U.S. DOJ also show the ACPD has acted similarly against racial minorities even when German Shepherds were used by their White comparators.

[22] During the hearing, Whisner and Stanley falsely contended that Allan and Gigi engaged in "mutual combat," which entails both parties intentionally fought and consented to fight. Allan never intended to fight with Gigi nor did he consent to fight with him. Allan was attacked.

physical appearance, and immutable characteristics, all alleged or implied, were sufficient for purposes of a pleading.[23] At most, the question of whether Allan passed as White or not should have been left to the trier of fact.

## III. THE DISTRICT COURT ERRED IN BARRING APPELLANT'S CLASS OF ONE CLAIM AGAINST APPELLEE ARLINGTON COUNTY

### A. Class of One Standard

To sufficiently state an Equal Protection Claim under a "class of one" theory, a plaintiff must plead facts demonstrating he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[24] Alternatively, a plaintiff from a protected class may introduce statistics to demonstrate a discriminatory effect. *Chavez*, 251 F.3d 635-38. In *Enquist v. Oregan Dep't of Agr.*, 553 U.S. 591 (2008), the Supreme Court clarified that selective police treatment "on the basis of race or sex would state an equal protection claim." *Id.*

### B. The District Court Erred in Dismissing Allan's Class of One Complaint

As Section II of this Brief explains, Whisner and Stanley intentionally treated Allan differently than his White aggressor, Gigi, when responding to Allan's assault and battery complaint, at not just one, but at multiple stages (the initial arrest, the procurement of the warrants and presentation to the magistrate, the excessive force). *Accord Emesowum*, 2020 WL 3050377 at *13 n.31.

---

[23] The district court must have been "especially solicitous[,]" and must have ruled out any possibility that Whisner and Stanley knew Allan was Arab before making such determination. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (discussing the 12(b)(6) standard for civil rights claims).

[24] The district court did not specifically address Allan's pleading of a class of one equal protection claim pertaining to Arlington County, possibly because the court had dismissed Allan's equal protection claim against Whisner and Stanley and addressed the deliberate indifference standard.

Additionally, even without any "comparators," the publicly available information that Arlington County has not concealed support Allan's Equal Protection Claims. *Chavez*, 251 F.3d 635-38. The numerous complaints the County has received alongside the statistics mentioned are sufficient for 12(b)(6) purposes. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 338-40 (4th Cir. 1994) (explaining the Supreme Court confirmed that § 1983 claims "are not subject to a 'heightened pleading standard'") (quoting *Leatherman v. Tarrant Co. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168) (1993)).

## IV.  THE DISTRICT COURT ERRED IN BARRING APPELLANT'S FAILURE TO TRAIN OR SUPERVISE CLAIM AGAINST APPELLEE ARLINGTON COUNTY

Count II of the Allan complaint does not seek to hold Arlington County liable solely for the conduct of Whisner and Stanley. Allan's complaint contains well-pled allegations against the County for deliberately failing to train or discipline its officers despite actual or constructive notice of systematic Fourth and Fourteenth Amendment violations, including the wrongful procurement of warrants and purposeful differential treatment between racial minorities and their White comparators when responding to 911 calls. As held, the district court erred.

### A. Deliberate Indifference Standard

Allan brought a *Monell* liability claim for failure to train and/or supervise.[25] When, "in light of the duties assigned to specific officers . . . the need for more or different training [or supervision] is so obvious," a County can reasonably "be said to have been deliberately indifferent to that need." *Jackson*, 15 F.3d at 341 (quoting *City of Canon, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

---

[25] The district court only addressed the training allegation. Transcript at 62-65.

The use of statistics in a pleading is allowed when combined with the pleading of specific constitutional deficiencies. *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 665-67 (S.D.N.Y. 2013) (holding officers exhibited deliberate indifference to equal protection violations by police officers because they adopted an "attitude of willful blindness toward statistical evidence of racial disparities"); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 538 (W.D. Tex. 2017) (allowing a *Monell* claim to proceed when the plaintiff's statistics showed officers' shootings "involve a much higher proportion of individuals displaying mental health issues than the national average"); *Vann v. City of N.Y.*, 72 F.3d 1040 (2d Cir. 1995) (concluding that deliberate indifference could be drawn from circumstantial evidence). These Second and Fifth Circuit cases are in line with the Supreme Court standard articulated in *City of Canton*. 489 U.S. at 397 (1989) ("Allegations that show that the decision maker was 'aware of, and acquiesced in, a pattern of constitutional violations' are sufficient to establish deliberate indifference.")

### B. The District Court Erroneously Found that Appellant Failed to Plead a Failure to Train or Supervise Claim Against Appellee Arlington County

The district court incorrectly construed case law when it determined that a six-month gap precludes Allan from using the statistics he relied on in his complaint to plead a failure to train and/or supervise.[26] The ACPD only releases its statistics after a complete year terminates. The court's determination that statistics from 2016 to 2021 cannot be used to plead systematic deficiencies concerning an incident that occurred right after the end of June 2022 is not supported by any precedent. Moreover, it would inconveniently close the bar for civil rights plaintiffs and foreclose any meaningful course to hold a municipality liable for *Monell*

---

[26] By "supervise," Allan refers to the failure to supervise, monitor, and/or discipline ACPD officers.

violations, especially for counties like Arlington that notoriously withhold information, as explained above. Such standard is inconsistent with *Leatherman*.

Similarly, the court erred in determining that the 25% increase in complaints of racially-biased policing between 2015 and 2019--a two-and-a-half-year gap--was too distant in time for purposes of a 12(b)(6). (While noteworthy that is the only statistical data available.) In *Emesowum*, the court considered allegations dating back 10 years prior to the plaintiff's incident. *Id*. at *7 (discussing *Vasquez v. Bombard*, No. 1:08-cv-843); *see also Floyd*, 959 F. Supp. 2d at 658 (considering statistics dating back 10 years); *see also Sanchez*, 283 F. Supp. 3d at 535 (discussing statistics dating back five years).

Lastly, the district court incorrectly stated that Allan's complaint did not include the total count of complaints about racial bias in county, and that he did not include the percentage of complaints as a share of total arrests. Clearly, the complaint did list the percentage of arrests, and the complaint mentioned that 14% of the 152 complaints were about racial discrimination. Am. Compl. at ¶¶ 51-52.

## CONCLUSION

For the foregoing reasons, and in the interests of civil rights and substantial justice, the district court's November 13, 2023, Order must be reversed, and Allan's case remanded for further proceedings.

Respectfully submitted,

*/s/ Rani Allan*
Rani Allan
(718) 309-4334
raniallan2013@gmail.com
***Appellant-Plaintiff Pro Se***

**Prior appeals (for appellants only)**

A.  Have you filed other cases in this court? **NO**.

## CERTIFICATE OF SERVICE
***********************

I certify that on May 20, 2024, I served a copy of this Informal Brief on all parties

through the CM/ECF system, except for Defendant Daniel Gigi, to whom a true and

correct copy of the foregoing document was served by mail at the address set forth below.

**Defendant Daniel Gigi**
13545 Tackhouse Court
Gainsville, VA 20155
*Defendant Pro Se* (not a party to this appeal)

*/s/ Rani Allan*_____
*Plaintiff-Appellant Pro Se*

EXHIBIT 1



**ARLINGTON BRANCH #7047**

# NAACP

P.O. Box 4528, Arlington, VA 22204
Tele: 1-877-501-6417
Email: 7047@arlingtonnaacp.com

June 16, 2020

The Honorable Libby Garvey
Chairwoman
Arlington County Board
2100 Clarendon Boulevard, Suite 300
Arlington, Virginia  22201
countyboard@arlingtonva.us

Dear Chairwoman Garvey and Members of the County Board:

On behalf of the members of Arlington Branch NAACP#7047 and over 9,600 petitioners, we urge you to listen to the members of the local community who have requested and continue to request that the Arlington County Police Department (ACPD) implements, as soon as possible, five research-backed life-saving measures listed below.  These demands are based, in large, on those recommendations of the 2015 President's Task Force on 21st Century Policing[1] that have the strongest base of evidence to support their effectiveness, as reported by the International Association of Chiefs of Police.[2]

1)  Establish a citizen's review board with a subpoena power.  According to the National Association for Civilian Oversight of Law Enforcement (NACOLE), civilian oversight protects civil rights, supports effective policing, ensures greater accountability, helps manage risk, increases confidence in police, and builds bridges between communities and police forces.  In today's climate of civilian unrest and lack of trust in police integrity,  establishing a citizen's review board would not only bring Arlington County in line with such great cities as Portland, Los Angeles, New Orleans, Kansas City and Albany, but improve trust between ACPD and our community by ensuring public confidence through accountability and transparency.

2)  Implement the Body-Worn Camera (BWC) program.  Surprisingly, Arlington County remains the only jurisdiction of its size in the D.C. region without a functioning BWC program.  To his credit, the County Manager has indicated willingness to propose its implementation in the CY2021 Capital Improvement Plan.  However, until the funding is provided and the equipment is purchased, the talk of this program will be of little value.  As community partners, we are willing offer any time and resources that we may have available, to assist the ACPD in moving quickly towards this goal.

---

[1] COPS Office. 2015. *President's Task Force on 21st Century Policing Implementation Guide: Moving from Recommendations to Action*. Washington, DC: Office of Community Oriented Policing Services.
[2] International Association of Chiefs of Police. *Starting With What Works: Using Evidence-Based Strategies to Improve Community-Police Relations*.



**ARLINGTON BRANCH #7047**

# NAACP

P.O. Box 4528, Arlington, VA 22204
Tele: 1-877-501-6417
Email: 7047@arlingtonnaacp.com

3)   Revise use-of-force policies to (a) ban the use of knee and choke holds, and (b) to clearly define rules on escalation with at least six levels of steps.

4)   Increase transparency by making individual officer misconduct and disciplinary histories publicly available.  It is vital to promote examples of procedural justice and legitimacy by practicing these principles internally; availability of this information to the public would go greatly towards promoting the public's trust in the integrity of the police force.

5)   Consider denial of recertification credentials to officers whose use of deadly force was determined to be unwarranted under the federal guidelines.

The need for swift implementation of these measures is supported by ACPD's own data. Arlington County is comprised of 75% white (excluding latinx) and 10% black residents, among others[3].  Nonetheless, 78% of all warnings and citations to residents in 2016 were issued to white residents, and 14% were issued to black residents.[4]  More alarmingly, only 66% of residents arrested for part II offenses[5] were white, while 30% were black.[6]  Notably, the ACPD statistics include members of the latinx community in the category of "white" population, which effectively misrepresents the data for "white" residents/offenders.  Moreover, in 2019, ACPD saw a 72% increase in use-of-force incidents, and between 2015 and 2019, a 25% increase in racially-biased policing complaints.  These data point to a troubling trend.

The events of the past several weeks, beginning with the murder of George Floyd, and continuing with the unnecessarily harsh treatment of peaceful protesters and the recent tazing of an unarmed black man in Fairfax County, are tragically not new.  But, while the prior acts of violence against unarmed black men and children led to some changes at the ACPD, such as enhanced reporting requirements for use-of-force incidents, a truly meaningful reform is yet to be implemented.  We cannot stand by and wait for another George Floyd to die, this time on Arlington County streets.  We urge you to act now.

Local elected and appointed government officials, law enforcement agencies, and the communities they serve are a three-legged stool in the effort to heal and restore community trust. Each leg must be in place to support a comprehensive approach to reduce crime and build trust and

---

[3] U.S. Census Bureau, 2010.
[4] The latest data that was made available by ACPD as of the date of this letter is 2016.
[5] Counterfeit/Forgery, Destruction of Property, Disorderly Conduct, Drug/Narcotic Offenses, Drunkenness, False Pretenses, Impersonation, Liquor Law Violations and Weapon Law Violations.
[6] On a larger scale, while the population of Virginia is approximately 68% white and 19% black, the ACPD officers issued traffic citations and warnings to white drivers in 65% of cases and to black drivers in 26% of cases. The data show similar disproportionality in numbers of offenders arrested for part II offenses: 57% white and 42% black.



# ARLINGTON BRANCH #7047
# NAACP

P.O. Box 4528, Arlington, VA 22204
Tele: 1-877-501-6417
Email: 7047@arlingtonnaacp.com

legitimacy. Success in our community will require collaboration and partnerships among our three groups, and we are reassured by the Board's and ACPD's demonstrated willingness to engage with us. This is why we are confident that the ACPD can work cooperatively with the Board to implement the above life-saving measures.

Attached to this letter is a petition originated by an Arlington high school student Ilene Kruger on June 5, 2020, with 1765 signatures, as well as a petition originated by the NAACP Arlington Branch 7047 on June 7, 2020 with 7919 signatures[7], showing the community and other's support in not only initiating a dialogue but also in seeing tangible changes to ACPD's policies and procedures. We look forward to your response and to working with you on this important issue.

Sincerely,

*Julius D. Spain Sr.*

Mr. Julius D. "JD" Spain, Sr.
President, Arlington Branch NAACP and
Regional Vice President, Region 3-North
Virginia State Conference NAACP

2 Attachments:
Ilene Kruger's Change.org petition (83 pages)
NAACP Arlington Branch 7047 Change.org petition (355 pages)

Copies to:
Libby Garvey, Arlington County Board Chair (lgarvey@arlingtonva.us)
Matt de Ferranti, Arlington County Board Member (mdeferranti@arlingtonva.us)
Katie Kristol, Arlington County Board Member (kcristol@arlingtonva.us)
Christian Dorsey, Arlington County Board Member (cdorsey@arlingtonva.us)
James Schwartz, Deputy County Manager (Jschwa@arlingtonva.us)
Steve MacIsaac, County Attorney (cao@arlingtonva.us)
Parisa Dehghani-████, Commonwealth's Attorney for Arlington County
(CWA_info@arlingtonva.us) and pdtafti@arlingtonva.us

---

[7] The signatories on the two petitions have not been cross-referenced.

Page **3** of 3

# EXHIBIT 2



U.S. Department of Justice
Civil Rights Division

KK:ANF:RG3
FOI/PA No. 24-00004-F

*Freedom of Information/PA Unit –4CON*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

*Via Electronic Mail Only*                                    5/15/2024
Mr. Rani Allan
605 Lancaster St. NE
Washington, DC 20017
raniallan2013@gmail.com

Dear Mr. Allan:

This is in further response to your October 2, 2023 Freedom of Information Act request seeking access to records pertaining to "1) copies of complaints the Department of Justice received from January 1, 2018 to the present alleging racial discrimination, racial bias, racial profiling, unreasonable seizure, and wrongful arrest against the Arlington County, Virginia Police Department or officers employed by it, as well as 2) copies of communications between the Department of Justice and the Arlington County, Virginia Police Department, from January 1, 2018 through the present concerning racial discrimination, racial bias, racial profiling, unreasonable seizure, and wrongful arrest."

After review of the responsive Civil Rights Division documents, I have determined that the enclosed documents may be released to you subject to the excision of the names and other identifying information of private citizens, pursuant to 5 U.S.C. § 552 (b)(7)(C) since disclosure thereof could reasonably be expected to constitute an unwarranted invasion of personal privacy. I have further determined that access to some documents should be denied in their entirety pursuant to 5 U.S.C. § 552 (b)(5) since the inter-agency memoranda consist of attorney work-product and predecisional deliberative materials.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-

684-6448; or facsimile at 202-741-5769.  Please reference the FOIA/PA No. above in any correspondence with OGIS.

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

# Robert Green

Robert Green, GIS
Freedom of Information/Privacy Acts Unit
Civil Rights Division

**ID: 286513-PSD**

CLOSED

RECEIVED:  3:52 p.m. April 26, 2023
@

LAST UPDATED:  3:28 p.m. May  26, 2023

# Correspondent information

| | |
|---|---|
| Name | (b)(7)(C) |
| Email | |
| Phone | |
| Address | |

# Reported Complaint

| | |
|---|---|
| What is your primary reason for contacting the Civil Rights Division? | Mistreated  by police, correctional staff, or inmates |
| | None |
| Did this happen while in custody or incarcerated? What type of prison or correctional facility? | Location:  Prison  (State/local) |
| Organization name | ACPD |
| Where did this happen? | Arlington, VA |

| | |
|---|---|
| **Do you believe any of these personal characteristics influenced why you were treated this way?** | Race/color, Sex |
| **Are you now or have ever been an active duty service member?** | Yes |
| **When did this happen?** | 12/1/2022 |

# Personal description

I were arrested not being told why I were arrested. I were searched at home and put in hand cuffs then escorted to the he Arlington va police department, once inside I were told to stand on the foot prints and place my hands on the hands prints which put me in a slightly bent over position. I were again being searched but this time a woman put her hands inside my bra and squeezed my left breast and pinched my nipple she came out then patted down my right side she then announced that we're about to search my right breast I were confused because she didn't announce herself before assaulting the left side she then went inside right bra and did the same thing then back to the left side again the whole time I'm froze I cannot believe that I'm going through this and still this is after me trying to make sense of what I we're being arrested for. The charges were dropped 3/14/2023 because my accuser didn't show up for court. I've been told to not retaliate, but by this woman swearing a false warrant against me placed me in danger of many things and I were sexually assaulted by a female officer in uniform at the ACPD. Outside of the assault I fear that she can at any time swear another warrant against me and I may have a warrant now that I have no idea about and based on me being a black woman society seems to blindly believe I'm jealous of the Caucasian woman and I'm the aggressor when in fact I have plenty evidence that she's for a long time been placing extremely violent and racist phone calls and messenger requests to me and I've continued to block her. The female officer is Caucasian also and there's an internal investigation going on but I can't get a clear sense on what way ACPD is going. I've served my country and my country has continuously let me and my family down.

# Report language

This report submitted in: English

# Activity

**resmith**                                                                                   5/26/23 3:28 p.m.

**ID: 127131-SDL**    CLOSED

RECEIVED: 12:29 p.m. January 5, 2022 @

LAST UPDATED: 4:31 p.m. January 5, 2022

# Correspondent information

Name

Email

Phone

Address

b)(7)(C)

# Reported Complaint

What is your primary reason for contacting the Civil Rights Division?

Mistreated by police, correctional staff, or inmates

None

Did this happen while in custody or incarcerated?
What type of prison or correctional facility?

Location: Outside of prison

Organization name

intersection

Where did this happen?

arlington, VA

Do you believe any of these personal characteristics influenced why you

Race/color

**were treated this way?**

**Are you now or have ever been an
active duty service member?**   No

**When did this happen?**   12/30/2021

# Personal description

If you look at the arlington court system, you see a strong racial bias against black and brown people in traffic ticketsfbl(7 I(C.J lltor court date 2/4 only has given black people tickets.(bl(7 I(C.J or court date 2/3 has 4/7 asnon-wh 1 tew h en 1 tsapr1 ma r iyw h 1 tetown.an d f (b) (7)(C) — — — — — 6 te 13 peopl e he pulled over on 12/29 are black when only 10% of the town is.

# Report language

This report submitted in: English

# Activity

b)(5) (b)(7)(C)

**ID: 164560-KSH**                    CLOSED

RECEIVED: 1055 p.m. May 27, 2022
@

LAST UPDATED: 4:38 p.m. May 31, 2022

# Correspondent information

Name

Email

Phone

Address

b)(7)(C)

# Reported Complaint

What is your primary reason for contacting the Civil Rights Division?

Mistreated by police, correctional staff, or inmates

None

Did this happen while in custody or incarcerated?
What type of prison or correctional facility?

Location: Outside of prison

Organization name

Arlington Police Department

Where did this happen?

Arlington, VA

**Do you believe any of these personal characteristics influenced why you were treated this way?**     National origin

**Are you now or have ever been an active duty service member?**     No

**When did this happen?**     4/15/2022

# Personal description

On April 15th approximately at 19:00 PM I was assaulted physically by the concierge in my building following an altercation that my wife and I had with another couple that resides in our building. The concierge hit me on my chest in an attempt to stop me from coming into my home as she was pretending she did not know who I was and that I did not reside in the building. So I called 911 when the cops arrived they refused to arrest the individual claiming she was just trying to come in between the other couple and I. Completely false!!! We also explained to the officer that the couple insulted us and threatened to release their German shepherd on my wife and I and my 3 little dogs. We even wrote it down in the report on what exactly transpired. The officer who was in charge of the report disregarded those keys facts and when we reminded her that we where threatened with dogs." the officer Replied" why didn't you tell me that" I replied" we did mention that and we even wrote in the report paper that you *gave* us to fill out. Two weeks went by the same officer showed up to my house to serve me papers for assault and battery. I told the officer that I was the one assaulted no one else's got assaulted and we got threatened with dogs. She said" I am sorry but if someone threatens you with dogs is not a crime in the common wealth of Virginia.

Two days after that my wife and I decided to go to the magistrate office to file charges on the concierge who assaulted me. The same officer showed up to the magistrate office and informed the magistrate office that I have made the following comments to the couple" do you want the smoke...do you want the smoke" I told the magistrate office that this is a lie.

7 or 8 officers showed on April 15th...no one mentioned such statement to me or my wife. And when the officer showed up to my residency two weeks later to serve with the papers she did not mention any thing about such statement.

the officer made up lies about us and even threatened to arrest me for simply trying to file charges on the concierge individual.

My wife and I decided to leave the magistrate office because they refused to bring charges on the concierge individual.

I believe because we are foreigners with a heavy accent that our complaint was dismissed. And also when I got assaulted I picked the phone immediately and called 911 and that's when the other couple said" well since your calling 9111 will call them as well and tell them you hit me"  this was injustice toward me and my family. And we followed what a common sense person will do and that is to call 911.

**ID: 167110-DXP**    CLOSED

RECEIVED:  6:19 p.m. June 7, 2022  @

LAST UPDATED:  8:11 a.m. June 9,  2022

# Correspondent information

Name

Email

Phone

Address

(b)(7)(C)

# Reported  Complaint

What is your primary reason for
contacting the Civil Rights Division?

Mistreated by police, correctional staff, or inmates

None

Did this happen while in custody or
incarcerated?
What type of prison or correctional
facility?

Location: Outside of prison

Organization name

ARLINGTON COUNTY POLICE DEPARTMENT

Where did this happen?

1425 N COURTHOUSE  ROAD

ARLINGTON, VA

Do you believe any of these personal
characteristics influenced why you
were treated this way?

Age, Race/color, Sex, Other

**Are you now or have ever been an active duty service member?**

Yes

**When did this happen?**

8/5/2021

# Personal description

I was discriminated because of my race by the officers of Arlington County Police department and the Arlington County Judicial system. I was charged unlawfully for burglary for entering a hotel that was reserved in my name and also charged with sexual battery for touching a woman's ankle that was lay-ing in the bed inside of my room. The woman stated in several different statements that I didn't touch her inappropriately. I have/had no current interactions with law enforcement and I am a former police officer. I was denied bond from 5 different judges in Circuit and District court. The case is still ongoing til date and the Prosecution has no evidence to present. My public defender wants me to accept a plea deal so I cannot file a lawsuit against the City of Arlington. While incarcerated, because I am a former Police Officer, I was on lockdown for 23hrs a day and for the 1 hour I was allowed to be out, I was out alone. I was also denied my(bl(7J(CJ

b)(7)(C)

# Report language

This report submitted in: English

# Activity

b)(5)

**ID: 274816-DCB**

CLOSED

RECEIVED:  7:51 p.m. April 2, 2023
@

LAST UPDATED:  2:36 p.m. April 3, 2023

# Correspondent information

Name

Email

Phone

Address

| b)(7)(C) |
|---|
| |

# Reported Complaint

What is your primary reason for contacting the Civil Rights Division?

Mistreated by police, correctional staff, or inmates

None

Did this happen while in custody or incarcerated?
What type of prison or correctional facility?

Location: Outside of prison

Organization name

Where did this happen?

| b)(7)(C) |
|---|
| |

**Do you believe any of these personal characteristics influenced why you were treated this way?**     Language, Sex

**Are you now or have ever been an active duty service member?**     No

**When did this happen?**     8/21/2021

# Personal description

I had dialed 911 for myself because i was having a panic attack after an altercation with my little brother. When the cops arrived he refused to speak with me outside of my bedroom and forced himself in my room and searched my room. When i asked him to leave he got aroused and wouldn't deescalate the situation when i am the one who called on my behalf. He saw that my family was speaking arabic and that i was a female and took it as an opportunity to racial profile me and arrest me because of HIS AROUSAL. Who gets aroused around a woman having a panic attack. He was completely inappropriate and almost put me in jail for 6 years because he abused his power. This is wrong and(bl( 7(CJ y lawyer was a misogynistic fatass bitch who didn't fight for my case and did the bare minimum. Please do not supply me with jewish lawyer *ever* again. Esp one that doesn't respect her body or womens boundaries and rights. Disgusting

# Report language

This report submitted in: English

# Activity

(b)(5) (b)(7)(C)

# EXHIBIT 3

*Democracy Dies in Darkness*

LOCAL CRIME & PUBLIC SAFETY

# Charged with trespassing at airport, she died in custody 2 weeks later

 By [Olivia Diaz](#)

August 28, 2023 at 7:44 p.m. EDT

Authorities say Abonesh Woldegeorges had been warned before about staying in D.C.-area airports without a ticket, so when police spotted the 73-year-old at Reagan National Airport on Aug. 13, they charged her with trespassing and took her to the Arlington County Detention Center. She was still being held there two weeks later, when she [collapsed and ultimately died](#).

Leaders with the NAACP Arlington Branch said the Aug. 27 incident raises questions about jail officials' ability to handle those in their custody, noting a string of deaths at the detention in recent years, as officials in multiple jurisdictions sought to explain Monday why Woldegeorges had been held so long on various misdemeanor offenses.

"We have three main questions," Michael Hemminger, president of the NAACP Arlington Branch, said in a statement. "One: Why was Ms. Woldegeorges, a 73-year-old woman suffering from mental illness, held in the jail for so long for such petty charges. Two: Why is Arlington County criminalizing homelessness? Three: Why do these incidents at the jail exclusively impact people of color?"

The Office of the Chief Medical Examiner did not give a cause of Woldegeorges's death Monday. Arlington Commonwealth's attorney Parisa Dehghani-Tafti said the Arlington County Police Department is investigating the matter, adding that her office would closely follow detectives' work. Dehghani-Tafti expressed her "sincere condolences to Ms. Woldegeorges's family."

"I also am saddened and frustrated that our jails have become our de facto shelters and hospitals for our communities," Dehghani-Tafti said in a statement.

Arlington Chief Public Defender Brad Haywood, whose office represented Woldegeorges, said Arlington has a broken behavioral health infrastructure, in which social programs aimed to help people in crisis are not given the resources needed to be successful.

"When you have people who don't have beds to sleep in, you find them sleeping in the airport or the Metro, and it's considered trespassing," he said. "Then it ends up in the sheriff's lap."

Court records show that Woldegeorges, who did not have a fixed address, was forbidden from entering the Dulles International Airport in October 2019 after authorities found her lingering in terminals "after posted hours." In May 2020, the Metropolitan Washington Airports Authority arrested her for being in the airport's main terminal. In May 2021, authorities arrested Woldegeorges after she was found lying under a blanket in the terminal. Court records show she was convicted in both cases — she was found guilty in absentia and fined in the first, and pleaded guilty and was sentenced to three days in jail in the second.

In May this year, police charged Woldegeorges with trespassing after they "conducted a welfare check" on her at Dulles, records show. She was granted bail in Loudoun County, but she was later charged with failing to appear at a July 19 hearing in that case. Loudoun officials had scheduled Woldegeorges for another hearing on Monday.

About 3 a.m. on Aug. 13, the airports authority said in a statement that police encountered Woldegeorges inside a public area of Reagan National Airport in Arlington. They arrested her and sent her to the Arlington jail.

Court records show Woldegeorges had two bond hearings since that arrest — one on Aug. 15 and another Aug. 23. Dehghani-Tafti, the commonwealth's attorney, said her office did not object to a request for Woldegeorges' bail in the two hearings, noting that prosecutors could not object at Woldegeorges's first hearing because a motion for bail was not fully presented to her office before a judge ordered the hearing continued to another date.

Haywood, chief public defender, said he could not comment on Woldegeorges's case specifically, but he said generally, it is common for bond motions to be continued or withdrawn. "If someone is in a crisis, defense counsel may withdraw the motion to regroup," he said.

Woldegeorges was granted a personal recognizance bond on Aug. 23, which means she could have left Arlington's jail without paying anything, provided there was no other legal reason to keep her. But authorities said she was held so she could be transported to Loudoun County over her alleged failure to appear at the July 19 hearing.

A spokeswoman with the Arlington County Sheriff's Office said Monday that officials notified authorities in Loudoun of the change in confinement on Aug. 23 — the same day she was given a personal recognizance bond in Arlington.

"Once an individual is released from their Arlington charge(s) and has another outstanding charge in Virginia, we immediately notify the other agency that we are holding an individual strictly on their charge," said Amy Meehan, a spokeswoman at the Arlington Sheriff's Office, in an email. "The other agency will then send deputies, in this instance, Loudoun County, to transport the individual to their facility where they will be held until they are released on their charge."

Thomas Julia, a spokesperson with the Loudoun County Sheriff's Office, said deputies were supposed to take Woldegeorges to Loudoun on Monday for her hearing. He said Loudoun officials did not consider the five-day period between her getting a personal recognizance bond and her scheduled pickup to be unusually long. Julia said transport timing depends on the availability of a transport vehicle, how urgently a person needs to be relocated and whether other people from that jail need to be transported to Loudoun.

"This one was not out of the ordinary," he said.

At about 7 a.m. Sunday, Woldegeorges was found unresponsive in her cell at the Arlington County jail, police said. Authorities conducted immediate resuscitation efforts, police said, and she was taken to the hospital, where she died. She was the eighth person to die in the Arlington County Jail over the past eight years. In Loudoun, a judge signed an order Monday dismissing the two pending charges against Woldegeorges, which was requested by her attorney in light of her death.

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Alexandria Division*

| | |
|---|---|
| **DELGARDO FRANKLIN II** | : |
| 14335 Rosetree Court | : |
| Silver Spring, MD 20906 | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | :   Case No.: 1:23-cv-601 |
| | : |
| | : |
| **ARLINGTON COUNTY, VIRGINIA** | : |
| | : |
| and, | : |
| | : |
| **TYLER W. DUNCAN** | : |
| (Police Officer) | : |
| | : |
| and, | : |
| | : |
| **HARLEY L. GUENTHER** | : |
| (Police Officer) | : |
| | : |
| and, | : |
| | : |
| **JOEL M. DAVIS** | : |
| (Police Officer) | : |
| | : |
| | : |
| and, | : |
| | : |
| **JOHN R. DONAGGIO** | : |
| (Police Officer) | : |
| | : |
| and, | : |
| | : |
| **STEVEN Z. WHITE** | : |
| (Police Officer) | : |
| | : |
| and, | : |
| | : |
| **OFFICER PARDEE** | : |
| (Police Officer) | : |

| | : |
|---|---|
| and, | : |
| | : |
| **OFFICER PEREZ** | : |
| **(Police Officer)** | : |
| | : |
| and, | : |
| | : |
| **OFFICER FREIERT** | : |
| **(Police Officer)** | : |
| | : |
| | : |
| and, | : |
| | : |
| | : |
| **JOHN DOE OFFICERS** | : |
| **(Police Officers)** | : |
| | : |
| and, | : |
| | : |
| **COMMONWEATLH'S ATTORNEY FOR THE** | : |
| **COUNTY OF ARLINGTON AND THE CITY** | : |
| **OF FALLS CHURCH** | : |
| Parisa Dehghani-Tafti | : |
| Commonwealth's Attorney | : |
| | : |
| | : |
| *Defendants.* | : |


## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Delgardo Franklin II ("Plaintiff" or "Mr. Franklin"), by and

through undersigned counsel, file this his First Amended Complaint pursuant to Federal Rule

of Civil Procedure 15(a)(1)(B), and moves this Honorable Court to grant judgment in his

favor and against Defendant Arlington County, Virginia (the "County" or "Arlington

County"), the Commonwealth's Attorney for the County of Arlington and the City of Falls

Church (the "Commonwealth's Attorney"), and the "Police Officer(s)" Defendants above

(collectively "Defendants"), jointly and severally, in the amounts herein set forth, and in support thereof states as follows:

## INTRODUCTION

1.      This is a civil action arising from the unlawful arrest and battery of Mr. Franklin on August 28, 2019, while innocently sitting at a bus stop talking on the phone with his family.  The bus stop is located near the intersection of Wilson Blvd. and N. Oakland St. in Arlington County, Virginia.  This civil action covers the period of time surrounding the seizure, arrest, incarceration, and the prosecution of Mr. Franklin, lasting between August 28, 2019 and May 4, 2021.

2.      Defendant police officers are Tyler W. Duncan, Badge 1668, the arresting officer, Harley L. Guenther, Badge 1640, Joel M. Davis, Badge 1500, Officer Pardee (Badge unknown), Officer Perez, Badge 1596, Officer John R. Donaggio, Badge unknown, Officer Steven Z. White, Officer Freiert, Badge 1608, and any unnamed police officers involved in the incident in paragraph 1 that resulted in the seizure, arrest, and subsequent prosecution of Mr. Franklin ("John Doe Officers"), collectively referred to as the "Officers," who are (or were) members of the Arlington County Police Department involved in the unlawful arrest and subsequent malicious prosecution of Mr. Franklin, and were involved (physically culpable or other acts or omissions) in using unreasonable and unnecessary force during the arrest, and denial of proper medical care causing serious and permanent injuries.

3.      The Arlington County Police Department and The Commonwealth's Attorney for Arlington County, Virginia and the City of Falls Church, Virginia (the "Commonwealth's Attorney") improperly and against the law without probable cause charged Mr. Franklin with 3 separate Felonies under VA Statute 18.2-57(A) & (C) and aggressively pursued convictions.

The Defendants pursued convictions through their criminal prosecution of Mr. Franklin for nearly 2 years. The case was docketed approximately 17 times. The Defendants sought pleas of guilty with convictions, and throughout the prosecution the Plaintiff maintained his innocence. Ultimately, because the Plaintiff was prepared to vindicate himself at Trial, the Defendants were forced to motion for nolle prosequi the charges against Mr. Franklin.

4.      Defendants are sued for violations of Mr. Franklin's rights under the United States Constitution and the common law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to hear the federal civil rights violations in this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4) and supplemental jurisdiction to hear the common law claims under 28 U.S.C. § 1367.

6.      Venue is proper under 28 U.S.C. § 1391 because the acts giving rise to this lawsuit occurred in Arlington, Virginia.

7.      The Commonwealth of Virginia and the County were given timely notice of this claim under Sections 8.01-195.6 and 15.2-209 *et seq.* of the Code of Virginia, by letter dated October 14, 2021, to the Attorney General of the Commonwealth and the County Attorney for Arlington County. *See* Oct. 21, 2021 Notice of Tort Action ("Notice") attached hereto as **Exhibit 1**.[1]

## PARTIES

---

[1] Attached is the Notice provided to the Commonwealth and the County. The Notice also includes copies of Certified Dispositions evidencing the court dates and that the charges were ultimately dropped. In addition, the Notice includes still photos from the video of the arrest, as well as an uncertified transcript of the audio captured from the videos. Various items from the audio are used in this Amended Complaint. A settlement demand has been removed from Exhibit 1.

8.     Plaintiff Delgardo Franklin II ("Mr. Franklin" or "Plaintiff") is and has been at all relevant times a resident of Maryland.  Mr. Franklin, at the time of the unlawful arrest, was a 24-year-old black man, and is disabled suffering from mental health issues.

9.     The Commonwealth of Virginia is a State in the United States with the right to sue and legal capacity to be sued.  The Commonwealth is responsible for the policies, procedures, actions, and omissions of the Arlington County Commonwealth's Attorney.

10.     Arlington County Commonwealth's Attorney, Parisa Dehghani-Tafti, has the right to sue and to be sued, and is responsible for pursuing a prosecution maliciously. is responsible for the policies, procedures, actions, and omissions of the Arlington County Police Department and the police officers it employs.

11.     Arlington County is a County in the Commonwealth of Virginia with the right to sue and be sued. Arlington County is responsible for the policies, procedures, actions, and omissions of the Arlington County Police Department and the police officers it employs.

12.     The Officers listed in Paragraph 2 of this Complaint all are or were sworn police officers of the Arlington County Police Department and were all part of Mr. Franklin's unlawful arrest and prosecution.  The police officers of the Arlington County Police Department act under color of law and within the scope of their employment.
Each of the Officers is sued in their official capacity and individual capacity.  None of the Officers involved were black.

## **FACTS**

### *The Arrest*

13.     On August 28, 2019, Mr. Franklin's family called 911 seeking assistance in response to a possible mental health emergency.  The 911 dispatcher dispatched the

Arlington County Police Department (the "Department") to respond.

14.     From video footage, Officers Freiert and Duncan were the initial responding officers.[2]  Officer Duncan was the Reporting (lead) Officer in this case, and from the video and audio evidence available was the officer in charge of the illegal seizure and unlawful arrest of Mr. Franklin.[3]

15.     Shortly after, Officer Guenther and Officer Davis surrounded Mr. Franklin from his back side, while Officer Freiert and Officer Duncan faced Mr. Franklin.

16.     Officer Pardee was the fifth officer to participate in the unlawful detention, assault and battery, and unlawful arrest of Mr. Franklin.  Officer Pardee can be seen driving at an excessive rate of speed  on Wilson Boulevard in Arlington County, VA endangering local traffic and pedestrians, to assist in the unlawful acts against Mr. Franklin.  The Arlington County Police Department wrongfully allowed this officer to respond to a mental health call having just sped excessively, adrenaline surely rushing, contrary to a layperson's rational decision-making process and contrary to training.

17.     The officers first arrived while Mr. Franklin was sitting alone, calmly, and objectively not bothering any person.  Instead of keeping the situation calm and relaxed, the officers escalated the tension and situation, in direct contrast to the goals of a mental health response.

18.     Officer Freiert and Officer Duncan spoke to and caused Mr. Franklin to stand from the bus bench, causing the situation to escalate.  Notably, during this entire

---

[2] Plaintiff incorporates by reference all video and audio evidence from 3 police cruisers, which Defendants have in their custody and possession and are able to review.  Plaintiff further reserves the right to play necessary and relevant portions at relevant hearings related to this civil action.
[3] This photo and other still photos are included in Exhibit 1 as part of the Notice (and are referenced as Exhibit B within the Notice itself).

encounter, Mr. Franklin was never told he was under arrest, nor was he advised to be in violation of any law.  In the immediate moments of the encounter, it was clear that Mr. Franklin as not free to leave, but it was also clear that he was not under arrest.  The officers escalated a peaceful situation into 3 Felony Assaults on Law-Enforcement Officers.  (Each of these offenses is punishable by a mandatory minimum 6 months in jail, not to be served concurrently.  Sitting and minding his business, a peaceful Mr. Franklin soon found himself arrested and charged with 3 Felonies.)

19.     The Officers continually limited Mr. Franklin's movement, despite Mr. Franklin not being under arrest.  In addition, Mr. Franklin's father and brother were present and witnessed this occurring to their loved one.

20.     The Plaintiff's father was then escorted from the immediate vicinity, and the Plaintiff is facing Officer Duncan.

21.     Mr. Franklin remained standing, and while not having broken any laws, he finds himself surrounded by police officers knowing his family is watching him.  Officer Duncan is heard stating "*You are not in any kind of trouble right now, Mr. Franklin, we just need to make sure you are ok*."

22.     Mr. Franklin thought, as Officer Duncan said, that he was not in any kind of trouble.

23.     During the exchange between Mr. Franklin and Officer Duncan, a total of four Officers can be seen surrounding Mr. Franklin.  A fifth officer arrives and joins the surrounding officers.

24.     Soon after Mr. Franklin is surrounded by four Officers, the inevitability of physical violence has seemingly vested because of the Officers' conduct.  One of the Officers

7

is holding what appears to be a handgun or a taser and is pointed directly at Mr. Franklin in the moments leading up to the batteries committed against Mr. Franklin.

25.     Without any indication that he had committed any crime, Officer Duncan told Mr. Franklin that "we are just going to cuff you so we can calm everything down," even though, according to Officer Duncan, Mr. Franklin was "not in any trouble." Officer Duncan also ordered Mr. Franklin to "go down to your knees" and "take a seat on the ground" during this exchange. Officer Duncan reiterated that Mr. Franklin was "not in any trouble."

26.     Mr. Franklin did not indicate that he intended to injure himself or anyone else, and at no point was there any reason to suspect that he had a weapon on his person. He did not attempt to flee and did not initiate any physical contact with any of the Officers.

27.     After the exchange between Mr. Franklin and Officer Duncan, the police officers tackled Mr. Franklin and unlawfully seized him. For several minutes before the tackle Mr. Franklin can be seen standing upright with his hands behind his back, and this was his position immediately before he was assaulted by 5 police officers. After this assault, the officers realized that they had no probable cause to arrest Mr. Franklin. Notably, the video/audio evidence is clear that the officer sustained no injuries and did not intend to pursue Felony Assaults against the Plaintiff. However, after the supervisory officer arrived, and after he acknowledged he was being recorded (audibly), the officers' narratives abruptly change, and the police evidence photographer is summoned to capture evidence that the Plaintiff battered the Defendants. In the police reports, the officers defended the unlawful arrest by citing that Mr. Franklin "bladed his body" and "flared his nostrils." Leading up to the seizure of Mr. Franklin, one officer can be seen pointing a weapon (a taser) at Mr. Franklin without ceasing.

28.    Mr. Franklin could only brace himself and clench his body in anticipation of what was coming, while not knowing whether he would survive what was about to happen. Notably, Officer Pardee had just been driving his police cruiser at an extraordinary speed on Arlington's Wilson Blvd.  The Arlington Police Department should have a policy that restricts high speed chasers to attend to medical intervention calls, but apparently this practice is permitted.

29.    The Officers can be seen tackling Mr. Franklin, with his stomach down, putting their weight on his spine and the back of his neck.  After beating, battering, and restraining Mr. Franklin's movement, they placed him in handcuffs and leg irons and sat him in the back of the police cruiser.

30.    The Officers can be heard many times in their own audio explaining they were "okay" (*i.e.*, no injuries) in the aftermath of their decision to become violent.  Officers are heard multiple times posing the questions "*are you good*?" and the responses are in the affirmative that they are good.  One officer can be heard saying that he had "*some of him on me*" referring to Mr. Franklin's blood and skin.

31.    A supervisor police Officer arrived at the scene while Mr. Franklin remained tied up in the back of the police cruiser.  It was not until after this supervisor arrived that the tone of the battering police officers changed.  Seemingly, the supervisor knew that this situation was problematic for the Officers because Mr. Franklin had committed no crimes. Officer Duncan can be heard explaining to the supervisor that Mr. Franklin was not under arrest, even though he was restrained in the back of the police cruiser.  One of the Officers, upon information and belief Officer Duncan, stated:

> *I don't have enough in terms of paper criteria other than him just fighting us, but people fight us and they are not crazy all the time . . . I think right*

*now, I don't think we have enough . . . I don't think I can get any obstruction*
*because he wasn't under arrest.*

32.     The supervisor Officer, who did not witness the event, led the Officers to
pursue felony charges of assaulting and battering law enforcement officers.  He asked the other
Officers questions designed to manufacture evidence against Mr. Franklin not supported by
the facts.  In turn, this led to felony charges that were unsupported and were not previously
seriously considered by the other Officers.

33.     After the Supervisor Officer finished speaking with the other Officers on the
scene, they decided to take Mr. Franklin into custody and arrest him without a warrant on
supposed felony assaults of police officers, and then to obtain arrest warrants charging him
with three counts of Felonious Assault and Battery on Law Enforcement Officers.

34.     The Officers then drove Mr. Franklin to be booked at the Arlington
County jail where he remained for several days.

35.     While he remained in the Arlington County jail, Mr. Franklin was denied
critical medical care for his emotional, mental, and physical conditions.

36.     The Washington Post recently published an article about Mr. Franklin's
case.  *See* Washington Post Article attached hereto as **Exhibit 2** (the online version was
posted on July 25, 2023, and the print version was published on July 26, 2023).

37.     Among other things, the Post article detailed the findings of three use of
force experts the Post asked to examine the available video from the Officers' dash cams,
Mr. Franklin's initial Complaint and the Officers' written statements about the case.
According to the article:

> The three experts who reviewed the dashboard-camera video and documents in the
> case told The Post the encounter was an example of how not to respond to a mental
> health crisis.  Although all five officers who tackled Franklin had crisis intervention

training that called for them to de-escalate the situation, they decided within minutes to forcibly take him into custody, the experts noted . . . 'Taking him down was not the answer,' said T.T. Williams Jr., a use of force expert who worked at the Los Angeles Police Department for 29 years. 'The man needed help.'

*See* Ex. 2.

38.    Another expert quoted in the article stated "it was like the officers never attended the [crisis intervention] training" or "didn't believe what they were being told because they didn't follow any of the protocols." *Id.*  Alphonse Gerhardstein, a civil rights attorney who helped the city of Cincinnati overhaul its use of force protocols, stated there was no reason to "lay hands on" Mr. Franklin, and "*certainly no reason to charge with a crime since all the physical contact was initiated by police*." *Id.* (emphasis added).

39.    Indeed, reasonable law enforcement personnel in the Officers' position would not have used force, or the level of force, the Officers used against Mr. Franklin.

### *The Prosecution*

40.    The Commonwealth's Attorney for the County vigorously prosecuted Mr. Franklin after his arrest.

41.    Rather than investigating the charges or reviewing the video recordings from the events of August 28, 2019, the Commonwealth's Attorney maintained the three felony counts against Mr. Franklin.

42.    Despite access to the video and audio of the arrest and the surrounding circumstances, the Commonwealth's Attorney continued to maintain the criminal proceedings against Mr. Franklin.

43.    During the prosecution, the case was docketed for court no less than seventeen (17) times before the Arlington County General District Court.

44.    Throughout the prosecution, the Commonwealth's Attorney rebuffed

requests that the charges against Mr. Franklin be dropped.

45.    In the course of the CA's investigation, Deputy Commonwealth Attorney

Elizabeth Tuomey stated the following in an email to Mr. Franklin's counsel:

> I have reviewed the video and it seems consistent with the reports by
> [Officers] Duncan and Freiert that while they were attempting to talk to him
> about the reason his dad called the police, he essentially assaulted (as in, an
> impending battery) the officers and/or committed disorderly conduct when
> he balled his fists and appeared to the officers that he wanted a fight.

This email and others are attached collectively hereto as **Exhibit 3**.

46.    Ms. Tuomey also quoted from the Officers' reports that Mr. Franklin

"bladed his body in an aggressive manner," "clenched his jaw," and "flared his nostrils."

Ms. Tuomey further stated that this "occurs between 15:27:37 and 15:27:47 on Duncan's

video."

47.    Despite these claims, this is not when the officers tackled and assaulted

Mr. Franklin—it was minutes later.  In a subsequent conversation, Ms. Tuomey stated

she had to "protect the officers" in this case and cannot drop the charges.  (Upon

information and belief, Ms. Tuomey is married to an Arlington County Police

Officer/Detective.)

48.    It was not until July 2020, nearly 11 months after his arrest, that the

Commonwealth's Attorney offered a plea bargain to Mr. Franklin.

49.    Among other things, the plea bargain the Commonwealth's Attorney

offered would have required Mr. Franklin, to admit, falsely, that he had assaulted and

battered police officers by pleading guilty.

50.    Mr. Franklin rejected the plea offer and continued to maintain his

innocence, insisting that the Commonwealth's Attorney should dismiss all charges.

51.     The Commonwealth's Attorney eventually amended the charges to misdemeanors (assault and battery) and set it for trial for February 11, 2021.

52.     In addition to all of the docketed proceedings, Mr. Franklin was preparing with counsel for trial to defend his rights while the case remained pending.

53.     On February 11, 2021, instead of going to trial, the Commonwealth's Attorney continued the case to May 4, 2021, when finally the Commonwealth's Attorney dropped all charges against Mr. Franklin.

54.     The official website for the Commonwealth's Attorney contends that the Commonwealth's Attorney "has long recognized the impact of the criminal legal system on people of color and is committed to highlighting, addressing, and reversing these disparities." *See* **Exhibit 4** attached hereto.  The Commonwealth's Attorney's website further boasts "establishing a new mental health docket."  *Id.* The Commonwealth's Attorney ran on these supposed principles when first elected in 2019, and currently is running for re-election on the same general platform.

55.     Thus, there presumably should have been some optimism that the Commonwealth's Attorney would have behaved differently upon investigation, but instead the Commonwealth's Attorney's Office "doubled down" in order to "protect the Officers."

56.     Moreover, the Commonwealth's Attorney's Office continued to press Mr. Franklin to plead guilty, which necessarily would require Mr. Franklin to admit to a set of facts that significantly would have undermined his instant case before this Court.  Toward that end, in an interview with the Washington Post about the instant case, the Commonwealth's Attorney falsely claimed that the dismissal of the charges against Mr. Franklin were "conditional."  *See* Ex. 2.  However, there were no conditions to the nolle pros entered by the

Arlington County court on May 4, 2021.  *See* Ex. 1 (May 4, 2021 disposition).  Rather, any claim of "conditions" placed on Mr. Franklin is an attempt to falsely claim that Mr. Franklin admitted to some wrongdoing; but he did not.  Indeed, the Commonwealth's Attorney continues to attempt to insulate her office, Arlington County and the Officers from liability.

<u>*Additional Facts Concerning Arlington County Police Policies and Prior Cases*</u>

57.     The Commonwealth's Attorney initially ran for office in 2019 promising to address disparate impact of the criminal justice system on minorities.  *See e.g.* Ex. 4.  This was necessary in Arlington County, as there are several claims of police excessive use of force and/or disparate treatment of minorities. Below is a list of just *some* of the cases filed against Arlington County on these issues:

a.  *Emesowum v. Arlington County*, No. 1:20-cv-113, 2020 WL 3050377 (E.D. Va. June 5, 2020) (denying Arlington County's motion to dismiss complaint alleging equal protection violations based on race under Section 1983).

b.  *Wells v. Fuentes*, No. 1:22-cv-00140, 2023 WL 3791390 (E.D. Va. June 2, 2023) (excessive force claimed against Arlington County).

c.  *Estate of Harris v. Arlington County*, No. 99-cv-1144, 2000 WL 34477900 (E.D. Va Jan. 14, 2000) (excessive force claimed against Arlington County).

d.  *Estate of Kennith Lee v. Arlington County*, 2000 U.S. Dist. LEXIS 10822 (E.D. Va. 2000) (excessive force / deadly force claim against Arlington County).

e.  Ramirez v. United States Park Police, 2023 U.S. Dist. LEXIS 16444

(D.D.C. Feb. 1, 2023) (excessive force claimed against Arlington County).

    f.    *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021) (claims against Arlington County for use of chemical irritants and use of force to disperse crowds).

    g.    *Idris Soyinka v. Arlington County*, Civ. Act. No. 1:21cv645 (AJT-IDD) (excessive force alleged against Arlington County).

    h.    One identified excessive force complaint in 2018 on Arlington police website.

58.    In 2020, *after* the Mr. Franklin's arrest and charges in this case, Arlington County undertook a review of its use of force procedures.  *See* Announcement of Review of Police Practices, Arlington County (July 16, 2020), attached hereto as **Exhibit 5**.  During the review process, Arlington County "spent significant effort revising its use-of-force policies to ensure that they were compliant with best practices and community expectations."  Hilliard Heintze, *Administrative Policy and Data Review of the Arlington County Police Department, Conducted on Behalf of Arlington County, Virginia, FINAL REPORT* (Oct. 4, 2021).  However, it is unclear what Arlington County has done to implement the new policies in practice.  Nevertheless, the policies were not updated at the time of Mr. Franklin's arrest and charges.

59.    A review of the Arlington County police web page information reveals that there is no mandatory excessive force training offered by the Arlington County Police Department.  *See* **Exhibit 6**.  There does appear to be an initial training for new officers at the Northern Virginia Criminal Justice Academy (the "NVCJA"), "a regional academy offering high quality, professional training to recruit officers who will go on to serve agencies in Northern Virginia."  *Id.*  This training occurs only once at the beginning of the

officers' career.  Indeed, the NVCJA website only lists two optional excessive force classes,

entitled "Science, Tactics and Legal Issues Surrounding Deadly Force," which does not

appear to be practical or "hands on," and an online class entitled "De-Escalation &

Minimizing Use of Force."  In any event, neither class is mandatory for Arlington County

police officers and it unknown how many officers opt to take these courses.  According to

the United States Department of Justice, officers should receive ongoing extensive skills and

knowledge training beyond cursory informational training.  In sum, it appears that Arlington

County lacks any mandatory excessive force training beyond the one-time basic training for

new officers.

***

60.     At the time of the actions and omissions aforesaid, the Officers and the

Commonwealth's Attorney were about the business of the County, engaging in activity

fairly and naturally incident to their duties as officers and employees of the County, and

acting within the scope of their employment and agency for the County.  Under the doctrines

of respondeat superior and municipal liability, and otherwise under applicable law, the

County is also liable for the above-described actions and omissions of the Commonwealth's

Attorney and the Officers.

61.     For many months, while the criminal charges remained pending against him,

Mr. Franklin was declared incompetent to stand trial because of mental and emotional

disabilities.

62.     During the entire unfortunate episode, which lasted nearly two years, Mr.

Franklin needed the constant care and support of his father and other family members and

friends.

63.     As a direct and proximate result of Defendants' actions and omissions

aforesaid, Mr. Franklin sustained severe injuries and damages, including but not

necessarily limited to physical injuries, psychological damage, emotional distress,

medical treatment costs incurred, false imprisonment, missed time from work, and

attorneys' fees and costs incurred, as well as pain, suffering, inconvenience and mental

anguish.

## COUNT I
## FOURTH AMENDMENT – UNREASONABLE SEIZURE – ARREST WITHOUT PROBABLE CAUSE
### (Against the Officers and the County)

64.     Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

65.     The Officers lacked reasonable suspicion to stop and seize Mr. Franklin, and

lacked probable cause to arrest Mr. Franklin on charges of assault on a police officer, or any

charges.

66.     The acts of the Officers violated Mr. Franklin's right to be free from an

unreasonable seizure in violation of the Fourth Amendment, enforceable through 42

U.S.C. § 1983.

67.     Mr. Franklin is a young, Black American, and none of the Officers were

Black.

68.     As a direct and proximate result of the Officers' actions and omissions, Mr.

Franklin sustained injuries and damages as set forth above.

69.     As set forth above and under applicable law, the County is liable for the

actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in

their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

## COUNT II
### FOURTH AMENDMENT – UNREASONABLE SEIZURE – EXCESSIVE FORCE
**(Against the Officers and the County)**

70.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

71.    The Officers used objectively unreasonable and excessive force in this detention and arrest of Mr. Franklin.

72.    The acts of the Officers violated Mr. Franklins' right to be free from an unreasonable seizure in violation of the Fourth Amendment, enforceable through 42 U.S.C. § 1983.

73.    As a direct and proximate result of the Officers' actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

74.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

## COUNT III
### FOURTEENTH AMENDMENT-VIOLATION OF RIGHT TO EQUAL PROTECTOIN
**(Against All Defendants)**

75.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

76.    Acting under color of state law, Defendants denied Mr. Franklin his right to equal

protection under the law for the purposes of the Fourteenth Amendment of the United States

Constitution, enforceable through 42 U.S.C. § 1983.

77.    Defendants had no reasonable suspicion or probable cause to believe crime was

afoot when five of the Officers surrounded and tackled Mr. Franklin.

78.    The Officers' use of force was unreasonable.

79.    By using force, arresting and prosecuting Mr. Franklin the above-described

manner, Defendants treated Mr. Franklin differently than similarly situated white individuals.

80.    This disparate treatment violated Mr. Franklin's right to equal protection under the

Fourteenth Amendment.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers,

in their individual and official capacities, the County, and the Commonwealth's Attorney, jointly

and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive

damages, plus attorney fees and costs

## COUNT IV
## MUNICIPAL LIABILITY 42 U.S.C. § 1983
### (Against the County)

81.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

82.    The County at all relevant times has maintained a policy, custom, or practice

that has been the cause, the moving force, behind the violation of citizens' rights. Specifically,

this policy, custom, or practice involves:

a.    The use of objectively unreasonable and excessive force on detainees and
arrestees;

b.    Arrests without probable cause;

    c.   Overcharging arrestees with assault on a police officer when they were simply being uncooperative;

    d.   The arrestees receiving serious injuries but the officers not being injured during such encounters;

    e.   Dismissal of such charges, demonstrating that the charges were meritless; and/or,

    f.   The County Police Department not adequately taking corrective action in response to citizen complaints.

83.    The above-described policy, custom, or practice, as evidenced by, among other things, the cases of excessive force cited above, was the direct, proximate cause of the Officers violating Mr. Franklin's Fourth and Fourteenth Amendment rights, enforceable through 42 U.S.C. § 1983.

84.    Further, the County has acted with deliberate indifference to the rights of its citizens and other persons present in the County by failing to adequately train its Officers on the proper use of force, particularly before 2020 when the incident in the instant case, as set forth above.

85.    As a direct and proximate result of County's actions and omissions aforesaid, Mr. Franklin sustained serious injuries and damage as set forth above.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the County in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

### COUNT V
### VIRGINIA COMMON LAW BATTERY
### (Against the Officers and the County)

86.     Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

87.     In swarming, seizing and arresting Mr. Franklin, the Officers intentionally touched Mr. Franklin.

88.     The Officers' intentional touching of Mr. Franklin was unwanted and was without justification, excuse or Mr. Franklin's consent.

89.     As a direct and proximate result of the Officers' actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

90.     As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

## COUNT VI
## VIRGINIA COMMON LAW ASSAULT
### (Against the Officers and the County)

91.     Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

92.     By their actions aforesaid, including, *inter alia*, their approach, seizure and arrest of Mr. Franklin, the Officers intentionally threatened Mr. Franklin and intentionally placed Mr. Franklin in reasonable fear of imminent physical injury; and in fact did physically injure Mr. Franklin.

93.     As a direct and proximate result of the Officers' actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

94.     As set forth above and under applicable law, the County is liable for the

actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

**COUNT VII**
**VIRGINIA COMMON LAW FALSE IMPRISONMENT**
**(Against all Defendants)**

95.     Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

96.     Defendants falsely imprisoned Mr. Franklin by their actions and omissions aforesaid, including, *inter alia*, seizing and then restraining Mr. Franklin in the back of a locked police car, imprisoning him in the Arlington County jail, and refusing to dismiss the charges against him thus causing him to appear in court on multiple occasions.

97.     Defendants' false imprisonment and restraint of Mr. Franklin was the result of Defendants' various use of force, words and acts, as described herein, which Mr. Franklin was afraid to ignore and to which he reasonably believed he must submit.

98.     Accordingly, Defendants restricted Mr. Franklin's freedom of movement without legal right.

99.     As a direct and proximate result of the Officers' and the Commonwealth's Attorney's actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

100.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in

their individual and official capacities, the County, and the Commonwealth's Attorney, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

## COUNT VIII
## MALICIOUS PROSECUTION - PURSUANT TO VIRGINIA COMMON LAW AND/OR 42 U.S.C § 1983
### (Against all Defendants)

101.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

102.    The Officers and the Commonwealth's Attorney instituted and cooperated in the institution of criminal proceedings against Mr. Franklin, charging him with and prosecuting him for three felony counts of assaulting law enforcement officers.

103.    The charges against Mr. Franklin were resolved in a manner favorable to Mr. Franklin, in that all charges were dismissed without any conviction of Mr. Franklin.

104.    The aforementioned criminal proceedings were instituted and maintained for nearly two years with malice and without probable cause, against Mr. Franklin, a young black man, attacked by Officers who were not black. The Officers had no sufficient reason for the initial seizure, and the charges against Mr. Franklin (brought only after the urging of Officer / Supervisor after the fact) were wholly unjustified.

105.    As a direct and proximate result of the Officers' and the Commonwealth's Attorney's actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

106.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, the County, and the Commonwealth's Attorney, jointly

and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive

damages, plus attorney fees and costs.

**COUNT IX**
**VIRGINIA COMMON LAW INTENTIONAL INFLICITION OF EMOTIONAL**
**DISTRESS**
**(Against all Defendants)**

107.     Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

108.     The Officers and the Commonwealth's Attorney, by their actions and

omissions aforesaid, including, *inter alia*, unlawfully seizing, arresting, battering,

assaulting, imprisoning and prosecuting Mr. Franklin, intentionally inflicted emotional

distress upon Mr. Franklin.

109.     The Officers and the Commonwealth's Attorney intended their specific

conduct and knew, or should have known, that this conduct would likely result in

emotional distress.

110.     The Officers and the Commonwealth's Attorney's conduct was outrageous and

intolerable in that it offends generally accepted standards of decency and morality.

111.     As a direct and proximate result of the Officers' and the Commonwealth's

Attorney's actions and omissions, Mr. Franklin sustained injuries and damages as set forth

above, including but not limited to severe emotional distress.

112.     As set forth above and under applicable law, the County is liable for the

actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in

their individual and official capacities, the County, and the Commonwealth's Attorney, jointly

and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive

damages, plus attorney fees and costs.

**COUNT X**
**VIRGINIA COMMON LAW NEGLIGENT INFLICITION OF EMOTIONAL DISTRESS**
**(Against all Defendants)**

113.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

114.    The Officers and the Commonwealth's Attorney, by their actions and omissions aforesaid, including, *inter alia*, unlawfully seizing, arresting, battering, assaulting, imprisoning and prosecuting Mr. Franklin, negligently inflicted emotional distress upon Mr. Franklin.

115.    The Officers' and the Commonwealth's Attorney's negligence proximately caused, by clear and convincing evidence, emotional distress, embarrassment, fright and shock that resulted in physical injury – bloodied hands and body, excessive pressure on spine and head, scraped face and neck, and tingling in his extremities affecting functionality.

116.    As a direct and proximate result of the Officers' and the Commonwealth's Attorney's actions and omissions, by clear and convincing evidence Mr. Franklin sustained injuries and damages as set forth above, including but not limited to severe emotional distress.

117.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, the County, and the Commonwealth's Attorney, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

**COUNT XI**
**BATTERY - 42 U.S.C § 1983**
**(Against the Officers and the County)**

118.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

119.    In swarming, seizing and arresting Mr. Franklin, the Officers intentionally touched Mr. Franklin.

120.    The Officers' intentional touching of Mr. Franklin was unwanted and was without justification, excuse or Mr. Franklin's consent.

121.    As a direct and proximate result of the Officers' actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

122.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

**COUNT XII**
**ASSAULT - 42 U.S.C § 1983**
**(Against the Officers and the County)**

123.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

124.    By their actions aforesaid, including, *inter alia*, their approach, seizure and arrest of Mr. Franklin, the Officers intentionally threatened Mr. Franklin and intentionally placed Mr. Franklin in reasonable fear of imminent physical injury; and in fact did physically injure Mr. Franklin.

125.    As a direct and proximate result of the Officers' actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

126.    As set forth above and under applicable law, the County is liable for the

actions and omissions of the Officers.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, and the County, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

**COUNT XIII**
**FALSE IMPRISONMENT - 42 U.S.C § 1983**
**(Against all Defendants)**

127.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

128.    Defendants falsely imprisoned Mr. Franklin by their actions and omissions aforesaid, including, *inter alia*, seizing and then restraining Mr. Franklin in the back of a locked police car, imprisoning him in the Arlington County jail, and refusing to dismiss the charges against him thus causing him to appear in court on multiple occasions.

129.    Defendants' false imprisonment and restraint of Mr. Franklin was the result of Defendants' various use of force, words and acts, as described herein, which Mr. Franklin was afraid to ignore and to which he reasonably believed he must submit.

130.    Accordingly, Defendants restricted Mr. Franklin's freedom of movement without legal right.

131.    As a direct and proximate result of the Officers' and the Commonwealth's Attorney's actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

132.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in

their individual and official capacities, the County, and the Commonwealth's Attorney, jointly and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive damages, plus attorney fees and costs.

## COUNT XIV
## MALICIOUS PROSECUTION - 42 U.S.C § 1983
### (Against all Defendants)

133.    Mr. Franklin incorporates all prior paragraphs as if fully set forth herein.

134.    The Officers and the Commonwealth's Attorney instituted and cooperated in the institution of criminal proceedings against Mr. Franklin, charging him with and prosecuting him for three felony counts of assaulting law enforcement officers.

135.    The charges against Mr. Franklin were resolved in a manner favorable to Mr. Franklin, in that all charges were dismissed without any conviction of Mr. Franklin.

136.    The aforementioned criminal proceedings were instituted and maintained for nearly two years with malice and without probable cause, against Mr. Franklin, a young black man, attacked by Officers who were not black.  The Officers had no sufficient reason for the initial seizure, and the charges against Mr. Franklin (brought only after the urging of Officer / Supervisor after the fact) were wholly unjustified.

137.    As a direct and proximate result of the Officers' and the Commonwealth's Attorney's actions and omissions, Mr. Franklin sustained injuries and damages as set forth above.

138.    As set forth above and under applicable law, the County is liable for the actions and omissions of the Officers and the Commonwealth's Attorney.

WHEREFORE, Plaintiff Delgardo Franklin II seeks judgment against the Officers, in their individual and official capacities, the County, and the Commonwealth's Attorney, jointly

and severally, in the amount of Ten Million Dollars ($10,000,000) compensatory and punitive

damages, plus attorney fees and costs.


TRIAL BY JURY IS HEREBY DEMANDED.

/s/ Jeffrey S. Danzig
Jeffrey S. Danzig, Esquire (VSB #41383)
LAW OFFICE OF JEFFREY S. DANZIG, PLLC
Counsel for Plaintiff

DELGARDO FRANKLIN II
By Counsel:

/s/ Jeffrey S. Danzig
Jeffrey S. Danzig, Esquire (VSB #41383)
LAW OFFICE OF JEFFREY S. DANZIG, PLLC
111 Park Place
Falls Church, Virginia 22046
(703) 241-4918 – telephone
(815) 301-9561 – facsimile
JDanzig@Danziglaw.com
Counsel for Plaintiff

Tyler R. Christians, Esquire (VSB # 78362)
  TO BE ADMITTED
CHRISTIANS LAW, PLLC
111 Park Place
Falls Church, Virginia 22046
(571) 641-3033 – telephone
(571) 641-3054 – facsimile
Tyler@TChristians.com
Counsel for Plaintiff



CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9TH day of August, 2023, I electronically filed the
foregoing with the Clerk of Court using the CM/ECF system, which will send notification of
such filing to all counsel of record.


/s/ Jeffrey S. Danzig
Jeffrey S. Danzig, Esquire

EXHIBIT 1 TO COMPLAINT

# CHRISTIANS LAW, PLLC.

111 Park Place, Suite #1B

FALLS CHURCH, VA 22046

OFFICE: (571) 641-3033 • CELL: (405) 401-2300 • FAX: (571) 641-3054

EMAIL: TYLER@TCHRISTIANS.C0M

**TYLER CHRISTIANS\***                                    **\*LICENSED IN VIRGINIA AND OKLAHOMA**

October 14, 2021

Mr. Mark Herring
Attorney General
Office of the Attorney General of Virginia
202 N 9th St.
Richmond VA, 23219

Ms. MinhChau N. Corr
County Attorney
Office of the County Attorney (Arlington, VA)
2100 Clarendon Blvd., Suite 403
Arlington, VA 22201

| | |
|---|---|
| **RE:** | **Notice of Tort Action for Claims under VA Code§ 15.2-209 and§ 8.01-195.6 for injuries and damages caused by Tortfeasors.** |
| **Claimant:** | **Mr. Delgardo Franklin II** |
| **Location:** | **Arlington County, Virginia** |
| **Dates:** | **August 28, 2019 - May 4, 2021.** |
| **Tortfeasors:** | **Arlington County Police Department** |
| | **Arlington County Commonwealth's Attorney** |
| | **Arlington County, Virginia** |
| | **Commonwealth of Virginia** |
| **Description:** | **Arlington County Police Department personal seizure and felony arrest & subsequent prosecution by Arlington County Commonwealth's Attorney.** |
| | **Police Incident# 2019-08280183.** |
| | **Commonwealth of Virginia v. FRANKLIN, Delgardo II.** |
| | **Case# GC19003464-00; GC19003465-00; GC19003466-00** |

---

# - *COVER PAGE* -

**Dear Attorney General Herring & County Attorney Corr:**

I hope this letter finds each of you doing well-your positions require daily diligence and attention, as well as leadership. Thank you for your public service.

*We are writing this letter in accordance with the Virginia Notice of Claim provisions cited above. In addition, please accept this letter as a formal request for any and all information retained by the Commonwealth and its agencies under the Freedom of Information Act. My client's claims include, but are not limited to the following:*

- • Assault & Battery,
- • False Imprisonment,
- • Illegal Search and Seizure,
- • Malicious Prosecution, and
- • Violation of Civil Rights.

We have attached the following documents/records in the corresponding lettered tabs.

- A- Copies of the police incident reports (NOT REDACTED),
- **B-** Images of the police illegally seizing Mr. Franklin II,
- C- Certified court dispositions, VA online case dockets, and the Commonwealth's plea offer,
- **D-** An *unofficial transcript* of the audio captured by equipment used by the Arlington County Police Department,[1]

**We believe the records indicate a serious and grave civil rights violation, as well as physical and mental health damages sustained as a result of this incident.** My clients have not approached the media nor sought publicity. Mr. Franklin II already suffered a gross invasion of his privacy and livelihood as a result of these criminal proceedings. We were looking forward to trial, which after many court appearances, was set for February 11, 2021 *(symbolically, or ironically, this day was the 31st anniversary of the Nelson Mandela's release from prison).*

**Aggravating Facts & Circumstances**

1. On August 28, 2019, the Arlington County Police responded to my client's family's phone call to the Arlington County Police Department-in search of help. Mr. Franklin II sat peacefully on a bench as he spoke to his father. Minutes later, he found himself surrounded, attacked, and seized by 5 police officers.[2] After this illegal seizure of my client, the Arlington County Police Department obtained warrants for the arrest and the Commonwealth's Attorney prosecuted 3 counts of Felonious Assault and Battery on Law Enforcement Officers.

---

[1] *This unofficial transcript was prepared by my office for trial purposes during the Commonwealth's felony prosecutions against Mr. Franklin II. Should any error be discovered, it is not intentional-transcribing these videos was very tedious and time-consuming.*

[2] *Counsel understands this Notice contains information that is highly sensitive and potentially provocative. To protect this information, we have withheld names/information related to police officers / others involved* *(The Police Report is not redacted and contains identifying information.)*

2. When the police illegally seized Mr. Franklin II, he was not committing a crime.  The police were never called to respond to criminal activity.  Mr. Franklin II peacefully sat on the bench speaking to his father.  His father witnessed the entire episode in person, on the scene.  During this seizure, the officers never told  Mr. Franklin II he was under arrest-to the contrary, they told him everything would be alright.

3. Mr. Franklin II remained under 3 Felony prosecutions for nearly 2 years.  During this prosecution, the case was docketed (approx.) 17 times.  Mr. Franklin II had family members present to support him at every court appearance.  Thus, this torturous prosecution continued for Mr. Franklin II until the charges were dismissed May 4, 2021.

4. ***Maybe most aggravating,*** after several months and court dockets,3 The Commonwealth of Virginia engaged in plea negotiations whereby they sought guilty pleas from Mr. Franklin II for assaulting and battering two law enforcement officers.[4]

Due to Mr. Franklin II's incompetence to stand trial and due to being under criminal prosecution, the statute of limitations for this case have been tolled by statute.  Because of these aggravated factors, my client is prepared to pursue all legally available remedies in all legally available forums.  In an effort to avoid  litigation, we are attaching a settlement proposal  in good faith.

Respectfully submitted,



Tyler Christians

**Cc:** **Arlington, VA County Manager**
*Mark Schwartz*
2100 Clarendon  Blvd.
Suite 317
Arlington, VA 2220I

**Arlington, VA County Board**
*Matt de Ferranti,* Chairperson  (countyboard@arlingtonva.us)
*Katie Cristo/* (countyboard@arlingtonva.us)
*Takis P. Karantonis* (countyboard@arlingtonva.us)
*Libby Garvey* (countyboard@arlingtonva.us)
*Christian Dorsey* (cdorsey@arlingtonva.us)

---

[3] *In the interest  of privacy, references to medical  information will be withheld from this Notice.*
[1] *Copy of the email from the Commonwealth (names/email  addresses omitted) wiLh Plea Offer.  (July 20, 2020.)*

# SETTLEMENT PROPOSAL

**A –**



# Arlington County Police Department
## Compact



| | | | |
|---|---|---|---|
| Print Date/Time: | 08/30/2019 08:54 | | ARLINGTON COUNTY POLICE |
| Login ID: | acg\kshayes | ORI Number: | |
| Case Number: | 2019-08280183 | | VA0070100 |

## Case Details:

| | | | |
|---|---|---|---|
| Case Number: | 2019-08280183 | Incident Type: | Assault and Battery |
| Location: | WILSON BLVD/ N OAKLAND ST | Occurred From: | 08/28/2019 15:19 |
| | Arlington.VA 22203 | Occurred Thru: | 08/28/201915:19 |
| | | Reported Date: | 08/28/201915:19Wednesday |
| Reporting Officer ID: | 1668-Duncan | Status: | Cleared | Status Date: | 08|28|2019 |
| Scene Processed By: | 1596-Perez | Disposition: | Cleared-ArresUAdult | Disposition Date: | 08/28/2019 |
| Assigned Bureau: | POL-Homicide/Robbery Unit | | |

### Case Assignments:

| Assigned Officer | Assignment Dalefrime | Assignment Type | Assigned By Oticer | Due Datefrime |
|---|---|---|---|---|
| 1668-Duncan | 08/28/2019 15:19 | Lead Investigator | 1668-Duncan | |

| Solvabili | Factors | Weight |
|---|---|---|
| Suspect can be named | | 0.000 |
| | Total: **0.000** | |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|
| | Slate | 138 | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY | 3 |

### Offense# 1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Group/ORI: | State | Crime Code: | 138 | Statute: 18.2-57 | Counts: | 3 | Attempt/ Commit Code: Committed |
| Description: | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY | | | | | Offense Date: | 08/28/2019 |
| NCIC Code: | 1399 | | Scene Code: | Highway/Road/Alley | | Bias/Motivation: | No bias/not applicable |
| Gang Related: | No | | IBR Seq. No: | | | | |

### Offender Sus ected of Usin

| | |
|---|---|
| Alcohol: | No |
| Drugs: | Unknown |
| Computer: | No |

| Evidence Collected | Criminal Activity | Tools Used | Security Systems |
|---|---|---|---|
| | None Applicable | | |

### Weapon Code : Unarmed

## Subjects



# Arlington County Police Department
## Compact



| | | | | |
|---|---|---|---|---|
| **Print Date/Time:** | 08/30/2019 08:54 | | | ARLINGTON COUNTY POLICE |
| **Login ID:** | acg\kshayes | **ORI Number:** | | VA0070100 |
| **Case Number:** | 2019-08280183 | | | |

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Other | | FRANKLIN.DELGARDO | | | Black | Male | |
| | | | | | | | 46 |
| Suspect | | FRANKLIN,DELGARDO NONE | 14335 ROSETREE CT | | Black | Male | |
| | | | SILVER SPRING.MD 209060000 | | | | 24 |
| Victim | | DUNCAN, TYLER W | 1425 N COURTHOUSE RD Arlington.VA 22201 | (703) 558-2222 | White | Male | |
| Victim | 2 | Guenther. Harley L | 1425 N COURTHOUSE RD Arlington.VA 22201 | (703) 558-2222 | | | |
| Victim | 3 | Davis. Joel Michael | 1425 N COURTHOUSE RD Arlington.VA 22201 | (703) 558-2222 | | | |

| **Subject#** | .1.::Q.thg_[ | | | | | | |
|---|---|---|---|---|---|---|---|
| **Primary:** | No | | | | | | |
| **Name:** | FRANKLIN, DELGARDO | **Race:** Black | **Sex:** Male | **DOB:** | | | |
| **Address:** | | **Height:** 5ft 11 in | **Weight:** 217.0 lbs. | | | | |
| | | **Eyes:** Brown | **Hair:** Black | **Age:** 46 | | | |
| **SSN:** | **0VL#:** | **Slate:** VA | | | | | |

Modus Operandi

| **Subject#** | 1-Suspect | | | | | | |
|---|---|---|---|---|---|---|---|
| **Primary:** | No | | | | | | |
| **Name:** | FRANKLIN, DELGARDO NONE | **Race:** Black | **Sex:** Male | **OOB:** /1994 | | | |
| **Address:** | SILVER SPRING MO 209060000 | **Height:** 6ft 1 in | **Weight:** 170.0lbs. | | | | |
| | | **Eyes:** Brown | **Hair:** Black | **Age:** 24 | | | |
| **SSN:** 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 | **OVL #:** F6521390129 | **State:** MD 03 | | | | | |

| Resident Status: | Nonresident |
|---|---|

Related **Off**

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

Modus Operandi



# Arlington County Police Department



## Compact

| | |
|---|---|
| Print Date/Time: | 08/3012019 08:54 |
| Login ID: | acg\kshayes |
| Case Number: | 2019-08280183 |

ARLINGTON COUNTY POLICE

ORI Number: VA0070100

Subiect#    1-Victim

| | | | | | |
|---|---|---|---|---|---|
| Primary: | No | | Victim Type: | Law Enforcement Officer | |
| Name: | DUNCAN, TYLER W | | Race: | While | Sex: Male |
| Address: | 1425 N COURTHOUSE RD Arlington VA 22201 | | | | |
| Primary Phone: | (703) 558-2222 | | State: | | |
| Resident Status: | Resident | | | | |

Related Offenses

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 138 | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

### Injury Types

Apparent Minor Injury

### Modus Operandi

**LEOKA Information**

| Incident Type: | Officer Assaulted Minor Injury | Officer Activity: | Mentally deranged assailant | Assignment Type: | One-officer vehicle. alone |
|---|---|---|---|---|---|
| | | | | LEOKA Status : | Cleared |
| Assault Weapon Detail: | Hands/Fist/Feet | | | | |

Subiect#    2-Victim

| | | | | |
|---|---|---|---|---|
| Primary: | No | | Victim Type: | Law Enforcement Officer |
| Name: | Guenther, Harley L | | | |
| Address: | 1425 N COURTHOUSE RD Arlington VA 22201 | | | |
| Primary Phone: | (703) 558-2222 | | State: | |
| Resident Status: | Resident | | | |

Related Offenses

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

### Injury Types

Apparent Minor Injury

### Modus Operandi

**LEOKA Information**

| Incident Type: | Officer Assaulted Minor Injury | **Officer Activity:** | Mentally deranged assailant | Assignment Type: | One-officer vehicle, alone |
|---|---|---|---|---|---|
| | | | | LEOKA Status : | Cleared |
| **Assault Weapon Detail:** | Hands/Fist/Feet | | | | |



# Arlington County Police Department
## Compact



| | | | |
|---|---|---|---|
| Print Date/Time: | 08/30/2019 08:54 | | ARLINGTON COUNTY POLICE |
| Login ID: | acg\kshayes | ORI Number: | VA007010D |
| Case Number: | 2019-08280183 | | |

Sub'ect #    3-Victim

| | | | | |
|---|---|---|---|---|
| Primary: | No | Victim Type: | Law Enforcement Officer | |
| Name: | Davis, Joel Michael | | | |
| Address: | 1425 N COURTHOUSE RD Arlington VA 22201 | | | |
| Primary Phone: | (703) 558-2222 | State: | | |
| Resident Status: | Resident | | | |

Related Offenses

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

**Injury Types**                                      **Modus Operandi**

Apparent Minor Injury

LEOKA Information

| | | | |
|---|---|---|---|
| **Incident Type:** | Officer Assaulted Minor Injury | **Officer Activity:** | Mentally deranged assailant | **Assignment Type:** | One-officer vehicle. alone |
| | | | | **LEOKA Status :** | Cleared |
| **Assault Weapon Detail:** | Hands/FisUFeet | | | | |

**Arrests**

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|
| 9727A | FRANKLIN, DELGARDO NONE | ███████████ Arlington,VA 22203 | 0812812019 15:19 | On-View Arrest | 24 |



# Arlington County Police Department

## Compact



| | | ARLINGTON COUNTY POLICE |
|---|---|---|
| **Print Date/Time:** 08/30/2019 08:54 | | |
| **Login ID:** acg\kshayes | **ORI Number:** | VA0070100 |
| **Case Number:** 2019-08280183 | | |

**Arrest#** 9IIJ...A

| **Name:** | FRANKLIN, DELGARDO NONE | **Date/Time:** 08/28/201915:19 | **Type:** On-View Arrest | |
|---|---|---|---|---|
| **Address:** | | **Race:** Black | **Sex:** Male | **DOB:** /1994 |
| | SILVER SPRING, MD 209060000 | **Height:** 6ft 1 in | **Weight:** 170.0 lbs. | |
| | | **Eyes:** Brown | **Hair:** Black | |
| **SSN:** | | **DVL#:** F652139012903 | **State:** MD | |

**Location:** WILSON BLVD/ N OAKLAND ST
Arlington,VA 22203

| **Age at Arrest:** | 24 | **Resident Status:** | Nonresident |
|---|---|---|---|
| **Alcohol Influence:** | Unknown | **Drug Influence:** | Yes |

| Arresting Officers | Bureau | School Resource Officer | Weapon Codes |
|---|---|---|---|
| -!-d-o-$a~-=0-b4d_1_ll | | N_o | Unarmed |

### Arrest Charges

| No. | Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|---|
| | State | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMTjJUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

| **Counts:** | | | |
|---|---|---|---|
| **Court Date/Time:** 08/29/2019 09:00 | **Other ORI:** No | | |

### Arrest Charges

| No. | Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|---|
| 2 | Stale | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

| **Counts:** | | | |
|---|---|---|---|
| **Court Date/Time:** 08/29/2019 09:00 | **Other ORI:** No | | |

### Arrest Charges

| No. | Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|---|
| 3 | State | 13B | 18.2-57 | ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR BIAS MOTIVATED W/ BODILY INJURY |

| Counts: | | | |
|---|---|---|---|
| Court Date/Time: 08/29/2019 09:00 | Other ORI: No | | |

### Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

### Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Routing:

Arrest Report, Officer: acg\tduncan, Supervisor: acg\jdonag, Merged By: acg\rgarci



# ARLINGTON COUNTY SHERIFF'S OFFICE
## BOOKING INFORMATION SHEET



| ARRESTEE INFORMATION |
|---|

**NAME: FRANKLIN**  DELGARDO  **NONE**
Last   First   Middle

ADDRESS:   SILVER SPRING  **MD**  209060000
Street   City   State   Zip

HM PHONE#: _____  DOB: ___/1994  SEX: _M_ RACE: _!L._ HGT:...[.:!_ WGT: -1IQ..

EYES: Brown   HAIR: Black   FACIAL HAIR: Beard, Full   POB:

SCARS/MARKSffAITOOS:   SSN#:

OL:F652139012903   **MD**  FBI#: 170496CH1   SID#: MD4154947   JID#:
ti   Skite

U.S. CITIZEN: **(y)** N  */NO*  INS#: _____  COUNTRY OF cmZENSHIP: u.S.A.
*See consular notifi.carion booklet and auaclzfact sheet if notification is mandarory or 11011-mandawry. Complere VA SiaJe Police 229 form anti fax to State Police and TCE.*

MILITARY: Y@  */fYBS*  Brmich:   Status:

OCCUPATION:   Employer:   Wk Phone#:

EMPLOYER ADDRESS:
Street   City   Stare   Zip

Does arrestee have or exhibit any mental health concerns? **(y)** N

Does arrester have any disabilities or medical issues that may require accommodations? Y **(R)**
*If YES can.ti.let ADA Coordinator*''-

| ARREST INFORMATION |
|---|

ARREST DATE: 8/28/2019  TIME: 3:19 PM  OFFENSE DATE:   TIME:
State   18.2-57
CHARGE(S):
Gang Affiliation: Y **QO**   Gang Charge: y Q::O   Arrestee Gang Victim: Y @:

ARRESTING OFFICER: Duncan   1668   Agency: ACPD  Inc #:2019-08280  83
l.osl   First   Middle   ID#

Officer Next Ct Dt:   Signature verifying content:

| EMERGENCY CONTACT INFORMATION |
|---|

NAME: FRANKLIN, DELGARDO   Relationship: Parent/Guardiart>J1one #: (202)487-1322

ADDRESS:
Street   Cily   State   Zip

| SHERIFF'S USE ONLY |
|---|

netainer Information;

Arrestee Transporteq from another facility: Y  N   Inmate Receipt: Y  N  P#:
MNI#:   CNT#:   BKG#:

BOOKING DEPUTY:
lASt   First   Middfe   Admin#

Donaggio, John **R**   08/28/2019 •roc²

Case Supplement, Officer: acg\jpardee, Supervisor: acg\swhite, Merged By: ACG\kordonez



## Arlington County Police Department
FIELD CASE SUPPLEMENT REPORT   c⊐ **2019-08280183**

| | RECOR(TU) OATEITIIC | OCCU iER.xJ)EHT*TYR: | |
|---|---|---|---|
| I- ½ W̅ | OCOIAABI FQOW 9AIDTleE | OCCUARIDBIAU (JA1T111_!' | ILOCAIDNOF OU.UIaIEIIU |

| | iaATUTEAIBSCRPTION' | | COUJITS | ATTErfPTICO' Mtr |
|---|---|---|---|---|
| Ø W ½ W U. U. 0 | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | JA(KfLSUBJECT TYPE | JLAHE (LAST.FR.ST.WOOLf SUFFD() | | |
|---|---|---|---|---|
| I- 0 W̅ III ⇒ # | 006    A.GEDAGE.RAI=GE | AIOOISS (STR=ET.CITT !:TATE =F) | | |
| | :v.0E | SFX    rW!TodlANC£    RAIIOE | | :c. |
| | DL !-NNBER/STATE | PR:dARY PHOH    1""o | 1""o n | |

| | Jir;C.KfIISUHl3 TYPE" | HAUE (IAST.FRST. Yeot.f SUFFf) | | |
|---|---|---|---|---|
| I- 0 W̅ III ⇒ # | IIOB    AGC or AGE ENIGE | /OOOISS (SIRFEt. OfV.STATE, ZT) | | |
| | RACE | SBC    P!IllIIsIR.AI-GE   IWOOHf cr llAI<Oi   1"AR | Im | |
| | OI ftUMHUJ'JSTA | PREJAN V PHOME    IPHOf:fJ2 | IPHOUEO | |

| | JACICETISUBJECBTYPE | IWIE (LAST, FRS1, WOOLE SUFFD< | | |
|---|---|---|---|---|
| I- 0 W̅ III ⇒ # | 006    AGE or AGE RANGE | AOOI=E.<0frmEET.CITT STATE. ZiT) | | |
| | RAC[ | sox    rJSHf oRAIIGE   I'....GITT*RAN);( | 1= | |
| | OI. h'UU6UV:;1Art | PR.fi.!RY PhChf.    1"""U2 | 1~*rn | |

| REPORTeC OfI'ER | | | M:E |
|---|---|---|---|
| 1697 Pardee | 08/28/2019 | White, Steven Z | 08/29/2019 |
| | | OF | |



## Arlington County Police Department

FIELD CASE SUPPLEMENT REPORT    CAr.u **2019-08280183**

### NARRATIVE

On Wednesday, August 28th, 2019, at approximately 1530 hours, I responded to Wilson Blvd and N. Oakland to assist officers with a subject reportedly going through a mental health crisis.

When I arrived, I assisted in detaining the subject and securing him in handcuffs and leg irons. He was evaluated by medics on scene and secured in a cruiser.

| AEP10fffiC omaR | DAIE | R4illiv.f1) BY | DAIE |
|---|---|---|---|
| **1697 Pardee** | **08/28/2019** | **White, Steven Z** | **08/29/2019** |
| | | OF | |

Case Supplement, Officer: acg\jmdavis, Supervisor: acg\jdonag, Merged By: ACG\kordonez

## Arlington County Police Department
### FIELD **CASE SUPPLEMENT REPORT**  c=.• **2019-08280183**

| PEPCRTHC OFA'.'EH | DATE | Rz:V6\W6'1 | MIE |
|---|---|---|---|
| 1500 **Davis** | 08/28/2019 | Donaggio, John R | 08/28/2019 |
| | | OF | |



**Arlington County Police Department**

**FIELD CASE SUPPLEMENT REPORT**    CAW **2019-08280183**

| | NARRATIVE | |

On August 28, 2019 at 1529 hours T responded to the area of Wi Ison Blvd. and N. Randolph St. for the report of a subject that was schizophrenic, having a psyciatric emergency, and possibly was under the influence of narcotics.

At the time of dispatch I was on a foot patrol in the area of N. Fairfax Dr. and N. Lincoln St. when units that were on scene already relayed that they needed the next responding unit to expedite their response and that a taser was unhoisted by an officer on scene.

As I pulled up to the scene, I observed Officer Duncan in a stance, an outstretched open hand, that led me to believe he was trying to cairn the subject down. Officer Freiert had his taser out. Officers Duncan and Frei11 had their back to Wilson Blvd. and the subject was facing the officers and had his back to buildings lining the North side of Wilson Blvd. As I exited my cruiser I could hear Officer Duncan asking the subject to drop to his knees.

I approached the subject from behind, on his left-hand side. Officer Duncan asked the subject to do this several times. On one occasion the subject was asked to take a seat. The subject turned around and looked at me on several occasions. The subject also put his hands in his pockets at one point and he was asked to take his hands out of his pockets.

Officer Guenther responded from the opposite side from where 1 was standing: behind the subject, off to his right-hand side.

Officer Duncan continued to ask the subject to drop to his knees and the subject made it clear he had no intention of doing this, saying something that sounded like: Do whatever you're going to do.

The subject again did not drop to his knees at this time.

I approached the subject from behind to atte.mpt to surprise him. As I did this, he turned to his left, facing me. He pulled his arms inwards towards his body and as I

| PI\PO\IT\IO OßUeR | DATE | REVE\\W 6V | OABE |
|---|---|---|---|
| **1500 Davis** | **08/28/2019** | **Donaggio, John R** | **08/28/2019** |
| | | OF | |

**Arlington County Police Department**

FIELD CASE SUPPLEMENT REPORT  CA-I- 2019-08280183

N AR Tl'{.ft( ortin ation)'''

reached for his right arm he pulled away from me. I saw a fifth officer arrive on scene. I said out loud to take the subject to the ground to prevent him from fleeing, injuring either himself or officers on scene and/or an escalation of force on our behalf. That officer Officer Pardee, lifted the subjects legs off the ground. The subject went to the ground and I went down also. l got my right arm under his right arm to help leverage it behind his back. I heard Officer Guenther mention biting. I was unsure if that meant he bit someone or was trying to. The subject was placed into handcuffs after a 20-30 second struggle over control of his arms.

I did not strike the subject in any way during this incident.

| REPORTING OFFCER | DATE | REVIEWED BY | O.I.C |
|---|---|---|---|
| 1500 Davis | 08/28/2019 | Donaggio, John R | 08/28/2019 |
| | | OF | |

**Agent Report**

# I.C.P.D. EVIDENCE FORM

Page 1 of

| Incident: | Assault on Police |
|---|---|
| Victim: | Arlington County Police OFC |
| Address: | Wilson Blvd.IN. Oakland St. |
| Agent/MPO: | Perez #1596 |

**Case Number**

2019 – 08280183

| Item no. | Item | Location | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LEO CPL Davis | Face/ RT Elbow | | | | | | | | | | | | | | |
| | LEO OFC Guenther | Face/Upper Lip/Interior Lip/RT Elbow | | | | | | | | | | | | | | |
| | LEO OFC Duncan | LT Forearm | | | | | | | | | | | | | | |
| | Suspect Delgardo Franklin | LT Elbow/RT Hand | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |

Processing location: Wilson BlvdJN. Oakland St.

Scene description: On side walk near bus stop

Date: 08/28/19        Time: 1556 Hrs        Weather: Rain

[{]Digital Photo   D Primer Residue Kit   D Video Tape/Digital Camcorder        PERK Kit: ☐ Victim ☐ Suspect

Processing time: _A p p ro x : 1 H R_____        Latent cards turned into evidence: _____

IDENTIFICATION* COLLECTION* PRESERVATION* DOCUMENTATION --------------------

Revised 01/201/

# I.C.P.D. EVIDENCE FORM

Page        of

| Incident: | Assault on Police |
| Victim: | Arlington County Police OFC |
| Address: | Wilson Blvd.IN. Oakland St. |
| Agent/MPO: | Perez #1596 |

| Case Number |
|---|
| 2019  -  08280183 |

| Item no. | Item | Location | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

**IDENTIFICATION* COLLECTION* PRESERVATION* DOCUMENTATION**

R-vised 05/2017

**Case Supplement, Officer: acg\aperez, Supervisor: acg\dwashi, Merged By:  ACG\kordonez**



### Arlington County Police Department
**FIELD CASE SUPPLEMENT REPORT**   CASH **2019-08280183**

| | STATUTE,tJESCAPIDIl | | | COUINTS | Amf4PTICOflW |
|---|---|---|---|---|---|
| (A W (A W l& l& 0 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | JACK£T,SUIl&:T TYPE | ,W,E (LAST, FRSl', IlDDLf SUlFFQ | | | |
|---|---|---|---|---|---|
| I- C W .... (A | DOB   AGE« AGERANGE | | | | |
| | | AC:mfSS (STRfET. OJY. STAlE, ZIP) | | | |
| | AACE | SEX   or IWlGf   IWElllT'' llAOOE   IHAR   nE | | | |
| | DL NUIlSERISTATE | PR,lIARVPl'O,'lf   1—SEI2   IPllOl<f03 | | | |

| | .lACl<ETISUBJECTTYPE | HN«E (LAST, FAST, IlDOLE SUlll<) | | | |
|---|---|---|---|---|---|
| I- C. W Ill .... (A | DOB   AGE«AGE RANGE | AOORESS(SIREU, CITY, STATE, ZIP) | | | |
| | RACE | SEX   IHlDHT RANGE   ..'   .. IWlGf   IHAR   nE | | | |
| | Ill MJIlDERISTATE | PRNARV PHONE   IPKOIE12   IOllOIUl | | | |

| | JACKEl/SIIBJECTTYPE | NAY£ (LOST, FAST, IllIOU' SUFFIX) | | | |
|---|---|---|---|---|---|
| I W Ill .... (A | DOB   AGE0<AGERANGI: | AOOAl:SS (STRl;T, CITY, STATE, ZIP) | | | |
| | AACf | SEX   rEIGHTot AAIGf   IWElJIT or RANCE   IHAK   I= | | | |
| | Ill h111IBllWIAIE | FRNARYPHOl;l   1—12   1 U3 | | | |

| RB'CIlTIlGOffl:fR | O.,TE | REVB'IDS ' | 114TE |
|---|---|---|---|
| **1596 Perez** | **08/28/2019** | **Washington, Damon L** | **08/28/2019** |
| | OF | | |



**Arlington County Police Department**

FIELD CASE SUPPLEMENT REPORT     CAse 2019-08280183

NARRATIVE

On today's date, August 28, 2019 at approximately 1530 Hrs, I, CPL. Perez#1596 responded to the area of Wilson Blvd. and N. Oakland St. for agent work. Officers on scene had detained a subject after a struggle. In the process of detaining the subject, several officers on scene suffered from minor injuries. I responded to assist in documenting those injuries, in addition, injuries to the subject.

Upon my arrival, the suspect was detained in handcuffs on the sidewalk near the bus stop at the above location. Due to the subject's combativeness, he remained in a control hold. The subject had injuries to his left elbow and right hand. Injuries to both areas appeared to be mild abrasions with minor bleeding. While the suspect was detained, I photographed the suspect's injuries.

Ofc. Davis appeared to have a scrape, red in color, on his forehead and top of his nose. In addition, he had a minor scrape to his right elbow. The areas appeared irritated and did not break skin. OFC. Guenther also sustained a minor injury to her upper lip, superior labial (inner lip) and right elbow. The injuries were minor and did not break skin. They appeared to be minor grazes. OFC. Duncan also sustained a minor injury to his left forearm. The area appeared to be a minor scraped from the top of his forearm down to his wrist. The injury did not cause broken skin with no active bleeding. All minor injuries to the above officers were documented by photographing the areas. I took mid-range and close-up photographs of the injuries. In addition, I further documented by photographing the injuries with a scale for measurement.

All photographs were taken at the above location of the incident. However, it was determined later upon leaving the scene that OFC. Guenther sustained the minor injury to her inner lip. I photographed the area as soon as the officer made contact at Arlington County Fire Station #2.

The photographs were downloaded to a CD and were to be submitted to the Forensic ID Unit.

| RIPORUIGOFR:ER | DATE | REVEWID BY | DATE |
|---|---|---|---|
| **1596 Perez** | 08/28/2019 | **Washington, Damon** L | 08/28/2019 |

OF

USCA4 Appeal: 24-1359   Doc: 17   Filed: 05/23/2024   Pg: 105 of 204
Case 1:24-cv-01660-RDB-WEJ   Document 21   Filed 01/04/2023   Page 28 of 53   Page ID# 333

Case Supplement, Officer: acg\hguenther, Supervisor: acg\jdooag, Merged By: ACG\kordonez

## Arlington County Police Department

FIELD CASE SUPPLEMENT REPORT    =  **2019-08280183**

| | REPORTIO S..._TERRAE | OCCURRchO VICCE'S TYPE | | |
|---|---|---|---|---|
| l_<br>z<br>W<br>><br>W | OCQBIRO HrOff EAT/FItJE | OCCU:1RED Ti U DArD®E | rOCAIDM Of  OCCUR%l1K f | |

| | STATUmOESCRPTIpl,l | | coutm | Afik.IPT,COIIMT |
|---|---|---|---|---|
| 0<br>W<br>0<br>z<br>W<br>u. | | | | |
| 11.<br>o | | | | |
| | | | | |
| | | | | |

| | JACKET\SUBJECT TYPE | | eJAt.f (LAST. FRST, btOOLf SUBfIX) | |
|---|---|---|---|---|
| W<br>l.)" | OOH | AGEmAf:.f.AA.tQ | I.OORESS (STREET, CITY STATE 2P) | |
| co<br>0 | BLCf | | SEX | I"ffil/T od!AIIGE    .-u,AAIIGE |
| | EK NVUBER,STATE | | PAJIARY PYOtlf | r-Q,:f3 |

| | J CKETtSUBJICFIVPE | | MA1£ (LAST" FRST. •OOLE SUFFD•) | |
|---|---|---|---|---|
| l_<br>U<br>." | D08 | AGforAGERANGf | AOORESS (STREET. OTV. STATE, ZP) | |
| co<br>0 | IIACf | | SEX    I >16.0tlf or EARlGE    IWEC ETor RANGE    1•IAA    IEYE | |
| | Ot r,aMOE. FfST AE | | PIWARY PHOflE    I'HOI.E._    IR•O!it "3 | |

| | JAO·ET\SUBJECTIYfE | | MAME  (LAST FR$1. UOOLf SUFFO•) | |
|---|---|---|---|---|
| b<br>U<br>W | D08 | ,t'iE.or AGt: RA:.Q: | A.COt:fISS ISTRE1. CITY, STAIE, 2P) | |
| co<br>0 | EAC1 | | Rf$1IT .. P."iGE    1WICif    IHAA | |
| | DL'1LIWiI:M'SIAIt: | | Rf(UAMY _.ONt    I  O1 .It    13 | |

| REPORThG OfOO R | MTE | RflEYIED BY | DATE |
|---|---|---|---|
| 1640 Guenther | 08/28/2019 | Donaggio,  John R | 08/28/2019 |
| | | OF | |

Page: 16 of 28



## Arlington County Police Department
### FIELD CASE SUPPLEMENT REPORT  CA **2019-08280183**

---

**NARRATIVE**

---

On August 28, 2019 at 1529 hours I responded to the area of Wilson Blvd. and N. Oakland St. for the report of a subject having a mental health emergency.

When the call was originally dispatched, I was in the area of N. George Mason Dr. and Wilson Blvd. Units on scene advised a taser was ready to be deployed if needed and have any other units coming to the scene, expedite their response. I activated my emergency equipment and responded to the scene.

On scene, I observed Officer Duncan attempting to talk to the subject and calm him down. Officer Freiert had his taser out pointed in the direction of the subject. Officers Duncan and Freiert were facing the Mattress Warehouse (3807 Wilson Blvd.) with their backs to Wilson Blvd. The subject was facing the officers and had his back to the Mattress Warehouse. Officer Duncan made several attempts to talk the subject into taking his hands out of his pockets, calming down, and doing down to his knees. No attempts were successful.

I approached the subject from behind on his right-hand side. Corporal Davis arrived on scene and approached the subject opposite of me, on the back left-hand side of the subject. The subject's father was standing behind me on my right side, facing the subject. The subject looked past me several times towards his father. During this time, Officer Duncan told the subject several times to take his hands out of his pockets and drop to his knees. The subject finally took his hands out of his pockets and placed them behind his back. Both the subject's fists were still balled-up and he did not listen to any other commands Officer Duncan gave him. From my vantage point, I could not see any objects in the subject's hands.

Corporal Davis and I began to approach the subject to place him in cuffs, the subject turned to the left and saw Corporal Davis approaching. The subject pulled his arms in towards his body. In an attempt to control the subject and place him into cuffs, one of the subject's arms struck me on the left side of my mouth. With the help of the other officers on scene, the subject was escorted to the ground in order to gain control and maintain the safety of all parties involved.

| RTPORIJIG OHTDtR | DAIE | REVEIMDBY | MIE |
|---|---|---|---|
| **1640 Guenther** | **08/28/2019** | **Donaggio, John R** | **08/28/2019** |
| | | OF | |



## Arlington County Police Department
### FIELD CASE SUPPLEMENT REPORT    ⇒   2019-08280183

Once on the ground, my left forearm was close to the subject's face. The subject's mouth was open and because he was moving around, it appeared as if the subject was attempting to bite my arm. I verbally reminded the other officers involved to watch out for his mouth. One of the Officer's arms was close to the subject's mouth, so I moved the Officer's arm away from the subject's mouth. A brief time later, the subject was placed into handcuffs and checked out my medics.

During the incident I sustained minor abrasions to my right elbow and a small cut on the inside of my mouth on the left side.

| REPORTING OFFICER | GATE | REVIEWED BY | GATE |
|---|---|---|---|
| 1640 Guenther | 08/28/2019 | Donaggio, John R | 08/28/2019 |
| | | OF | |

**Case Supplement, Officer: acg\afreiert, Supervisor: acg\jdonag, Merged By: ACG\kordonez**

### Arlington County Police Department
**FIELD CASE SUPPLEMENT REPORT** CASH **2019-08280183**

| EVENT | REPORTED DATE/TIME | OCCURRED INCIDENT TYPE | | |
|---|---|---|---|---|
| | OCCURRED FROM DATE/TIME | OCCURRED THRU DATE/TIME | LOCATION OF OCCURRENCE | |

| | STATUTE (/)tsawtiON | | COUNTS | AmUPTICOUMIT |
|---|---|---|---|---|
| (I) W C(o) W It. o | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| I-O al (I) | JACK&TISUBJE-CTTY!: | kAllf (LAST. FRST, UDUILE SUFAX) | |
|---|---|---|---|
| | DOB AGE or AGE RANGE | AOORESS (STRIET, CITY. STAIE, ZIP) | |
| | RAa: | SEX rWtTo, RAIIGE 1 odWIOI IHAR | |
| | [LNU1IH1,R-15Kl,TH | PRNARYPHOI-SE 1-12 | |

| I-O w m... (I) | JACKETISIIBJECTTYTE | IWIK (LAST. FRST, UDIILE SUFRQ | |
|---|---|---|---|
| | DOII AGforAGEAAMJE | AOOLfSS(smfET,CITY.STAIE,ZIf) | |
| | RAa: | SEX I -. IHAR | |
| | OI NUKBPJSTATE | mNARVPtoJHE ro,u | |

| I-O w al l) | JAO-ETISDRJECTTVPE | NAUf (LAST, Fre,T, UOOIE SUPE)X) | |
|---|---|---|---|
| | DOB AGEort>t:ERANGf | AKIlfSS(SmflT,CITY.STATE,2II') | |
| | RAa: | SOC IHfjlllf or RANGE l"lGIITarRANGE I- | |
| | OI.h1JilIBERISTA1f | Rf.NARYPHOPHE r I2 IMMU3 | |

| RflIRTTIIG OffIIR | | REVEIWED BY | |
|---|---|---|---|
| **1608 Freiert** | **08/28/2019** | **Donaggio, John R** OF | **08/28/2019** |

Page: 19 of 28

Case Supplement 2019-08280163 Pago 1 OF 3



**Arlington County Police Department**
FIELD CASE SUPPLEMENT REPORT     CASE # **2019-08280183**

I-          **NARRATIVE**

On August 28th, 2019 at 1522 hours I was in the area of a reported mental health subject. It was reported by the reporting parties (the subject's brother and father), that the subject was in the area of N. Oakland St and Wilson Blvd wearing a navy colored shirt, navy pants and gray Adidas shoes. The reporting party (RP) stated the subject was schizophrenic and had possibly "taken something synthetic". The RP also reported the subject was a threat to himself and others, and this has been going on since the prior week.

I located a subject matching that description sitting in the bus depot at the corner of N. Oakland St and Wilson Blvd. I exited my police vehicle and asked the subject, what was going on. The subject looked at me as if to acknowledge me but continued speaking with whoever he was on the phone with. I began to walk closer to the subject. I could hear the subject say "you called the cops on me?" and I asked the subject if he was on the phone with his father and brother. The subject stated no. I informed the subject I was here because his father and brother called about him and were worried about him. The subject stated he was fine. At this point Ofc. Duncan arrived on scene and the subject's father exited the vehicle he was in and began to approach me.

I spoke with the father. The father began to cry and tell me that his son (the subject in front of us) was not well. The father stated the subject was not in his right mind and he needed help. I turned back to the subject and again asked him what was going on today and that we wanted to help him. The subject abruptly got up and began to walk towards his father and myself. I began to notice the subject begin to clench his jaw and flare his nostrils. I backed away from the subject and asked him if he wanted to speak with a mental health professional. The subject raised his voice. flared his nostrils and continued to clench his jaw as he asked me "Do you want to speak with a mental health professional?". I informed the subject I did not, and was once again there to help him. The subject turned to his father and asked him multiple times to "give me my fucking phone charger". The father did not answer the subject and turned to me and continued to ask me to help his son. I asked the subject if he was feeling suicidal today?

The subject did not answer this question. The subject clenched his jaw, flared his

| REPORTING OFFICER | DATE | REVIEWED BY | DATE |
|---|---|---|---|
| **1608 Freiert** | **08/28/2019** | **Donaggio, John R** | **08/28/2019** |

OF



### Arlington County Police Department
**FIELD CASE SUPPLEMENT REPORT**    CAra 2019-08280183

---

#### NARRATIVE (continuation)

nostrils, balled up both of his fists and pressed them together. The subject looked around the area quickly and turned his eyes back to myself: The subject bladed his body towards me in a fighting posture and kept his fists clenched. Noticing all of the pre-assault indicators and fearing an attack was eminent, I created distanced between myself and the subject and drew my TASER. I told the subject I was not going to fight with him, and pointed my TASER directly at the subject. The subject placed his hands behind his back and began puffing out his chest. I ordered the subject to put his hands on his head and to get on the ground, multiple times. The subject continued to ignore commands and stand with his chest puffed out and hands behind his back. The subject was yelling profanities and stating he was not going anywhere and to leave him alone.

Ofc. Guenther and Cpl. Davis arrived on scene. The subject continued to ignore Ofc. Duncan and my commands to get on the ground. Ofc. Guenther, CPL Davis and Ofc. Duncan converged on the subject in an attempt to go hands on with the subject and detain him. The subject immediately began to resist, throwing his arms about wildly and trying to hit multiple officers.

I holstered my TASER and began to assist the other officers. I grabbed the subject's left arm and began to take the subject to the ground using an arm bar technique that I learned at the Northern Virginia Criminal Justice Training Academy. The arm bar was successful in assisting the subject to the ground. Myself and other officers continued to give commands for the subject to place his arms behind his back and the subject continued to actively resist. The subject was eventually placed into handcuffs by Ofc. Guenther. While in handcuffs the subject continued to thrash his body and began to kick his legs. I assisted other officers in gaining control of the subject's legs until leg shackles could be placed on the subject safely.

I followed Ofc. Duncan to booking, while he transported the subject. Once in booking, the subject would not answer the deputies questions and resisted the deputies as they attempted to conduct a search of his person. The subject had to be placed in a holding cell and multiple deputies had to assist in removing the subject's leg shackles.

See. Ofc. Duncan's case report for further details.

---

| REPORTING OFFICER | DATE | | DATE |
|---|---|---|---|
| 1608 Freiert | 08/28/2019 | Donaggio, John R | 08/28/2019 |
| | | OF | |

Case Report, Officer: acg\tduncan, Supervisor: acg\jdonag, Merged By: ACG\Swells

## Arlington County Police Department

**FIELD CASE REPORT**      CASE- 2019-08280183

| | | | | |
|---|---|---|---|---|
| REPORTED DATE/TIME | 8/28/2019 3:19 PM | Assault and Battery | | |
| OCCURRED FROM DATE/TIME 08/28/2019 15:19 | OCCURRED THRU DATE/TIME 08/28/2019 15:19 | LOCATION OF OCCURRENCE **WILSON BLVD** Arlington, VA | | |

| | STATUTE.tr'. dRPTI)N | | COUNTS | MIIYK-OIINIT |
|---|---|---|---|---|
| 01 | 18.2-57 ASSAULT & BATTERY: POLICE/FIRE/EMT/JUDGE/ETC OR **BIAS** MOTIVATED W/ BC | DI I | J mittec | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| JACI CERSUBJECT VPI: | | RAII: (1.AS1. FRS(, IIIIII.E SUIRX) | | | | | |
|---|---|---|---|---|---|---|---|
| Adult | Suspect | FRANKLIN, DELGARDO NONE | | | | | |
| DOB 11/26/1994 | AGE α AGE RANGE 24  24 | AIIIRISS (sttdT, CITY. STATE, ZIP) | | | | MD 209060000 | |
| RACE **Black** | | SEX Male | | HEIGHT/ RANGE 6'1 | 17, - | HAIR **Black** | I rown |
| DI ATE F652139012903 / **MD** | | PERMA AYI'I'OIIE | | 1~ 12 | | | 1-13 |

| JACK<ETSIBJECTVPI: | | IWIE (LAST, FRST, MIDILE SUFFDX) | | | | |
|---|---|---|---|---|---|---|
| Officer | Victim | DUNCAN, TYLER | | | | |
| DOB | AGE or AGE RANGE 2 | AOORESS (STREET, CITY, STATE, ZIP) 1425 N COURTHOUSE RD Arlington, VA 22201 | | | | |
| RACE White | | SEX Male | ,MGIT - | IHAR | 1~ | |
| OBUIMIIERISTA1f | | PRIIARYPIIOIIE (703)558-2222 | | 1-12 | r0U/l3 | |

| J.AO-ETSUBJCTIYTE | | NAME (LAST, FIIST, MIDILE SUFfm) | | | | |
|---|---|---|---|---|---|---|
| Officer | Victim | GUENTHER, HARLEY | | | | |
| DOB | AGE or AUE RANGE | AOORESS (STREF.T. CITY. STATE. 2I) 1425 N COURTHOUSE RD Arlington, VA 22201 | | | | |
| RACE White | | SEX Female | I HEIGHT OF IWIGE | .. 'EOIT.. RIJIOE | IHAR | |
| OI.IIUIIBER/S.IAJE | | PRIIARYPIIOII[ (703)558-2222 | r U2 | | | |

| REPORTING OFFICER | DA1f | | | |
|---|---|---|---|---|
| 1668 Duncan | 8/28/2019 | Donaggio, John R | 08/28/2019 | |
| | OF | | | |

Page: 22 of 28

Case Report 2019-08280183 Page 1 OF 7

USCA4 Appeal: 24-1358 Doc: 17 Filed: 05/23/2024 Pg: 112 of 204 Page ID# 340
Case 1:23-cv-01605-WEF Document 21-4 Filed 01/04/2024 Page 28 of 98 PageID# 340



# Arlington County Police Department

## FIELD CASE REPORT

CA-v 2019-08280183




## ADDITIONAL SUBJECTS

| JACKETTSUBJECT TYPE | | NW. E (IAST, FTIST, MODL.T SUFFCW) | | | | | |
|---|---|---|---|---|---|---|---|
| **Officer** | **Victim** | **DAVIS, JOEL** | | | | | |
| DDO | AGE or AGE RAMGE | AOORISS (STUEIT, CITY, STAIE, 3") | | | | | |
| | | 1425 N COURTHOUSE RD Arlington, VA 22201 | | | | | |
| AAD: | | SRX | I"GHTor PAIIGE | IWE'CHT" RANC1 | IHAR | rYY | |
| **White** | | **Male** | | | | | |
| OLt-lUMOCWSTATE | | Ph,'4AAYP6OCE | IPHO'O'., | | I"IO'E13 | | |
| | | **(703)558-2222** | | | | | |

| JAO×ETISUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE ZUFF96) | | | | | |
|---|---|---|---|---|---|---|---|
| **Adult** | **Other** | **FRANKLIN, DELGARDO** | | | | | |
| DOB | AGE or AGE RAANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | | |
| | **46 46** | | | | | | |
| RACE | | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | (YE | |
| **Black** | | **Male** | **5'11** | **217** | **Black** | **Brown** | |
| DL NUMBER/STATE | | PRIMARY PHONE | | PHONE #2 | | pour_X T3 | |

| JACKETISt1UIUSCI TYPE | | HAJ.IE (IA<,T, FIRST, UIXIIE SUIIIQ | | | | | |
|---|---|---|---|---|---|---|---|
| 00B | AGE. or AGE RANGE | AOORISS (STREIT, CBt", STAIE, ZP) | | | | | |
| AAOE | | SEX | 1'1£1lttflodWIGE | lm,e,rr odf**G£ | IHAA | Im | |
| OI P,LMMBL/SB,II | | PRIMARY PHOUE | | 1=4Q1E . | | 1""'O""'''' | |

| JADtZTISUBJCT TYPE | | IIAME (LAST. FRST, IJOOI.f SUFICX) | | | | | |
|---|---|---|---|---|---|---|---|
| 00B | AU,t, or AGE R.s.NGE | AOOI6S (STREIT, CITY STAIE, ZP) | | | | | |
| AAAOT | | SOC | rSffotAAl"3e | IV\U,t'T... AAHGE | IHAR | IEYE | |
| OI ftJM6WSTATE | | PR;]l1.ARY Pt10NE | | I""""C = | | I PHOT'8 | |

| JAO×ED1SUDIR,CI TYPE | | HA.ME (LAST. FAST, YOOU: SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| DOU | Atf, N J.Qr RAIAJE | AOOJESS (SIR(JT, QTY. STAIE, ZP) | | | | | |
| RIAO: | | SEX | IK)EITOIRAAGGE | IWE.QIT., RAAGGE | IHAA | __ lm | |
| OLt.1JWB(RISTATE | | PAMA.AY PHONE | | I""O5E OZ | | 'I'll '"'lm | |

| REPORTHO OHIX;ER | DATE | | |
|---|---|---|---|
| **1668 Duncan** | **8/28/2019** | **Donaggio, John R** | **08/28/2019** |
| | OF | | |

Case Report 2019-08280183 Page 2 OF 7

**Arlington County Police Department**
FIELD CASE REPORT  CA:v **2019-08280183**



**NARRATIVE-**



On August 28, 2019 at approximately 1519 hours, I was dispatched to the intersection of Wit.son Blvd and N Oakland St for a mental subject. Dispatched advised a father was on the phone stating his  on wa  having some type of schizophrenic or drug-induced mental break and was a threat to himself and others.

When I arrived, Ofc. Freiert was already attempting to speak with the individual. However, It became immediately obvious that the individual had no desire to speak to officers. 1 attempted to talk to the individual but he kept stating a series of short statements having to do with not wanting us to be there and asking why we were there.

ı activated my ICC camera and body-worn microphone. The remainder of the incident was fully recorded.

I continued to try to speak to the individual with minimal success. He continued to ask why we were bothering him and insisted that we leave him alone. Shortly after, an individual approached from farther West on the individual. This individual identified himself as the father of the subject, Delgardo Franklin (referred to forward as Mr. Franklin). Mr. Franklin approached officers and his son and identified his son by the same name, Delgardo Franklin U ( referred to forward as Delgardo). As soon as Mr. Franklin approached, Delgardo began to primarily talk to his fatber. Mr. Franklin appeared to have a computer charger in his hand and Delgardo immediately began to fixate on it. He insisted that Mr. Franklin give him the charger multiple times and continued to angrily ask why we were bothering him. Delgardo made multiple rapid approaches towards his father and myself and Ofc. Freiert gave commands for him to stop. We attempted to have Delgardo sit on a bench behind him or on the ground, but he actively refused.

At this time, Delgardo appeared to realize that police were not going to obey his wish to leave him alone. Delgardo attempted to again get the charger from his father but commands were given for him to cease. At that time, Delgardo balled one of his fists and placed it in his other hand which was open. Simultaneously, Delgardo bladed his body in an aggressive manner, appearing as if he was posturing for a fight. Ofc. Freiert and I immediately recognized Delgardo's escalated behavior and stepped back. Ofc.

| REPORTING OFFICER | DATE | REVIEWED BY | DATE |
|---|---|---|---|
| **1668 Duncan** | 8/28/2019 | Donaggio, John R | 08/28/2019 |
| | | OF | |

Arlington County Police Department

**FIELD CASE REPORT**   c.t.aa **2019-08280183**

---

**NARRATIVE (continuation)**

Freiert drew his taser and initially issued commands. I radioed the current situation and asked for additional units to expedite.

During the next several minutes while waiting for backup, I attempted to speak to Delgardo and deescalate the situation. Delgardo continued to insist on getting the charger and being allowed to leave. During this time, Delgardo alternated between an aggressive posture with both fists balled at his side, hands in his pockets (despite being given commands to show his hands), and hiding his hands behind his back. On several occasions, Delgardo appeared as if he would approach officers, however, commands were issued that temporarily deescalated the situation. Also of note, during this time, Delgardo appeared to display a twitch of some sort or possibly appearing distracted as if someone was talking to him, where he would rapidly look to his left then look back towards officers or his father.

On several occasions, Delgardo angrily told officers statements that would indicate he wanted us to attack him or something along the lines of "do what you have to do". At this time, Mr. Franklin was also pleading with his son to listen to officers. However, Delgardo continued to ignore commands. Shortly after, additional officers arrived on scene and took positions around Delgardo. Despite a multitude of attempts to deescalate the situation using CIT techniques, I was unable to get Delgardo to comply with surrendering.

It was established that Delgardo needed to be taken into custody in order to further assess his possible mental health concerns or drug intoxication. As officers moved in to take him into custody, Delgardo immediately showed that he would not be taken into custody without resistance; Delgardo recognized our approach and braced his hands and arms tightly in front of his body. Officer engaged with Delgardo and a fight ensued. During this struggle, Delgardo flailed his hands in attempts to shed officers. Mr. Delgardo was not initially able to be controlled and Cpl. Davis advised that he should be taken to the ground. Once on the ground Delgardo initially attempted to brace his arms under himself so that he could not be taken into custody. However, once his hands were removed from under him, Delgardo continued to flail in a punching manner and twist and kick his legs to attempt to shed our control. At one

| REPORTING OFFICER | DATE | RMENR&Y | |
|---|---|---|---|
| **1668 Duncan** | 8/28/2019 | Donaggio, John R | **08/28/2019** |
| | | OF | |

USCACase 24-1359, Case 1:00cv-0050-WEDoc Document 4216d 9586d#080928ge Page 83 of 8 Page PageID# 343



**Arlington County Police Department**
FIELD CASE REPORT                    CAT/U **2019-08280183**

**NARRATWE (continuation)**

point, while I was attempting to control his left arm, [ heard Ofc. Guenther yel l at
Delgardo something along the lines of "Don't bite!" I attempted to control his head and
right hand at this time. Immediately after, Delgardo began to grab my hand, in an
attempt to prevent me from controlling him. l was able to release his hand from mine
and officers continued to attempt to take Delgardo into custody.

Officers were able to place one handcuff on Delgardo's left hand and I was able to
leverage his arm behind his back. During the struggle to gain control of his right hand,
Delgardo continued to flail aggressively, mostly with his legs now, and resist officers.
Eventually, Mr. Delgardo's right hand was taken behind his back and take him into
custody.

However, once in handcuffs, Delgardo still attempted to resist being controlled.
Multiple officers kept Delgardo's legs in control as I applied a goose-neck hold to one
of his hands and arms to prevent him from further resistance. Ot1icers had to place
Delgardo in leg shackles to prevent his leg movement.

Delgardo appeared to have superficial cuts on his fingers, forearms, and el bows.
Additionally, multiple officers sustained cuts and abrasions on their hands, arms,
forearms, elbows, and face as a result of Delgardos flailing, punching and grabbing.

Medics, who were staged on scene, attempted to treat Delgardo's injmies and assess
his vitals. However, Delgardo was still resisting officers despite being in custody.
Additional.ly, Delgardo continued to insist we leave him alone and refused to answer
any other questions. Medics were able to check vitals and established that his wounds
did not need medical treatment. Medics left the scene as Delgardo was still resisting
officers, forcing us to maintain positive control of him on the ground.

Once I was relieved of my position controlling Delgardo, I spoke with his father. Mr.
Franklin stated that Delgardo had been acting very alarmingly ever since he allegedly
smoked an unknown substance in February of this year. Mr. Franklin stated that, after
smoking the unknown substance, Delgardo began to frequently exhibit strange
behavior. On multiple occasions, Mr. Franklin stated that Delgardo showed behavior

| RJPCRmG Offi ER | DATE | R. "VEV.m @ | DATE |
|---|---|---|---|
| **1668 Duncan** | **8/28/2019** | **Donaggio, John R** | **08/28/2019** |

OF



**Arlington County Police Department**

FIELD CASE REPORT        Lab. **2019-08280183**

**ARRATIVE** (continuifi n)

consistent with what he believed was a result of a psychotic episode. He stated that Franklin had been bouncing back and fourth between his mother's house and his  each time after another "psychotic episode. Mr. Franklin stated that Delgardo had most recently been staying with him in Woodbridge until another mental break. *Mr.* Franklin stated that, after this break, he attempted to admit his son into a private hospital for help. However, prior to admittance, staff wanted Delgardo to provide a urine sample for a drug screen. Delgardo apparently took exception to this and ran out. Prince William Police were eventually called and apparently witnessed Delgardo attack Mr. Franklin, but no police action was taken.

Mr. Franklin stated that after these events, which occurred approximately a week ago, Delgardo ran away. Mr. Franklin stated that he had not heard from his son since then, until today. Mr. Franklin said his son called him and insisted he bring him his computer charger. Delgardo apparently would only initially say he was in Virginia, then in Fairfax, then eventually gave his father the intersection of Wilson Blvd and N Oakland St.

L'Vlr. Franklin was insistent that Delgardo was not a frequent user of drugs and that he had no diagnosed mental health issues. He was not, however, aware of anything he had done in the past week. Furthermore, when l informed him that he would be going to booking, he seemed to indicate it was in his best interest and that he thought he needed to be here.

Because I was unable to assess if Delgardo fit criteria for a paperless ECO. It was established that Delgardo would be transpo1ted to booking for Assault of Police charges.

Cpl. A. Perez documented Delgardo's injuries as well as mine, Ofc. Guenther's, and Cpl. Davis's. Delgardo was transported to booking where he continued not to answer questions from anyone. Delgardo continued to actively resist deputies as he was being searched. Additionally, Delgardo refused to be assessed by OHS and they too were unable to assess if he fit criteria for an ECO.

| REPORTING OFFICER | DATE | REVIEWED BY | DATE |
|---|---|---|---|
| **1668 Duncan** | 8/28/2019 | **Donaggio, John R** | 08/28/2019 |

OF

## Arlington County Police Department

### FIELD CASE REPORT

CASE> **2019-08280183**

**fiiARRATIVE (continuation}**

The Magistrate attempted to conduct a probable cause hearing with Delgardo in his holding cell, but Delgardo refused to acknowledge her either. I completed the hearing with the Magistrate and three Assault of Police warrants were issued. The Magistrate was unable to hold a bond hearing at this time, due to Delgardo's intoxication or heightened mental state.

Mr. Franklin provided a statement. My ICC video was tagged with the case number. See other officer's supplements for their involvement.

| REPORTING OFFICER | DATE | REVIEWED BY | O..of |
|---|---|---|---|
| 1668 **Duncan** | 8/28/2019 | **Donaggio, John R** | 08/28/2019 |
| | | OF | |

**B –**



Case 1:21-cv-01504-WEC Document 42-1 Filed 05/04/2023 Page 88 PageID# 348





Case 1:23-cv-00864-MOC-WCM Document 42 Filed 04/03/2024 Page 88 of 88 PageID# 350



Case 1:21-cv-02600-ELH Document 44-5 Filed 08/09/22 Page 63 of 84 PageID# 351



Case 1:21-cv-00129-JMB-RSK    ECF No. 1-2    Filed 02/07/21    Page 1 of 1    PageID# 352











USCA4 Appeal: 24-1359 Doc: 17 Filed: 05/23/2024 Pg: 130 of 204

C –

**A 41'lt OFc'ARREST- Y/\f\/sJ...,**

COMMS1"WEALTH110FVIRGINIA Va. Code §19.2-71

[r] General District Comt [r] Criminal [ fTr;dlic
&ljp_gtp.n_._......_ [ ) Juvenile aud Domestic RclatiODS District Court

CI1YOR.COUNTY

TO ANY AU1HORIZED OFFICER:

You are hereby oororoauded in the name of the Commonwealth ofVuginia forthwith to arrest and bring the Accused before this Court to answer the charge that the Accused. within this city or count;)', o11or about P.Bf.D.Q.Q.19_._._____did unlawtully and feloniosly in violation of Section

8.2-57 _____,CodeofVuginia:

assault and batter Offi6ER GUENTI-IER kM'1JIRg erbaY!ngr.easen toluruw dlat m._pev.,.;J!1'
eotmcerneat.9fficgr. eedefin8'1lR_aulm99tlaA_F af §_8..Q_51.BRoaged ift pl!bllo_ditties.

ull4>

4(11
y1-
to\"PD-\ - ?e.\SQ 0 3 2019
vt>-

CLASS

).(°EXECUTED JmcstingtheAccusedmimed"" above J!.r._Y:

\"wcitd--"." ,,, 'v JJ.-
JH}'oo F

LJ.. dl-•Anesting Officer

r.1homulem

c>mued, ...::-.:::-lbomdproboblc

sworn statcmeotsof believe that **the** the offense

9.'-'-.JJNCAN. T 1668·ACPD _____,Complainant. • 1·i;r'Alf(T AND BAHIR ON LAW ENFORCEMENT OFFICER

CCRE/Fingerprinting Required

9 Q liLOS·lII">M. Offense TrackiDg Number:
DATBANDTIMB ISSVED 013GM1900011177

FORM00-312(MASTER,PAGEONBOFTWO)lOl13

---

20l!l: OK ZB QI g:l

CASE NO. C\q- '3,4Y{

A kjf

..!>.E.t.QARDO
LASTNAMl,FIRST NAMB,MIDDLENAME

.L433.S..Ras.etmeJ:t_
ADDIIJISSILOCAnON

filb!...er..Sp..ng.g _ MDJ9=90=6'-----

COMPLEIB DATA BELOW IF
RA CltSEX BOJOIN III wot.
MD. DAY YR. PT. Df. EYES HAIR
B M 1994 6' 01" 1170 BRO BLK
SSN

D.Ld STATE

[ ] Commercial Driver's License

Beat fDg Date mme
1ho/ts
t:e9

I &.-11!!

IJoM) I-

CJC\:}."Ÿ11
/d':t.r
/0,.I" IC1'
11ff}g

MI'£·IA»y,l..o

DAJBl'DmfBOFSIIR.VICII

BADGSNO,AOIINCYANDJURISDICTION

SHERIFF

torney for the Accused;
Tyler Chrestins

Offense Description (not a legal definition):

FELONY

1- em;; Y! J

## WAIVER OF PRELIMINARY HEARING

Undersranding my right to a preliminmry hearing before the Court named in this warrant to determine whether them is probable cause to believe that I committed a felony AND, having the consequences of my wmver c ained to me by the Judge of this Court, I ncvatheless WAIVE MY RIGHT TO.A PRELIMINARY HEARING oo the felony chlllpd in this wamnt. Certified to the Circuit Court of this jurisdiction.

_____    " ""........ ."" DA11!
MXUSaJ

_____

[ ] Tho Ac:coaed named wnthin was brought before me or appeared this day, and upon hearing the cvidence, I order the case catified to lhc grand jury of this jurisdiction, at its next mm dale, having found pn,bable cause to believe that the Accused committed the felony charged in this wanant.

[ ] Bail on certification $ ........_......._...................

( ) I ORDER lhe accused disdwged at prelimillmy hearing and the charge Is dismissed.

.........|........ ....... .........
.........|. ....... .........

\<f PROSIICIffING        I'RliSENT(HAMI:)

.P("'   ...\TTORNIIYPOSmfT (NAMII)
..- ..- -.. . TT'No-:JffOMBY".. IJ °A1TORNEY WAM!D

[ J Jntap.leta pmscnt    ( J Witnesses sworn
[ ) Certified pursuant to§ 19..2-190.1.
Plea of Accused: ( ) not guilty  [ ) guilty  [ J no!o contend=
{ ] Plea voluntarily and intelligently entend after the defendant was apprised of bis light against compulsory self-incrimination and huugltt to confnJat die witnesses .bim.
[ ] Plea and Recommendation
And was TRIED and FOUND by me:
[ ) not guilty    [ J  goilty as charged
[ J guilty of....    ................._........_  .......
VCC ...."---"-"--".    .",.."" _...    __---.
[ ) facts sufficient to find guilt but defa-acljudjcatiOD/ d1&position to ...- ...-".
DATBANB-TIM!I
and pJace accused on probalicm. H 4.1-30S. 18.2-57.3, 18,.2-2S1 or 19..2-303.2
( J A separate order fur FD3t Off=der is auachod and iDcoJporated in this order.

DAD
And was FOUND by me to  be: [ ] cauying bazardous materials
( ) ddving a c:oduunv:tal motor vehicle

lq-lORDER a nolle prosequi on die pn,secudon's motion
[ J I ORDER the cbarr-dismissed  [ 1 with prejudice
[ ) conditioned upon paymmt of costs and
( ] succcssf1ll complclion of[ ] traf8c: school
[ ] 1D8lme driver school, § 16.1-69.48:1.
( ] aa:mdand satisfacdon, §19.2-151.
[ ) under§§ 4.MOS, 18.2-57.3.18.2·251 or 19.2-303.2.
"FORM DC-312-(MAST!!R.PAGBTWO OPTW0)07n9

---

[ J   Guilty- upon a violation of a[erJD or condition of a deferred adjudication/disposition.
I impose the following Disposition:
[ ] FINB of$ ........................ ....with $ ....-.........................suspended
[ ] JAIL SBNTBNCB of .....................- ...............................imposed,
( ) of which ......-,......_____days mandatory miDbnum, with
.----'..".----"-.-----.......- suspended fora period of .............................. condicioned apon being of good behavior, keeping the F,8Ce. obeying this order and paying fines and costs. Cffilit is allowed pursuant to §S3.1-187 for time spent in confinement.
[ ) Serve jail sentence beginning ....._ ...........................__........".....
( ) od weekends only
[ ] Worlcn:!ease  ( ) amborizll:d if eligible    [ ) requin,d
[ 1             J-.µot - - - -
Public work force[ 1 mrthorized  [ J not authorized
[ 1 odPROBATION fur ........................ ..............-  ...- ..... ..
( ).VASAP  ( J local community-baKd probation agency
( ) t.lonitering by OPS/other uacking device
DRIVER'S UCENSB mapended for - ..............-   ...- .....
[ :] Resuicted Driver"s Uceme per allll:hcd onfa
[ 1 Iimftion interlock for ._._..........................._............
[ ] RESTITUTtON Older incorporated
[.1 COMMUNITY SERVICE ............ hOUS to be completed by ...-.......-........."._and supervised by ...". ...____
( ) eobeCRdited against fines and costs
[ ] Contact prolnmted betweeu defendant and victimlvic:cim•s family or household manbas
[ ] Reimburse CommonM8ltb for investigatory medical fees
[ J Pay $50 feeto the Court for Trauma Center Fund
[ ] Other--...-" .................--   .......-- ...................".........

· C J   Submit to FINOBRPRINTING and photograph per8lltadicd onit:t
[ J  Remanded for[ 1 FINOBRPRINTINCK.'CRERepon
[ 1 ..........._....-...  .-_".·_-...    ...........
( ) DNA order incmporated
I J Bail on Appeal S----·..". ....-........
j.... "1.,1, I
DA11!         JUDQII

---

Offense Tracking N mber: .. : !1.Q?-J]iQ99.}J..Q)t..,;...
P.rellminary'Heario11asts    "6 :. "•· · L

| | |
|---|---|
| 120 Ct. Appt. Atty | $ ........................t .._ |
| 113 Coan Reporter | ..."----·--·-·--·..••..--.... |
| 113WJtmss | |
| **TOTAL** | |
| **FINE** | |
| **COSTS** | |
| **461 FIXEDMISDFEB** | |
| **462 FIXED DRUG MISD FEB** | |
| **001 INT CRIM CHILD FEB** | |
| **113 Wl'INBSS FBB** | |
| **113 IONl'IION INTERLOCK** | |
| **113 DUIFBE** | |
| 113 ...............· ............................. | |
| **120 er. AWr. A'ITY** | |
| **121 TRIAL IN ABSENCE FEB** | |
| **US-WBIGHIN&FBB-·** | ............-. i.n.r.-... |
| **133 BLOOD TEST FBB** | |
| **137 TIMBTOPAY** | |
| **192 TRAUMA CBNTBR FEB** | |
| **228 COtnmlOUSB CONS'IRUCIION FEE** | ............"-....."-- |
| **234 JAB.. ADMISSION FEE** | |
| **243 LOCALTRAINING ACADEMYFI3B** | |
| **244 COUlmiOUSB FEB SECURDY** | |
| OTBBR(SPBCFY) | |
| ...... .·_ | |
| **TOTAL** | $ __ ...............· .............. |
| [ J Slay ofdieproc:eedingspanaantto§16.1-131.1 | |

DATB         JUDml

ARUNITTON COUNTY GENERAL OISTIUCTCOUltr

I,the undusi Clerk or Deputy Oerk of lhe
abovenan1eocoun,au111.en11calcpiÛSl:allt10Va.Code
8.01-391 (q  on1hisdl!le tlla:thedocument lowhich this
authc:nticationisaflixedisatniecopy of arecordin  the .
abovpn!71edcoutt,madeinpi; y duties.
DATE  7fc'7'              l'fl l
                    Clerk/Deputy Clerk

GENERAL DISTRICT COURT ONLINE CASE IN. .MATION SYSTEM

### Arlington General District Court

QO

## Traffic/Criminal Case Details

### Case/Defendant Information

| | | |
|---|---|---|
| Arlington General District @fi | c.,.icuiiiii.: Gfi!ioo3464-00 | F11oiiosi:i9J2oi9 Data: | Locality : COMMONWEALTH OF VA |
| | Name: FRANKLIN, OaGARDO; II | 51atus: Released On Recognizance | Dction11<1 Attorney : CHRISTIANS, TYLER |
| Name Search | Addniu: SILVER SPRING, MD 20906 | AKA1: | |
| Case Number Search | Gonde-r: Male | Race: Black | DOB ****  |
| Hearing Date Search | | | |
| Service/Process Sei'Irch | | | |

### Ch11rve Information

| | |
|---|---|
| Charga 1 ASSLT: ON IAW ENF/DOC PERSON | |
| Codo Section: 18,2-57 | caso Typ,o Felony | aou:6 |
| oif.••••c.j._oahii/i<iig- | Affbitcai.,oiihiihoii>• | Compl11nant : OfiiDUNCAN, /._ |
| Amandad Chorgo : ASSAULT&. BATTERY | Amended Coda: 18.2-57 | Amaldeci case Type : Mi idemeanor |

Name Search
Case Number Search
Hearing Date search
Service/Process Search

### Hearing Information

| 1.....2019 | Time | Resuti | Hearing Type | courtroo m | Plea | continuance COde |
|---|---|---|---|---|---|---|
| | 09:00 AM | continued | Arraignment | 3B | | |
| 8/30/2019 | 09:00 AM | Continued | Arraignment | 38 | | |
| 9/03/2019 | 09:00 AM | Continued | Bond | 38 | | |
| 9/27/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 10/11/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 10/25/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 12/06/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 1/24/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| 3/13/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| 03/27/2020 | 10:00 AM | Continued | Review Progress | 3B | | |
| 04/17/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| 06/26/2020 | 10:00 AM | continued | Review Progress | 38 | | |
| 8/18/2020 | 11:30AM | Continued | Preliminary | 38 | | |
| 11/10/2020 | 10:30 AM | Continued | Adjudicatory | 38 | | |
| 11/04/2020 | 10:00 AM | Continued | Motion | 38 | | |
| 2/11/2021 | 10:30 AH | Continued | Adjudicatory | 38 | | |
| 5/04/2021 | 02:00 PM | fCnatized | Disposition | JSR | | |

### Service/Process

### Disposition Information

| | | | |
|---|---|---|---|
| Fln□l LD1Ino1Ilton: Nolle Prosequi | | | |
| Sentence Timlt: OOMonlhs OOODays OOHours | Sentence S11?porola: OOMonth's-ooooays..ooHo-u-rs** TimCff: | | |
| Probation Ypo: | Probation Tim: OOVeors OOMonths OOODays | | Probatlan Start■: |
| OporDtor Licen10 00Years OOMonths OOODays Sv1pan1on Timo: | Restrict1on EHC!fctllvc Da1o: | .c. | |
| Operator License Restriction Codes : | | | |
| Fino: | | | Flna/eo.t. Dua : |
| Flna/Colts Paid : | FlnCl/Con& Pald Data : | | VASAP: |

!Back II> SBllrCh Results!

Home I Virginia's court System I Online Services I case Status and Information I Court Administration I Dltector1es I Forms I Judicial Brar.en Agencies I Programs

Buld #: 6.1 2 3

**,"  • R1lANTOF ARREST - li'li'.T** (t/lt.'4;v{,

_,- NWZ'....A'Lni.OFYIRG1NIA   Vo.Code§ 19.2-71,  ..,. ..

2019 - 08 861 8 7

CASENO.  Gc\t.t - ::;4c,_,5

Min..Jmm...                                     ]  General District Court  [x] C:rimina1  [ ] Traffic
CHYORCOUNTY                                   []Juvenile and Domestic Relations District Court

ACCUSED:

E. .DJil.iYABl)..Q_____ _
LASTNAMl|PIRSTNAME,MIDDLBNAME

.143.3.S..Ra§.ette.LCL
MmfU!SSIL.QCAUON

.5.ilY....MIU.9..2..Q.6    "

al;sol,eii  t-rrr
HearlngDaWlbne

10(i, /rct  5T'4-1

TO ANY AUTHORIZBD OFFICER:

•   You are hereby  commanded  in the name ofthe CommonweaJtb ofVirginia forthwith to arrest and
bring the Accused before this Court 10  answer the chmge that1he Accused, within this city or coun1;y,
on or about  D.Bll.8QJU9_____ did unlawfuDy aJld feJoniously in violation ofSection
1.8,1;5.'Z_____

rcD DUNCAN..fcne"riAg.Qf baviAg reaaeA ta l1111H1 It.8T .....I.J  'i' nl u-

COMPLBI'BDATABELOWIFxm.wH

| RACH | swt | DO | Ur. | War. | EYES | HAIR |
|---|---|---|---|---|---|---|
| B | |M | MO  DAY  YB.  Fr. DI. 1994 6' 01" 1170 | | 320 | BLK |
| | SSN | | | | | |

loltshoa

Clf1 1\t'l

assautt anc1 batter
officer. 11& defiRed institisection  EOf§18 2-S:Z. Siifigdcd ill ptmllc d  mtes

Cl.mmm..w nm.... Lirmlo

CLASS  ck:                  17141 YfiNY  ·

EXBG';'Tm>by-
e.boyef'!7i]'j';

0  0J1 9.     1 1z z

.;.c'._ub,, t) DATBANDTIMEOFSI!IMCB  ,Am:stmg0fficer

Jt.lE  f    O   Q
BADODNO.MDINCYANDJUBJSDICnON

for-- · ----------- · --- ·
SBmlJRI

Attomey for the Accused:

< J:..c

<.alJ. 19.O
d. 11       1/4
"_f I

ti 10 2..- LJ -

,o•,  c

I, the undersigned. have foUlld probable cause to believe that the Accused committed 1he offense
charged, on the swom statemeots of

QFF  p pN,.T !. 8   ACP.P """·___.___ --·--..·---•Complamao.t.

Short Offense Descrh tioa (mrt a lee,al defioiting)•
I ASSAULT ANDBATIER ON LAW ENFORCEMENT OFFICEl5

CCRE/Flngerprlntlng Required

.QBLZ.8/2019  OS:IUM
DATB ANDTDdBJSSUED

Dnha EI-Qaesny

0ffease Tracking Number:
013GM1900011176

IOllADMINIBI'RA11VBDSBONLY
VuginiaCrimeCode: ASL-134

FELONY

SCANNED

f0llM DC-311(MASIER,I'AGl'ONBOPTWO) 10fl3

**WAIVER OF PRELIMINARY BEARING**

Under.dandiDg my right to a prellminary hearing before the Court named in lhis wanant to detennioe whether there is probable cause to believe1h2t I committed a felony AND, having the consequences cf my waiver e.itplaincd to me by the Judge of this Coart,'l ncvenheless WAIVE MY RIGHI TO A PRELIMINARY HEARING on the felony charged in tbis wrnant Cedified to die Cin:uit Conn of this jurisdiction.

| ACICUSED | DATB |
|---|---|

| ATToNI?Y PO1A0CIJSI!D | MIIGII |

Offense Traclrdng Number: ............9..\ \JI2OOOll w:. >

Prellmlnary Bearing Cciil

| | |
|---|---|
| 120 Ct. Appt. Atty | $ ..............:. ......... |
| 113 **Court Jteporte1'** | |
| 113 W11nm | |
| | |
| **TOTAL** | |

[ J The Accused named wilhin was brought before me or appeared this day, and upon hearing1be evidence, I order the case cemfied to the grand jury of this jurisdiction. at its next tam date. having found probable cause to believe that the Accused committed the felony charged in this wmrant.

·.LJ  BBQ110  certification $  ......._.  ..................

·.[ ] I ORDER 1he accused discbarged at preliminary hearing and the charge is disnrisv:d

[ ] 1be duuge was reduced to ...............................................

The Accused was this day: ( ] med ill absence  l)t1in:sent

PIICIS!!CU1DIGATmRNBYflBSIDffOIAMIll

1\,r""'"DI!R!NDAH1'SA'ITO1nNBY PRIS!!lff(NAMIQ

.... Y.11 ....  L) · ..  .TT ATmRNEYWA1VED
[ ] IDtaprct.er present    [ ) Witnesses .....
■ d ified punrmnt1os 192-190.1.
Plea of Accused:. [ ] not gniltJ  [ ] guilty   [ ] nolo contcndctc
    [ ] Pica volwuarily and intdligeudy C1l tcled after the defendant was apprised of his light against compulsoJy self-incrimination and bis right to confront the **wim** against birn.
[ ] Pica and lucommendatim1.

And was TRIBD and FOUND by me:
( ) not guilty    [ ]     guilty as cbargcd
[ J guilty of ...............................................
    VCC ........". .........". .............i..-....
( ) facts sufficient to find'gailti>Dt defer adjudication/

ctisposilioo  _ _ _ _ _ _ _ _ _

811d place accused OD probasioo, §§ 4.l-30S, 18.2-S7.3, 18.2-251 or 19.2-303.2.
    [ ] A sepandCorder for First Offender is attached and intotporated in this order.

And was FOUND by me to be: [ J canying bazardoua materials
    [ J  drM11gacommerdalmotorwllicle
OR DBR anolle proscqul on 1be pn,sec:ution's motion
[ ] I ORDBR theclwge dismissed [ J with prejudice
    [ J condidoncd apon payment of costs and
        [ J  succesaful completion of [ ) traffic school
            ( ) rnalllledr1'VCl'school. §16.1-69.48:1.
        l J accord and Slllisfaclion. t 19.2-tsl.
        C J  mim::r H  4.1-305, 18.2-S7.3, 18.2-251 or 19.2-303.2.
FORMDC-312 c,IAS'11Dt. PAGBl WO OPTWO) tl1n9 •

( ) Ouilty- upon a violation of a term or condition of a deferred adjndication/disposilion.

1 impose the following Disposition:
( 1   PINBof$ .........................-.with$ .........................- .... suspended
[ )   JAIL SENTENCE of .....................................,, ......imposed.
        [ ] of which ...............................days mandatory rnirrirnom. with
            ............................................................ suspended for a period
            of.............................. conditioned upon being of good behavior.
keeping the peace, obeying this on!er and paying fines and 00Sts.
Credit is allowed pUISUalll to § 53.1-187 for time spent inconfinement.
[ J  Serve jail seotenco beginning .........................................................
        [ ] on weekends only
[ ] Work release [ ] authorized if eligt'l,!e     ( ) JCqUired
[ J  Public work foms[ J authorized [ ) not aulhorized' .......  ·
[ J  OD PROBATION for ...........  "''""""'  ..........
        [ J V.ASAP  [ ] local OOIllIllIIllIity probation agency
        [ ] Mdiutoring by OPS/other tracking dcvkic
    J DRIVBR.'S UCBNSB suspended for----------------------- —
        Rcscrictcd Driver's License per aaachcd order
        [ ) Ignition interlock for.... ....--.--...-......"""'''...........__.-......
( J•• RP.S'lTI'UTION order mc:o.tpOI1ltCd
·c·) CO        SBR. VICB.-- hems to be **completed**
    • by ...........". .........". ...........i..-... and supervised by ----.........----
        [ ·J -to be credited against fines and costs
[ J Contact prohll>ited between defendant and viclimlvictim's family or household members
( J Reimbume Commonwealth for iJlvesligatory medical fees
[ ) Pay $SO fee to die Court for l'ramaa Centa- Fund
( ] Olier_.-.................................................

[ ] Submit to PINGGERFRIN'I"DllOand photograph per attached orda-

[ J Remanded to ( [JFING... BRPRIN1'ING/CCRB Report
[ I DNA order incorporated—
[ ) BallonAppeal $ .. __...........................''._ ..........

5° .., '1:L· f ....... C7l-
D,;111                              J1lDCIll

FINE
COSTS
461 FIXBD MJSD PBB
462 FIXED DRUG MISD FBB
001 INTCRIMCHiiDFEB
113 Wll'NBSS FBB
113 IGNI110N INTBRLOCK
113DUIFEB
113 •..-.•-••.-••..-.•-
120 cr.APPT.AT!Y
Ul  TRIAL IN ABSENCE FEB
125·.-WBIGHmG·FEB .
133 BLOOl>11!ST JIBE
13'7 TIMBTOPAY
192 TRAUMA CBNTER. FEB
228 COUR1HOUSB CONSTRUCTION FEB
234 JAIL ADMISSION FEB
243 LOCALTRAININO ACADBMYFEB
244 COURTHOUSE SECURITYFEB

OTIIER(SPBCIFY)

•.-.---.-

| **TOTAL** | $ .......................-.....-.............. |
|---|---|

[ J  S18)'Of the pro«:eedings pursuant to f 16.1-131.1

DATB                              JUI)GB

ARUNGtaN couNtv GENf!lIAL msm1t.Ti;;t>uitf

I.•hr -111<'tP7Ili1111 t::leitorllopul)'Clarko(the
,ibov• .1amet. cour,. 1ul!1enucatt ount?anl tn Vn.Code
,:.111-WJ 1C101,!h11rt!!te lha tht •Jocwnem ,o,. l\n:1' this
,utneP.l:retior ,s1im:en is a *uut* :op\ ft1 a recora in thr.
uame<.couro, ;taot'. di peffl!rm&llCt;ollllll' ofllaatdutics.

*t  7/ 1*  a.

USCA4 Appeal: 24-1359    Doc: 17    Filed: 05/23/2024    Pg: 138 of 204
Case 1:22cv-00164-MSN-WEF Document 21    Filed 08/04/2022 Page 5 of 8    PageID# 366

10/14/21, 2:35 AM                    GENERAL DISTRICT COURT ONLINE CASE INFORMATION SYSTEM

Arlington General District Court                    *QO**

## Traffic/Criminal Case Details*

### case/Defendant Information

| | |
|---|---|
| rlington General District **ffll** | |

**Number :** GC19003465-00 | **Filed** 08/29/2019 D,atc: | Loiotliv : coi-li-loiiweAi.rHOFVA

**Namo:** FRANKUN, DELGARDO; II | **Status :** Released On Recognizance | **oeAttomey:** CHRISTIANS, TYLER

**Addrus:** SILVER SPRING, HD 20906 | **AKA1:** | **AKA2:**

**Gender :** Male | **Ib,ce •** Black | **DOB :** ████ ****

Nome Seilrch
Case Number Search
Henring Date Search
Servic /Process Search

### Charge [Information

**ChoffIO:** ASSLT: ON LAW ENF/DOC PERSOIII

**Codo Section :** 18.2-57 | **coso Type :** Felony | **Clau:** 6

N*me Se11rch
Case Number Search
Hoarfng Dato Search
Service/Process Search

oiion** oac.; .'osiia/ioi9 | iiita,oe12a121119 | **Complainant:** OFF DUIIICAN, T

**Amondod 01orgo :** ASSAULT& BATTERY | **Amandal Codo:** 18,2-57 | **Amended CHc Type:** Misdemeanor

### Hearing Information

| Data | nme | Result | Hearing Type | Courtroom | Pica | Continuance COde |
|---|---|---|---|---|---|---|
| 08/29/2019 | 09:00 AH | Continued | Arraignment | 3B | | |
| 08/30/2019 | 09:00 AH | Continued | Arraignment | 3B | | |
| 09/03/2019 | 09:00 AH | Continued | Bond | 3B | | |
| 9/27/2019 | 10:00 AH | Continued | Review Progress | 3B | | |
| 10/11/2019 | 10:00 AH | Continued | Review Progress | JB | | |
| 10/25/2019 | 10:00 AH | Continued | Review Progress | 3B | | |
| 12/06/2019 | 10:00 AH | Continued | **Review Progress** | 38 | | |
| 1/24/2020 | **10:00 AH** | Continued | Review Progress | 38 | | |
| 3/13/2020 | 10:00 AH | Continued | Review Progress | 38 | | |
| 3/27/2020 | 10:00 AH | Continued | Review Progress | 3B | | |
| 4/17/2020 | 10:00 AH | Continued | Review Progress | 3B | | |
| 6/26/2020 | 10:00 AM | Continued | Review Progress | 3B | | |
| 8/18/2020 | 11:30 AM | Continued | Preliminary | 3B | | |
| 11/10/2020 | 10:30 AH | Continued | Adjudicatory | 3B | | |
| 11/04/2020 | 10:00 AM | Continued | Motion | 3B | | |
| 2/11/2021 | **10:30 AM** | **Continued** | Adjudicatory | 38 | | |
| 5/04/2021 | 02:00 PH | Finalized | Disposition | JSR | | |

### Sarvica/Process

### Disposition Information

Fina( DIIPalllun : _Nolle Prosequi_ •• •

~~santcince Time : OOMonths OOOOays oOHDIJrs~ | **sentence S01p;f f:** OOMonths DOOOays DOI-lours

**Probation Typa :** | **Prob-ellon Tim:** OOYears OOMonths DOODays | **Probation Starts :**

Operator UcenH OOYears 00Months 0b0Oays• | Restriction effccttva Dato :
Suspension Timo :
—— Operator Uccrii.ii²*-
Ratrktlon COdcs ;
·  ·  ·  ·    ftno; | **Cosb:** | **Fine/Costs Due :**

**Fine/Costs Paid :** | fine/Costs P.ald Dato : |

**!Bad< to Search Refills**

Home I Virginia's Court System I Online Services I Case Status and Inlarmation I Court Administration I Directories I Forms I Judicial Brar.en Agencies I Pr09rans

Bcdd 4: 6.1.Z.3

https://eapps.courts.state.va.us/gdcourts/criminalDetail.do?fonnAction=newSearch?ts=1634193288964&clientSearchCounter-=4&localFipsCode=013        1/1

2019-08280183

**WARRANT OF ARREST- FE** ;vtc. ,/

COM nib HRGJ)l1A   Va.Code§ l'J:Z-71 ,r

CASE No. Get -34

-4.

(r)General District Court ] Criminal [ ] Tmffic
At '----------------M--M--- [ ]Juvenile and Domestic Relations Dis1ricl Court
Q1Y ORCOUNIY

A<llJSl!D:

EMHKLIM. I> ». L.9. AlmQ----- -
LAST NAMB, PIRST NAMB, MIDDLS NAMB

.1..433.S. Ct---- -
ADml ESSI LOCATION

Silv MD 29..2!).fi...

TO ANY AUTIIORIZED OFFICER:
You are hereby commanded in the name of the Commonwealth of VirgiDia forthwith to auest and bring the Accused before 1his Comt to amwer the cbiuge that the Accused, within this city or c:ounty, on or about D.8.I'-.812919   M------ did unlawfully aud feloniously in violation of Section

1.8.J=5.7-:;m-e:r+-... ----------------------------- Code of Vuginia,
assault and — i'8 lojuwl .g oJl:aulxq Paa&BR 1Gkaou:lha.l . _ as rrferue111e11t office...
as defined lo s.d>sedioo Eof i;18.2r57. 9Agagad In-plibile dtltie9;   I '3 J./1,0

g (JAltcc ltfr
Bearfng Dat & Tlme

\C> u q SiM
Iolis l"l SNNj

ttk9
C 3'.) f d
1

RACB SBX   MO. DAY YL PT. IN.
B M   /1994 6 01" 1170 ... BLK

Cammen:lalDmc,'sLirmsc

t=========-===1to 20

GLASS f.i,.   FE   .%'h'il:'E4:
bf BXECUTEl>byc::igthc ed   --
Tlz"in   nv   ..1t..tl.l-1u'..
:.,\.,\:i..,
.Am:mng Officer

I.t.t3 ·- /CPJ) ctx2
IIADGENO ,AOENCY AND JURISDjC]ION

for------ ""
SH!IRD'JI

Attomey for the Accused:

I, the undmigned, have found probable cause to believe that the Accused committed the offense charged, based on the swom statements of

OFF' DUNCAN T 1668 ACPD ---------------"...O_____ Comp.lainant.

CCRE/Fingerprintlng Required

OS:18RM=---
DAIBAND TIMBJSSUED

Dwia EI-Qacsny

Shmt Offense Descri'Dion(11Otaleagal definition).
ASSAULT AND BATTER ON WENFORCEENT OFFICEI

Offense Tmckmg Number:
013.GM1900011178

fOB.ADMINISIRA11VBUSBONI X
Vuginia Crime Code: ASL-1342-F_&

FELONY

SCANNED

l'OJtM Jt1(MASTER.PAGBONEOPTWO) 10/1!

## ::.WAIVER OF PRELIMINARY BEARING

Understanding my right to a preliminary hearing befo the Court named in this wanant to determine whether there is probable cause to believe that I **00mmitted** a felony AND, having the 000sequences of my waiver explained to me by the Judge of this Court, I nevertheless . AIVB**MY RIGHT TO A PREUMINARY IIEARINO** on the felony charged in this wammL Certified to the Circuit Court of this jurisdic:tion.

| Offense Tnc ng Number. | Jtl 2M.!9®0l1t-,8 - |
|---|---|
| | **Preliminary B**    Costs |
| 120  Ct. Appt. Atty | $ _....._ : _ .....·.....· |
| 113 Comt Reporter | |
| 113 WItness | |
| **TOTAL** | |

Aa:usJ!D                                      DATE

FINE

COSTS

[ ] The   named within was brought before me or appeared lbis day, and upon hearing the evidence. I order the case cc:nificd to the **grandjUJy** of this jmisdiction. at its next term date, having fOUlld _probable., WSE 1p believe lhal lhe Accused the fel:ony c:barged in **dus** Wllffil.lt.

•,·r. .J. lcm.c:11:rti.fication$ -------------- ..,....

[ ] I ORDER.the accused discharged at preliminary hearing and the charge is dismissed.

[ ] lbe   c:bmge was reduced to ------ :-------;------.
The Accused was this day: [ ] Cried in absence   present

**ti<("** PltmECUONOATTOIUIEY PRESINT(NAMI!)

(:;)(" DllFl!HDANr'S ATJOll:-mY PWlNJ(NAMll)
  -····""NU"ATrORNBY- TT :ATIORNBY WAIVED  - ... -·

[ ] Intaprcter present    [J  W-rtncsses sworn
[ ] Certified pursuant to § 19.2-190.1.
Pica of Accused: [ ] not guilty   [ ] guilty   [Jno1o contende:rc

[ J  Plea volmltuily and Intelligently entered after the defendant was apprised of his **rightco** f-incrimiDalion and iis right to o0 the witncs.Bes agams him.

[ ] Plea and Rec:ommcndation
And was TRIBD and FOUND byme:
[ ] not guilty    [ J   guilty as c:1 large4
[ J  guilty of ........,...... ·------------..........-:..... • •
      VCC ...........---.... ''':-:.......... " ..·----..... " "'".,....
[ J  facts sufficient to find guilt but defer adjudication/ disposition to ........_____
                              1BAND11M11
and place accused on probation, H 4.1-305, 18.2-573, 18.2-251 or 19.1w303.2.
[ ' ] A separate <mia· for First Offendm- Is attached and incoJponttm in this order.

DA111                              JUIIGII
And was POUND by me to be: ( Jcarrying hazardous nweria.ls
-··J·.L Ying ac:ommen:ia1 motor vehicle
**B R** -aolle proseqai on the posecution's molion
[ J'l ORDER the c:Jwgc **dismissed** [ J with prejudice
[ J   c:ndilioncd upon payment of costs and
  [ 9  successful completion of [ '] traffic school
      [ ] ma111le driver sdlool. 116.1-69.48:1.
      (]  accmdandsatisfaction,§ 19.2-151.
      [ ] under§§ 4.1-305, 18.lw57.3, 18.lw251 or 19.2-303.2.
PORM DC-312 (MAS1ER. PAOl!1WO OP'IWO)tnn9

[ J  Guilty- upon a violation of a term or condition of a de.femd adjudication/disposition.

I impose the following Disposition:

[ ] FINB of$ ......- .....- ....------with$ ."..- ...------------suspended
( ) JAIL SENTENCB of ---------------------- imposed,
      [ ] of which ------------···.... days mandaroly **o.inimmn**, with ......_,...._.....-........ [••J--noi-authorizecl.. suspended for a **period**
      of -------------•conditioned upon being of good behavior, keeping the peace. obeying this ordez and paying fines and cosis. Credit is allowed punuant to § 53.1-187 for time spent in confinement.
( )  Save jail sentence beginning _____
      ( ] weeke.nds only
[ l  Work release  [ ] IID1homcd if eligible    [ ] required
  • •.........• ...[•J--noi-authorizecl..---------------
[ J  Public: work force( J authorized  [ J not Blltho.riz.cd
[ ]  on PROBATION for ..........._____:...
      ( ) VASAP   [ ] local commuaity-bascd probalion agency
      [ ]  Mbnltorlng by GPS/odlu tndcing device
[ ]  D.RIVBR 'S UCENSB suspended for ----------- ..·------...---
      [ ' ] Restricted Daver's License per attached oJdcr
  \.    ([  \]pition Jntr:doct for _____
[ ]  RFSITIUl'ION order mcorporatl:d
[ ' ] CX>MMUNITY SBR.VICB ,.........hours to be complctccl by ...... .-------... and supervised by ........-· ..·------.........,
  · [ ] to be credimi against fines and costs
( ]  Contact probibi1cd between defecanl and vidim/vii:tim's family or household members
[ ]  Reimhmse Commonwealth for invesdgatOJy medical fees
( J  Pay $SO fee to the Court for Trauma Center Pund
[ J  Other-----.-----..·----- ..,......_____,

[ J  Submit to FINGBRPRINTINOand photograph pel'aauhed Older
[ l  Remanded for[ J PINGBRPRINTINGICCRBRq.ort
      [ ] ------------.-----..·------- .-----.-
[ J  DNA cmlcr incotparated
[ J  Bail OD Appeal $ •------.-•...-.••.--------..•.•------.---.
  _l   t?.....-z._ l                ?--
      DA111                        nmcrm

FINE

COSTS

461 FIXEDMISDFBB

462 PJXBD DRUG MISD FBB

001  INT CRIM amD    FEB
113  WITNESS FBB
113  IGNITION INTBRLOCK
113 DUIFBB
11.3 .—

120   CT. APPi'. ATT'i
121  TRIAL IN ABSENCE FBE
• 12S""WBIGHIKGR'!lt ·---
133  BLOOD'IESTFBE
137  TIMBTOPAY
192  'IRAUMA CENTER FEB
228  CX>UR 4110HSR
      CONSTRUCHON PBB

234   JAIL ADMISSION FEB
243  LOCALTRAINJNO
      ACADBMYPEB
244  CX>UR'IHOUSE
      SBCURI'IY PEB

OTHER (SPECIFY)

TOTAL        $ ...._____

[ ] SCavoftbeproceNtingspursaantto I 16.1-131.l

DA111                    MIGB

A;    - C Ul'IT-Y(-il3;E <ICTCOURT

I, thellndcuigned Clerk or.0eputr Or:rk of the
11bovellanteocourt,authenticate pursuant to Va.Code
8.01-391 (C)onlhisd:ite that thedoalment towhich this
authenticationisaffixed isa truecopyof aretold in the
abl>v ed    coun, rr,ade in periormaaceof myofficial duties.
!fi7/,;l

DATE        ':Ir      ty

USCA4 Appeal: 24-1359   Doc: 17   Filed: 05/23/2024   Pg: 143 of 204
Case 1:23-cv-01409-WEF Document 121-2 Filed 03/05/24 Page 5 of 68 PageID# 370

10/14/21, 2:35 AM

GENERAL DISTRICT COURT ONLINE CASE II'    .MATION SYSTEM

Arlington General District Court

**QO**

## Traffic/Criminal Case Details

**Sington General District |**

**Cas./Offendant Information**
- **6ioeiiumber:** GC19003466-00
- c— N-m-•-FRA N K U N -D-E-I G A R D O - I l

**Name Search**
**C.-a1,: Number Search**
**Hearing Date Search**
Ser\ite/Pt-ocess Sear-ch

Addrau: SILVER SPRING, MD 20906
Gender : Male

**pFiled** 08/29/2019
-s- .--Rel-sa-s-ed_O_n_R_ec_og_n_izance
AKAi:
Raeo - Black
J

Locality: COMMCINWEALTHOF VA
-Def..,.. Attorney, CHRJSTIANS, IYLER.

AKA 2:
**DOS**

**Charge Information**

Cho,va - ASSLT: ON LAW ENF/DOC PERSON

**Neuna S0;1rch**
**Case Number Search**
**Heating Date Search**
Service/Process Search

code Sectio,n 18.2·57
- """""oii,ie osJ2s/:ioiii
' Amended Ch-rv- : ASSAULT & BATTERY

caso Type : Felony
""""" ...........08/28/20 i9
Amended Cede, 18.2·57

CIIHS:6
Complahanr: 'OFF'OUNCA' j,- T.
Amended Case Type : Misdemeanor

**Hearing Information**

| IDfIto | Time, | Result | H9rIngTYpe | courtroom | Plea | ConIInuancc, Cocle |
|---|---|---|---|---|---|---|
| /29/2019 | 09:00 AM | Continued | Arraignment | 38 | | |
| iOS/30/2019 | 09:00 AM | Continued | Arraignment | 3B | | |
| [09/03/2019 | 09:00 AM | Continued | Bond | 38 | | |
| '09/27/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 10/11/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 10/25/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| 12/06/2019 | 10:00 AM | Continued | Review Progress | 38 | | |
| rl/24/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| 3/13/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| 3/27/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| "4/17/2020 | 10:00 AM | Continued | Review Progress | 38 | | |
| p6l26/2020 | 10:00 AM | Continued | Review Progress | 3B | | |
| fS/18/2020 | 11:30AM | Continued | Preliminary | 38 | | |
| jl/10/2020 | 10:30 AM | Continu·d | Adjudicatory | 38 | | |
| 111/04/2020 | 10:00 AM | Continued | Motion | 38 | | |
| 102/11/2021 | 10:30 AM | Continued | Adjudicatory | 38 | | |
| ps,04l2021 | 02:00 PM | Finalized | Disposition | JSR | | |

**Service/Process**

**Disposition Information**

Anal Dispos.ition : Nolle Prosequi

r--sa . ,ch-co Tl m-., O O M o-n_th_s_o o o o--y-s O O H-ou_rs_ --sc- -'_c_e_co S.,--pon-d'ed OO=M o-nths oooDavs oOHours
Time:

| Probation TYpe : | Probation Time : OOYears ODMonths OOODays | Probation Start& : |
|---|---|---|
| Opera.., UCCftsa OOYears OOMonths OOODays Suspon tion Ttmo: | Rast:rid:Ion Iffactlve Date : | |
| Operator Liccriu Aostriction Codas , | | |
| fIno: | ca..,. | Fine/Costs Due <· · |
| fIno/Ccistt: Patd : · | Pinet/Costs Paid Dato: | **VASAP :** |

[Back to Seardl ROSUIIs)

Home I Vt inta,-s Court Sy-Stem I Online Services I case Status and InformaUon I Court Admin:Stration I Directories I Fonns I Judicial Branen Agencies I PrograMs

Build #: 6 1 2 3

https://eapps.courts.state.va.us/gdcourts/criminalDetail.do?formAction::::newSearch?ts::::1634193309268&clienISearchCounter=4&localFipsCode::::013    1/1

**From:**
**Sent**        Monday, July 20, 2020 2:03 PM
**To:**
**Subject:**      RE: Delgardo Franklin 8/18/20

Here is my plea offer, which expires 8/14/20 COB:

Felony APO's against Q • ___ nd ······ amend to mlsd A&B.12 month deferred disposition on each, plea of guilty, finding of guilt.ls withheld; supervised probation with mental health treatment and medication compliance. GGB. To be dismissed if compliant.

Fefony APO against-NP.

**D –**

**Visual**

### Arbitrator 360-AV Viewer- (1)
- 3:28:24 - starts speeding
  - o   this is not the officer's usual car
  - o   3:42:00- "I don't know, I am borrowing this car today."
- 3:28:28- accelerates/ sirens turned on (or the audio just turns on)
- 3:28:55 / 3:29:05 / 3:29:15 / 3:29:51 / 3:30:15 - officer runs a red light
  - o   five red lights ran
- 3:30:35 - arrives to the scene
- 3:31:08 - tackle
- 3:34:47 - EMT walking very casually -wearing gloves but not assisting anyone
- 3:37:30 - another struggle ensues/ an officer fast walks over to help, but once he gets a better look at the situation, he stops and turns around and walks away
  - o   NOTE: whatever this struggle was, the surrounding officers must not have thought it was a situation where they needed to get involved
- 3:40:50- medics start checking out Franklin (takes his blood pressure)
- 3:42:25 - looking in his car for shackles
- 3:55:05 - stands Franklin up and walks him over to the car
  - o   NOTE: rain is covering most of the view, AV (3) has better visual on this

### Arbitrator 360-AV Viewer - 2,9,51,16 (2)
- 3:36:25 - radio - conservative radio (for the entirety of the video)
  - o   Larry O'Connor show/ WMAL / 03:38:03 - talking about ICE detainer

### Arbitrator 360-AV Viewer - (3)
- 3:24:14 - the second police officer arrives
- 2:40:40- one officer talks with Franklin's dad/ one officer is standing with Franklin
- 3:24:49 - Franklin moves his phone away from his face/ stands up from the bench
  - o   this is where the audio begins
- 3:28:00-the TASER is being pointed at Franklin
- 3:30:15 - four officers are now in view
- 3:30:55 / 3:31:03 - the officer on the right of Franklin motions to the female officer to come closer
  - o   NOTE: seems like the tackle was planned - not like one sudden movement by Franklin made the officers react all at once
- 3:31:03 - the back officers begin to move in on Franklin (in the middle of another officer's sentence saying "everything is going to be alright")
- 3:31:08 - tackle
- 3:31:24 - the group hits the ground
- 3:31:39 - an officers elbow raises in the air and goes down in the group
  - o   NOTE: looks like a punch
- 3:32:30- the officers have control of Franklin

1

- o 3:31:09-3:32:30 is how long the "struggle" lasts
  - ▪ one minute, 21seconds
- 3:33:25 - medics arrive and approach Franklin and the officers
- 3:47:37 - officer moves his car to talk with Franklin's dad (changing the view)
- 3:49:01-talking with Franklin's dad
- 3:53:24- the "boss" shows up
- 3:55:09 - the officers stand Franklin up and walks him over to the car
- 3:55:12 - they come into view from the inside of the car
- 3:55:23 - Franklin is resisting, but did not kick and his arms are handcuffed
  - o he is just swaying/ bobbing his head/ two officers are holding him
- 3:56:11- Franklin is secured in the car

**Audio**

**Arbitrator 360 - AV Viewer - 2.9.51.16 (1)**
(tackle)-3:31:08
- 3:31:13 - "stop" (xS)- multiple officers/ "give me your hand" {x2} - female officer
  - o NOTE: the officers sound clam
- 3:31:17 - "get on the ground" - officer
- 3:31:19 - "stay on the ground" (x2) - officer/ "stop" - female officer
- 3:31:26 - "relax" (x3)- officer
- 3:31:36 - "stop, you're biting me" - female officer
- 3:31:38 - "we're good here" - officer
- 3:31:38 - "biting?" - officer
- 3:31:39 - female officer grunts
  - o NOTE: sound someone would make when working out/ exerting energy
- 3:31:44 - "hips to the ground" (x2) - officer
- 3:31:50 - "I only got one leg" -officer
- 3:31:58 - struggle (sounds of loud grunting/ "woah")
- 3:32:02 - "you're fine" (x2) - female officer
- 3:32:16- "we're good" - officer
- 3:32:19 - "alright, everyone breathe" (x3) - officer
- 3:32:24- grunts (as if in pain)/ "what the fuck!" - Franklin
- 3:32:34- grunt (as if in pain or in frustration) - Franklin
  - o NOTE: compare with the female officer's grunts
- 3:32:52 - "stay here, everyone..." - officer
- 3:32:55 - "we're good" - officer
- 3:33:12 - "come on your side for me, bud" - officer
- 3:33:17 - "your dad's right here (radio cuts over)" -female officer
- 3:33:25 - "we got one in custody" - officer (over radio)
- 3:34:02 - "I might have some stuff on my arm" - officer
- 3:34:07 - "I'm good" - officer

2

- 3:34:08 - "I might have gotten a little bit of him on me" - officer
- 3:34:26-8- "you're good?" - officer (asking a few times)/ "I'm good!" - officer
- 3:34:37 - "relax" (multiple) - officer/ grunting- Franklin
- 3:34:59 - "Mr. Franklin, try to keep straight, you might be injured" - officer
- 3:35:11- "Mr. Franklin, if have any injuries ... (radio cuts over the audio)" - officer
- 3:35:20 - "Mr. Franklin, do you have any injuries besides your scratches?" - officer
- 3:35:29 - "Mr. Franklin, do you have any injuries besides scrapes?"- officer/ Franklin cuts him off (mumbles)/ "ok" - officer
- 3:35:35 - "relax" (multiple times) - officers
- 3:35: 47 - "get the fuck off me" - Franklin
- 3:35:48-9 - "you got to calm down man" / "relax" (multiple times) - officers
- 3:36:33 - "good?" "yeah" - officers
- **3:36:39** - "you **good** (name, inaudible)" - officer/ "I think... I got something on my hand... but I think..." (radio is cutting over the audio)
- 3:37:24- "no, no!" / another struggle ensues"
    - o  lasts until 3:37:44
- 3:37:46 - "you alright?"/ "yeah I'm good" - officers (response was cheerful)
- 3:37:50 - "I got a good little arm bar right here"
- 3:37:56 - "I think we are good in the leg" - officer
- 3:38:00- "relax" (multiple) - officers
    - o  this lasts for a minute - until 3:39:00
- 3:39:20- "why are we here right now? What's going on? Why are you feeling like this? Who were you talking to, Mr. Franklin?" - officer
- 3:39:38-3:40:03 - "just relax, relax, everything is going to be alright, alright? Your family is here. We are going to check you out as soon as you calm down, ok? I understand that but I need you to calm down before we do that, ok? Like I said man, we don't need to be here if you don't need to be here. Alright, but we need you to calm down for us to get out of here, alright? We need to check you out, we can't do that, we have to be over here, ok?" - officer to Franklin
    - o  Franklin's responses are inaudible
- 3:40:25 - "looks like he got some abrasions on his elbow." - officer (talking about **Franklin)**
- 3:40:27 - "his hands are pretty torn up" - officer (talking about Franklin)
- 3:40:33 - "I can't see anything else" (x2) - officer
- 3:40: 40 - "he tore his wrist pretty good" - officer (talking about Franklin)
- **3:44:02** - "Dunkin, you good?" / "yeah, I'm good" - officers
- 3:47:03 - "anyone else got any injuries?" - officer
    - o  no audible responses to this (if any)
- 3:56:14- "he kicked off my radio, so..." - officer
- 3:56:24 - "Tyler, you have any injuries?" - officers
    - o  no audible response
- 3:56:26 - "You guys all good? (x2)" - officers

3

- 3:56:29 - "this motherfucker - has me ... hands were..." - female voice (officer?)
  - at this point, there is a female EMT but neither female is on screen

**Arbitrator 360-AV Viewer- Z.9.51.16 (3)**
- 3:24:49 - "hold on, hey, my man, come on, just sit down. Relax. Ok, just relax. We will talk it out in just a second..." - officer (in response to Franklin standing up)
- 3:25:56- "what's your name bud. What's your name? I said what's your name brother?"
  - 3:26:06 - "We have the same name" - Franklin's dad (brief conversation with dad)
- 3:26:47 - "Mr. Franklin, what's going on today man? We are just trying to figure out what's going on, I know you don't want to do this. We don't want to be here if we don't have to. We are just want to know what's going on, ok. We got called because we are **just checking on you,** ok? (Franklin -  "nothing") Obviously it's not nothing, man" - officer
- 3:27:29 -  "do you want medic?" ("nope" - Franklin) "are you inured in any way?" ("nope" - Franklin) "do you have any physical pain other than what's going on right now?" ("nah" - Franklin) "don't blow up, don't blow up" -  officer
  - 3:27:42 - Someone is saying "stop" in the background. I think it is Franklin's dad but it could be Franklin himself.
- 3:27:54- "my man I need you to relax" -  officer
- 3:28:00 -  "we got one with a **TASER"** -  radio
- 3:28:01-3:28:23 - "my man back up. My man can you just back up for me. Mr. Franklin, do me a favor take a seat back down for me right there for me, ok? No one needs... hey... Mr. Franklin, Mr. Franklin, nobody needs to do anything crazy right now. Do me a favor, take a seat right there for me we'll settle everything down" -  officer
  - 3:28:17 / 3:28:30- "keep your hands out of your pockets" (multiple times)- officer (background of this conversation)
- 3:28:26- "we are not fighting right now... relax" -  officer
- 3:28:35- "Alex I still have hands, say I'm  sorry" - over the radio
- 3:28:40- "Mr. Franklin, look at me, Mr. Franklin, look at me right now" -  officer
- 3:28:53 -  "Mr. Franklin, keep your hands out of your pocket. Don't blow up on us, ok? Just sit down for me" -  officer
- 3:29:06 - "just relax for me, take a seat, ok?" - officer
- 3:29:15-3:29:36 - "alright we can deal with the charger in a second, Mr. Franklin. Do me a favor just just sit down for me, ok? Because we need to talk to you but we need to calm everything down. Obviously we got a lot of people are coming, Ok Mr. Franklin? I know you don't want us here (x2), ok? We don't want to be here if we don't have to,  ok?" - officer
- 3:29:33 -  "but we need everybody to calm down, and we need to slow this thing down, ok?" - officer
- 3:29:37 -  "so Mr. Franklin, Mr. Franklin, look at me here. What I need you to do is take a seat for me ok?" -  officer

- 3:29:46- "Mr. Franklin, just stay right there, take a seat for me ok?" - officer
- 3:29:51- "keep your hands out of your pockets" - officer
- 3:29:54 - "Mr. Franklin, we are not going to do anything we do not need to do, ok? Keep your hands out of your pockets, and just go to your knees for me, ok?" - officer
- 3:30: 00 - "we are just going to put you in cuffs so we can calm everything down, alright?" - officer
- 3:30:06 - "Mr. Franklin, go down to your knees for me. Just go down to your knees for me ok? Everything is going to be ok, we just need to slow things down, alright?" - officer
- 3:30:16 - "Mr. Franklin keep talking to me ok? Keep talking to me" - officer
- 3:30:23 - "We just need you to go to your knees so we can calm everything down, ok?" -officer
- 3:30:29- **"You are not in any kind of trouble right now, Mr. Franklin, we just need to make sure that you are ok."** - officer
- 3:30:31- "I understand that but we need to slow things down so we can figure out what's going on" - officer
- 3:30:36 - "do me a favor just take a seat, ok? Mr. Franklin, just take a seat on the ground for me on the ground for me, ok? You're not in any kind of trouble" - officer
- 3:30:55- "Mr. Franklin, what I need you to do... listen... nobody's trying hurt you. We're all here to help you, ok?" - officer
- 3:31:03 - "I understand you don't want to... I understand you don't want to talk to us, but we need to make sure everything is ok, alight?" - officer
  - o As the officer is saying this, the two officers standing behind Franklin start to move in.

(tackle) - 3:31:08
- 3:31:13 - 'stop" (multiple times)-female officer
  3:31:26 - "relax, put your hands behind you head." - officer
- 3:31:29 - "I got him. Just give him to me." - officer
- 3:31:33 - "let go" (x3) - female officer
- 3:31:36 - "stop your biting." -female officer
- 3:31:39 - "biting?" - officer
- 3:31:37 - "we're good" - officer
- 3:31:58 - "no (x3), just let go" -female officer
- 3:32:03 - "right there, you're fine, you're fine" - female officer
- 3:32:19- "everyone breathe (x3), everyone's good" - officer
- 3:32:44 - "I don't know what I'm stuck on I'm stuck on... I'm stuck on his pants" - officer
- 3:32:57 - "we have one in custody right now" - over the radio
- 3:33:05 - "yeah make sure he can breathe" - officer
- 3:33:09- "turn to your side for me, brother" - both female and male officer
- 3:33:14 - "you're good, just breathe, your dad is right here, come on" -female officer
- 3:33:24 - "we got one is custody" - over the radio
- 3:33:32 - "hey, check yourself, ok?" - officer
- 3:33:47 - "I got him Harley, if you could get..." - officer

5

- 3:33:54- "just relax, I got it all on camera" - officer
- 3:34:01- "I'm good, I might have some of his stuff on my arms" - officer
- 3:34:05 - "yeah I got a little bit... yeah I'm good" - officer
- 3:34:09 - "I might have gotten a little bit of him on me" - officer
- 3:34:19 - "Mr. Franklin, you got a couple scrapes on you, ok? The medics need to check you out, ok?" - officer
- 3:34:25 - "you good?" - officer
- 3:34:26 - "yeah we're all good" - officer
  - **multiple different voices- "I'm good"/ "yeah"**
- 3:34:59- "Mr. Franklin, besides your scrapes, do you have any injuries?" - officer
- 3:35:10- "Mr. Franklin, do you have any injuries that medics need to check out besides your scratches?" - officer
- 3:35:18- "I am trying to talk to you to see if you are injured in any way. Do you have any injuries besides your scrapes?" - officer
- 3:35:26- "Mr. Franklin, ("what's up?" - Franklin), do you have any injuries, ("get the fuck off me" - Franklin), ok" - officer
- 3:35:47 - "you got to calm down man, you got to relax" - officer
- 3:35:55- "talk to me. What's your first name? Delgado? What's your first name? Delgardo? Ok. So Delgardo. Do you go by Delgardo, Delgaro, or Franklin? What's going on with you today?" - officer
- 3:36:18- "can you breathe Mr. Franklin?" - officer
- 3:36:34- "yeah, I just got some of him on me, ha, I don't think I have anything..." - **officer**
- 3:37:04- "Mr. Franklin, what's going on with you right now man, what's happening?" - officer
- 3:37:12- "can you breathe? ("Fuck you" - Franklin), alright. As long as you can talk you can breathe, relax" - officer
- 3:37:28- "nope, nope! Relax." - officers
  - grunting- another struggle ensues
- 3:37:37 - "relax, relax, Mr. Franklin." - officer
- 3:37:45 - "Joel, you alright?"- officer
- **3:37:46-** "yeah, I am good." - officer (Joel)
- 3:37:49 - "I got, I got a good little arm bar right here. So let's just hold this. We're good in the legs." - officer
- 3:38:20 - "his eyes are a little constricted - K-2 - did they get dilated?" - officer
- 3:39:12 - "Mr. Franklin, what's going with you today? Did you smoke some K-2 or something?" - officer
- 3:39:21- "what's going on, why are you feeling like this?" - officer
- 3:39:28- "who were you talking to, Mr. Franklin?" - officer
- 3:39:38- "just relax Mr. Franklin, everything is going to be alright. Alright? Your family is here. The medics going to check you out as soon as you calm down, ok? ("get the fuck off me" - Franklin) I understand that but I need you to calm down before I do that, ok?

6

Like is said, man, we don't need to be here if you don't need to be here. Alright? But we need you to calm down for us to get out of here." - officer

- 3:39:57 - "the medics are going to check you out, but they can't do that if we have to be over here on you, ok?" - officer
- 3:40:22 - "Is there anything we can do for you guys?" - EMT to officer
- 3:40:24 - "he's got some scratches pretty good on his hands and on his elbow... he got some graze on his elbow. Yeah, his hands are pretty tore up. I can't see anything else" - officer
- 3:40:38 - "he tore his wrist pretty good, but I don't think that is going to be a problem right now" - officer
- 3:40:47 - "just relax, they are going to get your blood pressure" - officer
- 3:41:06 - "that's dad over there, he might know medical history'' -officer
- 3:31:21 - constant "just relax" - officer
- 3:41:37 - "everything's going to be ok Mr. Franklin, just relax" - officer
- 3:41:51 - "my cameras on" - officer
- 3:42:00 - "Mr. Franklin, I need you to talk more than saying get off me ok? What's going on with you today? Why is your dad here looking for you? ("I don't know" - Franklin) Ok, why does he have your charger? ("give me my fucking charger'' - Franklin) What do you have your charger for? What's it for, is it for your computer? Is it for your computer or your phone? What's it for? Huh? ("give me my charger" - Franklin) Ok, I got to know what is it for, man. Is it for your computer or your phone? ("get the fuck off of me" - Franklin) Alright, Mr. Franklin" - officer
- 4:43:12 - "you should probably bandage his elbow so he doesn't get anything... blood on..." - officer to EMT
- 3:43:15 - "that's why... I'm trying to work around you guys" - EMT
- 3:43:30 - "get off of me." - Franklin
- 3:43:32 - "I'm not on you, sir." - EMT
    o taking Franklin's blood pressure
- 3:43:34 - "I am" - officer
- **3:44:04 - "yeah, I'm good"** - **officer**
- **3:44:40 - "nah,** I'm **good"** - **officer**
- 3:46:10 - "my fucking hands!" - Franklin
- 3:47:02 - "anybody else got any injuries?"
    o no audible responses (if any)
- **3:49:01 - "are you guys good?"/ "yeah!"** - **officers**
    o officer talks to Franklin's dad
    3:56:29 - "so are you thinking..., or are you thinking assault by police?"
- 3:56:33 - "we are trying to talk to him and everything like that, but he is not answering our question, are you suicidal and everything like that, then he turns around and starts balling his fists. I mean, we don't have criteria. Just because you fight the police doesn't mean..." - officers discussing
- **3:56:26** - Tyler do you have any injuries?" - officer
- 3:56: 27 - "nah, I'm good." - officer (Tyler Duncan)

- 3:56:38 - "he wasn't answering my question, if he is suicidal or anything like that. Then he turns around and starts balling his fists and everything like that." - officer
- 3:56:43 - "we can't... we don't have criteria. And just because you are fighting doesn't mean... just because you're fighting the police doesn't mean..." - officers
- 3:56:55 - "It's assault right there when he starts trying... when he resists... but also when he stars balling his fists" - officers
- 3:57:10 - "the dad says he only smoked in February, he has no history of mental health. I don't know. He thought he had a backpack" - officers discussing
- 3:57:33 - "what are you going to do buddy?" - officer ("boss")
- 3:57:34 - "we are working that through" - officer
- 3:57:35 - "so, he has not been able to answer any questions in terms to us fitting criteria. I certainly think he is going through some psychotic or drug induced episode. But I don't have enough in terms of paper criteria other than him just fighting us, but people fight us and they are not crazy all the time. So, uh, I mean he was balling his fists, and then we went to try to go hands on, he was resisting all sorts" - officer
- 3:58:03 - discussing bag - officers
- 3:58:11 - "I think right now, I don't think we have enough... I don't think I have enough..." - officer
- 3:58:28 - "photographing Tyler next" - officer ("boss")
- 3:58:36 - "we were just... I mean... I don't think we have enough..." - officer
- 3:58:51 - "mine was recording the whole time (x2)" - officer
- **3:59:24 - "nobody panic, all good. All good." - officer**
- 3:59:36 - "whatever mental health evaluation needs to be done" - officer
- 3:59:46 - "I don't think I can get any obstruction because he wasn't under arrest" - officer
- 4:01:09 - "anything else on your arm?" -female voice (taking pictures of injuries)
- 4:01:10 - "nothing that I have been able to find. Nothing that I can see." - officer
- **4:01:51 - "scratches? Anything?" - officer (asking the other officers about their injuries)**
- **4:01:58 - "No - liked grazed" - officer**
- 4:02:10 - "I just want to make sure. Dunkin has an injury, Joel has an injury, and Harley has an injury. Ok, ok, we're good." - officer
- **4:02:24 - "no one needs to go to the hospital right now though? We're good" - officer**

EXCLUSIVE

# Video shows 5 officers tackling mentally ill man. Experts question why.

The Arlington police offcers took down Delgardo Franklin II after he refused to surrender. It defied their training, a Post investigation found.

By Salvador Rizzo and Nilo Tabrizy

Updated July 26, 2023 at 5:35 p.m. EDT | Published July 25, 2023 at 6:00 a.m. EDT

Delgardo Franklin II had been hearing voices in his head but refusing mental health treatment for weeks. So his father took matters into his own hands, calling Arlington police while his son sat at a bus stop on a summer day in 2019.

Four years later, the father, also named Delgardo Franklin, still chokes up describing the anger and regret he feels over what happened next.

As one officer pointed a Taser device at the younger Franklin, another ordered him to kneel so he could be handcuffed, video of the encounter obtained by The Washington Post shows. When Franklin refused, five officers circled him and moved in on cue, wrestling him to the ground.

Police then jailed Franklin and charged him with assaulting three officers. All of it while his father stood by, watching in disbelief as police overpowered an unarmed man he told them was in mental distress.

"He's noncombative. He's nonaggressive," the father recalled in an interview. "He's dropping a couple of F-bombs. How would you expect someone to not be upset and agitated when you're approaching them? Yes, I called them. But, again, I called them for help."

Three policing experts who reviewed the dashboard-camera video and documents in the case told The Post the encounter was an example of how not to respond to a mental health crisis. Although all five officers who tackled Franklin had crisis intervention training that called for them to de-escalate the situation, they decided within minutes to forcibly take him into custody, the experts noted.

"Taking him down was not the answer," said T.T. Williams Jr., a use-of-force expert who worked at the Los Angeles Police Department for 29 years. "The man needed help."

Franklin's mental health deteriorated after the encounter, his father said. He was prosecuted for a year and a half, even after a Virginia judge found him incompetent to stand trial. Another judge found that his competence had been restored months later, but the charges were ultimately dropped in May 2021, after the case was docketed for hearings 17 times.

Police video of the encounter is now the central piece of evidence in a lawsuit Franklin filed in Alexandria federal court in May, alleging wrongful arrest, excessive force, false imprisonment, malicious prosecution and emotional distress. Arlington County officials and the five officers, who are all White, face an Aug. 8 deadline to respond in court. Franklin's attorneys, Tyler Christians and Jeffrey Danzig, declined to say how much money he is seeking in damages.

A spokesperson for the Arlington County Police Department declined to comment on the lawsuit. In a statement, the department said that it "remains committed to treating all individuals with dignity and respect and protecting the constitutional rights of its constituents," and that officers "strive to resolve all incidents through voluntary compliance while ensuring the safety of Arlington's community members, homes, and businesses." In a written report, one of the officers claimed to have made a "multitude of attempts to deescalate the situation" and asserted that Franklin "needed" to be taken into custody.

Franklin, who is Black and disabled, was 24 at the time of the Aug. 28, 2019, incident. His father said he had noticed Franklin "laughing to himself" and behaving strangely in the weeks leading up to it. After Franklin twice stormed out of places where his parents tried to get him medical attention, his father requested help from the police. If officers could observe Franklin behaving erratically, they could get an emergency custody order and take him in for a mental health evaluation, the father said.

Video of the encounter shows that Franklin removed his hands from his pockets after officers asked him to do so and that he was not carrying weapons. Police encountered him sitting alone in a bus shelter at the intersection of North Oakland Street and Wilson Boulevard, speaking by cellphone to his father, who arrived at the scene just as police did.

"From the perspective of Delgardo, he's not doing anything wrong," said Peter A. Joy, director of the Criminal Justice Clinic at Washington University in St. Louis's School of Law. "But he's not complying with the police orders. … Above all, the police want individuals to comply with their orders. And if a person is not compliant, then oftentimes the police will escalate the situation."

In their written narratives describing the encounter, the two lead officers at the scene, Tyler W. Duncan and Alex Freiert, said they feared Franklin was about to attack them because he clenched his jaw, flared his nostrils, balled his fists and "bladed his body." Franklin's father told police at the time that he thought his son possibly had "taken something synthetic," but Franklin's attorneys said there was no evidence of drug use. The video does not show Franklin assuming a fighting stance or raising his fists, and his attorneys argued he posed no threat to the officers. Franklin appears agitated in the video, pacing next to a bus stop and raising his voice at the police.

"Imagine being surrounded by five police officers who are going to tackle you to the ground," Christians said.

The video shows that Freiert pointed a Taser at Franklin moments before Duncan told Franklin to kneel so he could be handcuffed. "Keep your hands out of your pockets and go to your knees for me, okay? We're just going to put you in cuffs so we can calm everything down," Duncan says in the video.

Franklin and three of the officers suffered injuries in the ensuing scuffle, but Franklin's were the only ones to break skin, according to a written report from an officer who arrived after the incident to take photographs of the scene.

The Post requested copies of the photographs showing the officers' injuries. The police department denied the request, citing an exemption in Virginia's Freedom of Information Act that covers records of criminal investigations.

Police officers and other officials in Arlington have been getting Crisis Intervention Team (CIT) training since 2018. The program was designed to provide help and resources to mentally ill individuals, with a goal of diverting them from jail, and teach police officers de-escalation techniques. The Memphis Police Department developed CIT training in 1988, after police there killed a 27-year-old man in a mental health crisis, and its methodology has since been replicated by departments across the country.

More than half of Arlington's patrol officers had completed the 40-hour CIT training course as of March, according to the county's website. All five officers who tackled Franklin had received the training as of August 2019, according to records provided by the Arlington County Police Department.

In one CIT role-playing exercise that was being taught at the time of the 2019 incident, Arlington police officers would encounter a schizophrenic individual causing a disturbance, and the goal was "to persuade the individual to leave and enter treatment," according to materials The Post obtained under Virginia's Freedom of Information Act. "Any use of force by the officer(s) will cause the scenario to stop and require re-training," the worksheet says.

A separate PowerPoint presentation used for Arlington's CIT training in 2019 says officers should "avoid physical confrontation" with individuals displaying signs of "psychotic disorders." Five pages of community resources were attached, including contacts for a mental health magistrate and the Arlington County forensic jail diversion team.

Duncan wrote in his police report that after Franklin refused to kneel and surrender, "it was established that Delgardo needed to be taken into custody in order to further assess his possible mental health concerns or drug intoxication."

"Despite a multitude of attempts to de-escalate the situation using CIT techniques, I was unable to get Delgardo to comply with surrendering," Duncan wrote. "As officers moved in to take him into custody, Delgardo immediately showed that he would not be taken into custody without resistance; Delgardo recognized our approach and braced his hands and arms tightly in front of his body."

After reviewing the CIT training materials Arlington used in 2019 and police accounts of the incident, Joy said that "it was like the officers never attended the training" or "didn't believe what they were being told, because they didn't follow any of the protocols."

Franklin was charged with three felony counts of assaulting police — based on injuries suffered by Duncan and Officers Joel M. Davis and Harley L. Guenther. Freiert and the fifth officer involved in restraining Franklin, Jason Pardee, did not claim injuries.

Alphonse Gerhardstein, a civil rights attorney who has represented victims of police misconduct and helped overhaul the Cincinnati police use-of-force policies, said he questioned why prosecutors pursued the case. Gerhardstein said there was no need to "lay hands on" Franklin to resolve the situation and "certainly no basis to charge with a crime since all the physical contact was initiated by police."

Arlington General District Court Judge R. Frances O'Brien found that Franklin was incompetent to stand trial in January 2020. Another judge, Daniel T. Lopez, found in June of that year that Franklin's competence had been restored after some treatment and medication. An assistant commonwealth's attorney in Arlington, Elizabeth Tuomey, offered a deal in July 2020 that required Franklin to plead guilty to misdemeanor counts in exchange for no jail time. He refused.

In an email to Franklin's attorney that month, Tuomey wrote that the video showed Franklin "essentially assaulted (as in, an impending battery) the officers and/or committed disorderly conduct when he balled his fists and appeared to the officers that he wanted to fight." She added that "the mental health component is a mitigating factor to me, and I will heavily consider it in making an offer, but I am not willing to dismiss the charges." The prosecutor downgraded the charges from felonies to misdemeanors in August 2020, then agreed to drop all charges in May 2021 after asking that Franklin maintain good behavior and provide a letter from a doctor or therapist attesting that he was getting medical treatment. Tuomey declined to comment.

Arlington Commonwealth's Attorney Parisa Dehghani-Tafti (D) said in an interview that she could not comment on pending litigation but that she was looking into why Franklin's case took about 21 months to resolve.

"We amended the charges to what we thought were more accurate to the facts," Dehghani-Tafti said. "It was ultimately dismissed as part of a general continuance, where there were conditions that had to be met."

Case 1:23-cv-00601-RDA-WEF   Document 42-2   Filed 08/09/23   Page 5 of 5 PageID# 385

> **"We hope this case will be used to illustrate what not to do when a father calls for help."**
>
> — Delgardo Franklin II

Franklin declined to be interviewed for this article. His father and attorneys said that his mental health had improved since the charges were dropped but that the experience had scarred his family.

"Thankfully, the evidence speaks for itself," Franklin and his attorneys said in a joint statement. "We hope this case will be used to illustrate what not to do when a father calls for help."

Duncan wrote in his police report that he spoke to Franklin's father after the incident. When told his son was being booked in the Arlington County jail, "he seemed to indicate it was in his best interest and that he thought he needed to be here," Duncan wrote. In the interview with The Post, which was conducted at Christians's law office, Franklin's father disputed that he told police his son needed to be in jail or that it was in his best interest.

In his report, Duncan wrote that Prince William County police had been called to a hospital and "witnessed Delgardo attack Mr. Franklin" during an earlier incident. Franklin's father said police were already at that hospital, Sentara Northern Virginia Medical Center in Woodbridge, when he took his son there for an evaluation that he angrily refused in mid-August 2019, days before the Arlington incident. Franklin's father disputed that his son attacked him. A spokesman for the Prince William County Police Department said that court records did not show someone named Delgardo Franklin had been arrested or charged during those dates and that, without a court order, police records identifying victims or "other parties" are exempt from disclosure.

"There's still no way any sensible human being that saw that video could even begin to remotely think that my son was either about to attack those officers or that they were in any kind of danger," Delgardo Franklin said.

## Tyler Christians

| | |
|---|---|
| **From:** | Elizabeth Tuomey <etuomey@arlingtonva.us> |
| **Sent:** | Monday, July 20, 2020 2:03 PM |
| **To:** | Tyler Christians |
| **Subject:** | RE: Delgardo Franklin 8/18/20 |

Here is my plea offer, which expires 8/14/20 COB:
Felony APO's against Duncan and Guenther amend to misd A&B. 12 month deferred disposition on each, plea of guilty, finding of guilt is withheld; supervised probation with mental health treatment and medication compliance.  GGB. To be dismissed if compliant.

Felony APO against Davis: NP.


**From:** Elizabeth Tuomey
**Sent:** Monday, July 13, 2020 4:49 PM
**To:** Tyler Christians <tyler@tchristians.com>
**Subject:** RE: Delgardo Franklin 8/18/20

It was a pleasure speaking to you today over the telephone.  I have reviewed the video and it seems consistent with the reports by Duncan and Freiert that while they were attempting to talk to him about the reason his dad called the police, he essentially assaulted (as in, an impending battery) the officers and/or committed disorderly conduct when he balled his fists and appeared to the officers that he wanted to fight.

According to Duncan's report:

At that time, Delgardo balled one of his fists and placed it in his other hand which was open. Simultaneously, Delgardo bladed his body in an aggressive manner, appearing as if he was posturing for a fight. Ofc. Freiert and I immediately recognized Delgardo's escalated behavior and stepped back.


According to Freiert's report:

The subject did not answer this question. The subject clenched his jaw, flared his nostrils, balled up both of his fists and pressed them together. The subject looked around the area quickly and turned his eyes back to myself. The subject bladed his body towards me in a fighting posture and kept his fists clenched. Noticing all of the pre-assault indicators and fearing an attack was eminent, I created distanced between myself and the subject and drew my TASER.


In reviewing the video, it is clear the exact moment when this happens, as everyone standing around immediately moves back. You can hear the officers saying "Don't bow up" and "I need you to relax."  However, Mr. Franklin was obscured by the bus shelter and you can't see what he is doing.

This occurs between 15:27:37 and 15:27:47 on Duncan's video.

1

My view is that these actions by Mr. Franklin give the police probable cause to arrest him. During the struggle, he tries to bite Officer Guenther, according to her report.

That being said, the mental health component is a mitigating factor to me, and I will heavily consider it in making an offer, but I am not willing to dismiss the charges.

**From:** Tyler Christians <tyler@tchristians.com>
**Sent:** Monday, July 13, 2020 2:24 PM
**To:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Subject:** RE: Delgardo Franklin 8/18/20

**EXTERNAL EMAIL:** This email originated from outside Arlington County.

**CAUTION:** This external email also contains file attachments. Do not open files that you are not specifically expecting to receive, even from known senders.

**From:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Sent:** Monday, July 13, 2020 9:34 AM
**To:** Tyler Christians <tyler@tchristians.com>
**Subject:** Re: Delgardo Franklin 8/18/20

This afternoon around 2:00 should work. Call me then.

Elizabeth Tuorney
Deputy Commonwealth's Attorney
1425 N. Courthouse Road
Suite 5200
Arlington, VA 22201
(703)228-4413

**From:** Tyler Christians <tyler@tchristians.com>
**Sent:** Monday, July 13, 2020 9:14:58 AM
**To:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Subject:** RE: Delgardo Franklin 8/18/20

**EXTERNAL EMAIL:** This email originated from outside Arlington County.

**CAUT-IPN:** Thts external em:ail a!s6(::9fitains fiie attae:: rilents:: Do not ogen]J! sthat you are i.pt pe· iffoally expecting to receive. evehfrom known sender:$.

I have the videos. I have the police reports. I have not seen pictures.

He was determined incompetent, but has been restored. If you want - I think it'll be better to brief you from my end telephonically and/or in person.

When might you have a few minutes?

Tyler



Tyler Christians
CHRISTIANS LAW, Pll.C
*Attnrncy* & *Owirer*
Phone: 57l-6,U-30:-13  Espm"1ol: 571-28(i-757,t
Fax: .57l-6,U-305,t
111 PMk Place, Suite 2D, Falls Church, VA 22<H6
Website: www.1d11istia11s.com Email: lvlcr@1d1ristia11s.<·om

# firJODCIC:l

*The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.*

*Thank you.*

**From:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Sent:** Sunday, July 12, 2020 2:52 PM
**To:** Tyler Christians <tyler@tchristians.com>
**Subject:** Delgardo Franklin 8/18/20

Tyler,

I am now assigned to this case. Do you have all the discovery in the case? We have 1 DVD with 3 videos, police reports, and record (if any [I don't have the file with me right now]). We should also have photos but I don't believe they were attached to the file.

Please let me know what, if any, materials you still need.

Was Mr. Franklin initially incompetent? How is he doing now? Is he connected to services and what does that look like currently?

Elizabeth Tuomey
Deputy Commonwealth's Attorney
1425 N. Courthouse Road
Suite 5200
Arlington, VA 22201
(703) 228-4413
Fax: (703) 228-7116

## Tyler Christians

| | |
|---|---|
| **From:** | Elizabeth Tuomey <etuomey@arlingtonva.us> |
| **Sent:** | Wednesday, February 10, 2021 3:10 PM |
| **To:** | Tyler Christians |
| **Subject:** | RE: court reporter |

I did just speak to dad - he called while I was in court.

He said his son just got approved for Medicaid and he has been compliant with his medications and therapy.

How about a general continuance to 8/28/21 (or thereabouts) and as long as he remains of GGB and provides a letter from his Dr/therapist that he is maintaining medication compliance I will then move to n.p.?

Elizabeth Tuomey
Deputy Commonwealth's Attorney
1425 N. Courthouse Road
Suite 5200
Arlington, VA 22201
(703) 228-4413
Fax: (703) 228-7116
*She/Her*

Please be advised that any email sent to or from an Arlington County email address may be subject to disclosure under the Freedom of Information Act (FOIA).

**From:** Tyler Christians <tyler@tchristians.com>
**Sent:** Wednesday, February 10, 2021 3:00 PM
**To:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Subject:** Re: court reporter

**EXTERNAL EMAIL:** This email originated from outside Arlington County.

**CAUTION:** This external email also contains file at(achments. Do not open files that you are not specifically expecting to receive, even from known senders. •

Sorry I was out getting food. Here is the latest full summary from last March. After COVID, he has continued, but has been on less regular visits - which is consistent with this report here.

**From:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Sent:** Wednesday, February 10, 2021 2:07:55 PM
**To:** Tyler Christians <tyler@tchristians.com>
**Subject:** Re: court reporter

Do you have any documentation of his treatment compliance? Dads phone goes to voicemail which is full.

Elizabeth Tuomey
Deputy Commonwealth's Attorney
1425 N. Courthouse Road
Suite 5200

1

Arlington, VA 22201
{703}228-4413


Please be advised that any email sent to or from an Arlington County email address may be subject to disclosure under the Freedom of Information Act (FOIA).

**From:** Tyler Christians <tyler@tchristians.com>
**Sent:** Wednesday, February 10, 20211:42:11 PM
**To:** Elizabeth Tuomey <etuomey@arlingtonva.us>
**Subject:** court reporter

**EXTERNAL EMAIL:** This email originated from outside Arlington County.

**CAUTION**          n a,lem :il 1.so contains file att chments. Do not open files that you are not specifically expecting to.,rec;eive, even ,r9r,n.,knpwri ser:i'cdrs.

I have to confirm w/ court reporter- and I can save an appearance fee I believe at this point. With weather, I think they could charge more.


ffi   CHRISTIANS L

mtmrlBlr!l

**Tyler Christians**
*Attorney ft Owner*

Email: tyler@tchristians.com
Phale: 571-641-3033 I :      517-286-7574
Fax:   571-641-30'54 I Website: tchristians.com
111 Park Place, Suite 20, Falls Church, VA21IJ46


*The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.*



EXHIBIT 4

# Parisa Dehghani-Tafti



**Are you interested in pursuing a career in public prosecution? If so, click on this link to see what positions are open.**

Parisa Dehghani-Tafti is the Commonwealth's Attorney for Arlington County and the City of Falls Church. Parisa was first elected to a four-year term in November 2019.  She came to the office of Commonwealth's Attorney with a twenty-year record of criminal justice reform as an innocence protection attorney, a public defender, and a law professor. Parisa sought the Office because, in her own words, "I always knew what I hoped for in a justice system, and so I finally decided to live inside that hope."

As The Commonwealth's Attorney, Parisa's core philosophy is that safety and justice are not opposite but complementary values and that a prosecutor's primary responsibility is to treat crime as crime and people as people.  Parisa has long recognized the impact of the criminal legal system on people of color and is committed to highlighting, addressing, and reversing these disparities. She has turned these values into policies of safety and justice for all, including providing fair discovery, eliminating peremptory strikes in juries, not requesting cash bail, not certifying children as adults, staffing the only Conviction Review Unit in Virginia, establishing a new mental health docket, expanding drug court, reducing the jail population to its lowest in history, securing indictments and convictions in all serious crimes, creating a novel restorative justice program for young people, and helping to win more than $ 700,000 in criminal justice grants to Arlington and the City of Falls Church.

Prior to being elected Commonwealth's Attorney, Parisa served as an innocence protection attorney representing innocent individuals in DC, Virginia, and Maryland incarcerated for crimes they did not commit, as a public defender litigating cases of constitutional magnitude, and as a law professor helping train the next generation of criminal law attorneys.

Parisa earned her B.A. in Philosophy and Comparative Literature from the University of California, Berkeley, and her J.D. from New York University School of Law.  She resides in Arlington with her family.  She enjoys reading Jane Austen and James Baldwin and has an abiding attachment to Star Trek.





EXHIBIT 5

Home (https://www.arlingtonva.us/Home)  /  About Arlington
(https://www.arlingtonva.us/About-Arlington)  /  News
(https://www.arlingtonva.us/About-Arlington/Newsroom)  /  News Articles
(https://www.arlingtonva.us/About-Arlington/Newsroom/Articles)  /  2020 News
Articles  List  (https://www.arlingtonva.us/About-Arlington/Newsroom/Articles/2020)
/  Arlington Launches Review of Police Policies and Practices

# Arlington Launches Review of Police Policies and Practices

Published on July 16, 2020

***Correction:  This news release has been corrected to include the County Attorney and the Commonwealth's Attorney who will both serve as ex-officio members of the group.***

---

- **Fifteen-member citizen group to report back by end of the year**

- **External assessment of police practices and group review of policy issues**

Following recent events involving policing and racial justice across the United States, the County Board has asked the County Manager to lead a review of police policies and practices. This review will ensure that the Arlington County Police Department is current with policing best practices and continue to build trust between our police and the community.

8/23/23, 9:49 AM    Arlington Launches Review of Police Policies and Practices - Official Website of Arlington County Virginia Government

The first step will be an external review and assessment of current policies and practices areas:

⬥ **Review of use of Force**: De-escalation tactics; lethal and non-lethal force; and, foot an pursuits.

⬥ **Training and Supervision**: Police Academy training; and training for implicit bias and c intervention.

⬥ **Cameras**: Both body-worn and vehicle dash cameras; and policies regarding use of thi equipment.

⬥ **Recruitment and Retention:** Screening for bias; psychological evaluation; mental healt programs; process for officer evaluation; promotion and leadership development prog compensation, including pay and benefits.

⬥ **Internal Affairs:**Statistics; structures and procedures; effectiveness through an anony climate survey; grievance processes; and use of force investigations.

⬥ **Data/Statistics**: Reviewing data collected for arrests and stops over the past 3 years a its consistency.

This external assessment will begin on July 20, 2020 and be led by two parties with expe departmental assessments, police practices, policy review, criminal justice reform and co analysis: Marcia K. Thompson, Vice President at Hilliard Heintze, an attorney and law enf practitioner with more than 20 years working in the criminal justice field; and Dr. Julie She Associate Dean at the Jimmy and Rosalynn Carter School for Peace and Conflict Resolut George Mason University (see biographies below).

The themes of this assessment will be shared with the 15-member Police Practices Grou early in the fall and will support the work of the group moving forward. The PPG will begi August and will also discuss the following four important policy areas:

⬥ **Police civilian review board — what type and approach?**

⬥ **The role of the police department in providing mental health services;**

- **The role for the police department in traffic enforcement; and**

- **The opportunity for alternative dispute resolution, including restorative justice & med**

The PPG will use the themes identified during the assessment to inform discussion and work to offer options policy areas and report to the County Manager by December 21, 2020. The PPG will hold public engagement s gather community input on these issues. The results will be provided to the County Manager as he hires a ne after a national search. (Note: Chief Jay Farr will be retiring before the end of this year). The information will a basis of potential recommendations for improvements to the County Board.

County Board Chair Libby Garvey noted that "this group will start us on a journey to tackle important issues we face as a community regarding public safety for all of our residents. fine police department in Arlington, however, it can and should be better. Arlington Police the review and look forward to being a part of this important effort. These times call for a at how our community addresses public safety and policing."

"I want to thank each of those who have agreed to participate in this important work," Co Manager Mark Schwartz stated. "This group will hopefully strengthen the bonds of trust officers and residents of the County and explore the difficult issues facing law enforceme Our Police Department has a longstanding history of working with the community to prov professional services and a mission to treat all individuals with respect but also recogniz for improvements. Arlington is not immune to the challenges seen elsewhere, and I know be better for the work of this group."

The PPG's first meeting is scheduled for August 3, 2020. **View the PPG webpage, (https://departments.arlingtonva.us/cmo/police-practices-work-group/)**

# Appointments

**Allison Carpenter**, Deputy Public Defender, Arlington County and resident. She has worke community agencies and organizations to reduce recidivism and promote public safety.

**Cicely Whitfield**, longtime Arlington resident and advocate. Cicely also serves as the Chie Officer for Bridges to Independence, focused on leading individuals and families out of homelessness.

**David FitzGerald**, member of the Community Service Board, responsible for oversight of provided by the Department of Human Services to persons challenged by mental health, i

Case 1:23-cv-00913-RDA-IDD  Document 442-1  Filed  08/30/23  Page 4 of 8  PageID# 304

disabilities and substance use.

**Devanshi Patel**, local social justice lawyer focused primarily on juvenile and family law m Devanshi also is the Chief Executive Officer of CYFA (Center for Youth and Family Advoca focuses on developing comprehensive solutions to social justice issues to improve the li young people and families in Arlington.

**Elizabeth Jones Valderrama**, Executive Director of Offender Aid and Restoration of Arling Alexandria and Falls Church, a community-based nonprofit which journeys with specific i adults and youth of all genders, impacted by the criminal legal system and also addresse systemic racism responsible for mass incarceration and other structural inequities in our

**Kathleen McSweeney**, active resident and advocate in Arlington County. Previously serve Planning Commission, serves on the Census Complete Count Committee, and chairs the Facilities Advisory Committee. Kathleen also serves on the Board for Challenging Racism

**Kent Carter**, Vice President of the Arlington Branch NAACP, the nation's oldest civil rights organization committed to eliminating race-based discrimination and to ensure the healt being of all persons.

**Kim Phillip**, founding member of Arlington for Justice, a newly formed group working to b era of public safety to our neighborhoods by seeking reform of Arlington's criminal justic

**LaTasha Chamberlain**, Captain, Arlington County Police Department responsible for supp operations.

**Matt Puia,** Sergeant, Arlington County Police Department, responsible for police operatio

**Naomi Verdugo**, longtime advocate and active member of the Arlington Mental Health an Alliance, group of local advocates comprised of community members living with mental i other disabilities, and their families.

**Rodney Turner**, former member of Arlington County's Fire Station #8 Task Force and curr member of the Joint Facilities Advisory Commission, is a resident of the High View Park neighborhood for 18 years and a member of the John M. Langston Citizens Association. an attorney specializing in financial services regulation.

**Saul Reyes**, Executive Director of BU-GATA, an advocacy organization founded in 1992 to and train Latino leaders in low-income communities facing the threat of displacement. B also interested in addressing racial disparities in policing and other areas of public safety

**Scott Wanek,** President of the Arlington Coalition of Police (ACOP), representing current Arlington police officers.

**Whytni Kernodle**, Co-Founder of Black Parents of Arlington, focused on organizing and e black parents for the purpose of improving the lives and education of black children in Ar

*Note: The County Attorney and the Commonwealth's Attorney will also serve as ex offic of the group and be asked to attend all meetings.*



**(https://arlingtonva.s3.amazonaws.c**

## content/uploads/sites/35/2020/07/MarciaThompson.jpg)

# Marcia K. Thompson, Esq.

**Vice President, Hilliard Heintze Law Enforcement Consulting**

Marcia K. Thompson is an attorney and law enforcement practitioner with over 20 years the criminal justice field. As a Vice President within the Law Enforcement Consulting pra provides oversight, management and technical assistance on law enforcement assessm trainings and reviews. Marcia has served as a law enforcement administrator at the Univ Chicago Police Department, where she oversaw professional standards, accreditation, co training, records management, recruitment, field training, in-service training, leadership d succession planning, community engagement, youth outreach and the community advisory committee in support of the university's transparency and inclusion initiative.

Case 1:23-cv-00815-RDA-WEF Document 17-1 Filed 05/23/2024 Page 170 of 204

Marcia has served as an advisor to law enforcement organizations on civil rights and law enforcement issues for over 15 years. She has been an active member of the IACP Civil a Rights Committee for over 10 years. In addition, she has provided insight and guidance o and novel civil rights and human rights matters impacting law enforcement nationally, inc bias-free policing, tasers, use of force, stop and frisk, constitutional policing, procedural j crimes, and affinity group protections. She has also served as General Counsel and advis National Organization of Black Law Enforcement Executives (NOBLE) for many years. In capacities, she provided a legal perspective and civil rights lens on law enforcement, com policing and criminal justice matters.

Marcia is a Virginia Supreme Court certified mediator as well as a collaborative problem-change management facilitator, and equal employment opportunity (EEO) and civil rights professional. While serving as an Ombudsman for an entire federal agency, she impartial agency-wide concerns and trends regarding policy, practices and procedures. For many y Marcia has served as a federal fact finder, EEO investigator and hearing officer, providing hearings and drafting administrative appellate determinations. She has conducted large f dialogues with community members on police departments and other related public serv several cities, including Washington, D.C.; New Orleans, Louisiana; Chicago, Illinois; and B Maryland. She has participated in and held other facilitated dialogues on workplace and topics, and taught others to use similar facilitative and problem- solving techniques to en pertinent stakeholders.

Marcia has provided advisory and consulting services to national law enforcement organ over 15 years. She led Hillard Heintze's team of subject-matter experts working with the Sheriff's Department, focusing on use of force, management issues, staffing, and training led law enforcement assessments and training, technical assistance and compliance wo departments ranging from: Birmingham, Alabama; Gainesville, Florida; Murfreesboro Ten Virgin Islands, Winslow Township and Boulder, Colorado.

Marcia was a professor for almost 10 years at Bowie State University, teaching criminal j social justice, civil rights, conflict resolution, juvenile analysis, criminology, criminal law, constitutional law, criminal procedure, evidence, trial and advocacy practice, victimology, mediation, police management, intelligence, and public records and ethics. She received Bachelor of Arts in Criminal Justice from Michigan State University and her Juris Doctora George Mason University School of Law. She is licensed to practice law in Virginia.



 **(https://arlingtonva.s3.amazonaws.com**

**content/uploads/sites/35/2020/07/julieshed.jpg)**

# Julie Shedd, Associate Dean and Associate Professor

**Jimmy and Rosalynn Carter School for Peace and Conflict Resolution, George Mason U**

Dr. Shedd is currently the Associate Dean of the Jimmy and Rosalynn Carter School for P Conflict Resolution at George Mason. She teaches both introductory and research metho and courses on terrorism, extremism, global conflicts, and ideologies. She holds a Ph.D. Conflict Analysis and Resolution from George Mason University and a BA in Political Scie Psychology from George Washington University. Her research includes work on the relati media to conflict, specifically focused on media coverage of terrorism and the role of wo political violence. She has shepherded the Carter School's efforts to increase distance ed and overseen a wide range of innovations in experiential and service learning. She served academic project manager for the development of the school's Point of View Internation and Research Center. Her practice engagements include media literacy and dialogue trai conflict resolution in schools, police community engagement projects, and a series of co engagement processes for local government.

Tagged as:

**Archive**      **Police**      **Public Safety**

## Quick Links

8/23/23, 3:48 PM    Arlington Launches Review of Police Policies and Practices | Official Website of Arlington County Virginia Government

(https://www.arlingtonva.us/Reusable-Content/Quick-Links)

## Libraries

(https://www.arlingtonva.us/Home/Top-task-two/Libraries)

## About Domestic Violence

Domestic violence involves a pattern of abusive behaviors used by one individual to power and control over another individual in the context of an intimate or family relationship.

(https://www.arlingtonva.us/Government/Programs/Health/Adult-Behavioral-Healthcare/Domestic-Violence)





EXHIBIT 6

Home (https://www.arlingtonva.us/Home) / Government
(https://www.arlingtonva.us/Government) / Police Department
(https://www.arlingtonva.us/Government/Departments/Police-Department) /
Careers at the Arlington County Police Department
(https://www.arlingtonva.us/Government/Departments/Police-Department/Police-
Jobsp) / Training Opportunities

# Training Opportunities

## Our Training Philosophy

ACPD is committed to fostering a training environment which produces police officers that can serve our diverse and inclusive community with the utmost professionalism. Our Training and Career Development Unit is tasked with ensuring that training throughout the agency is consistent, aligns with smart practices, meets the needs and expectations of our community, and utilizes the most progressive and proven methods. Our officers are equipped with extensive knowledge, skills and abilities so they can successfully manage and safely resolve a range of incidents, which span from basic calls for service, such as neighborhood disputes, to active violence incidents. Training is centered around the principles of de-escalation, is based upon realistic scenarios and builds upon officer experiences.

Over the past five years, our sworn staff has attended over 55,000 hours of training annually. This training covers topics such as legal issues/review, cultural diversity, implicit bias, ethics, verbal judo, conflict communications, defensive tactics, firearms, active violence response, tactical emergency casualty care (TECC), investigations, and other topics related to the daily responsibilities of a police officer.

## Training For New Officers

Recruit officers are paid their full salary plus benefits throughout the pre-academy, academy and post-academy training.

# Pre-Academy Training (date of hire until Acade session begins)

Prior to each academy session at the Northern Virginia Criminal Justice Training Academ officers are trained in shooting fundamentals, geography, constitutional law, departmenta functional fitness and formation by ACPD's Training and Career Development Unit. This tr complementary to what is offered at the Northern Virginia Criminal Justice Training Acad the foundation to the successful start of the basic training program.

# Basic Training at the Northern Virginia Criminal Justice Training Academy (NVCJA)

After being hired by the Department, new officers begin their training at the NVCJA, a regi academy offering high quality, professional training to recruit officers who will go on to s agencies in Northern Virginia. Recruit officers enrolled in the Basic Law Enforcement Sch complete over 800 hours of training curriculum, which orients them to the diverse day-to- challenges experienced by law enforcement personnel while on the job. NVCJA is a com academy, typically in session Tuesday-Friday each week. Academy sessions begin twice July and January and last six months.

More about basic training at the NVJCA (https://www.nvcja.org/ba)

# Field Training

Following local training, the new officers complete the Department's 12-week Field Traini Officers work alongside a Field Training Officer (FTO), who serves as a mentor to them th field training. The FTO is also responsible for teaching and evaluating them as they begin knowledge gained during basic training at the academy to real world situations they enco responding to calls for service. Following successful completion of field training, the offic solo patrol.

# Training Throughout Your Career

## External Training Opportunities

As a member organization of NVCJA, officers in Arlington County have access to more th different programs through their Professional Development Training program, as well as t opportunities through reciprocal agreements with the Fairfax County and Prince William Criminal Justice Academies.

Personnel regularly participate in additional training opportunities offered through Federa law enforcement agencies, both locally and outside the National Capital Region. This incl offerings through the FBI National Academy, FEMA courses in Incident Command, Hazm and courses offered through New Mexico Tech on explosives.



## Internal Training Opportunities

Personnel regularly participate in internal training opportunities throughout the year on ta vehicle operations, firearms, department programs, initiatives and other relevant topics.

The Department has also developed a number of programs to prepare its officers for Acti
Events, led by the Tactical Training Unit and the Arlington County High Threat Response P

- Tactical Training Unit: This unit provides training that integrates the disciplines o
  Violence Response, Tactical Emergency Casualty Care (TECC), Control Tactics, F
  General Tactical Instruction and Taser. Patrol officers have a minimum of 6 traini
  year provided by TTU, in addition to other training opportunities.
- High Threat Response Program: The Department has dedicated a full-time office
  program to ensure an integrated response to Active Violence Incidents by police,
  other County/Regional agencies. This integrated response is reinforced through
  collaborative training.

# Crisis Intervention Training

Additionally, the department is committed to our Crisis Intervention Training
(https://www.arlingtonva.us/Government/Programs/Health/CIT) program provided in co
with the Department of Human Services. This training equips officers with the knowledge
necessary to deal with a situation involving a person in a mental crisis. However, many of
learned are often used to deescalate a variety of situations, regardless of the mental stat
parties involved.

More about career development opportunities.
(https://www.arlingtonva.us/Government/Departments/Police-Department/Police-Jobsp
Development-Opportunities)

Case 1:23-cv-00601-RDA-WEF  Training Opportunities | Police Website of Arlington County Virginia Government  Page 5 of 6  PageID# 5

# PERSONNEL AND RECRUITMENT UNIT



- Contact a Police Recruiter (https://www.arlingtonva.us/Government/Departments/ Department/Contact-a-Police-Recruiter)
- Email the Personnel and Recruitment Unit (mailto:acpdrecruiting@arlingtonva.us)
- Phone (703) 228-4330 (tel:+17032284330)
- Fax (703) 228-0485 (tel:+17032280485)



*The Arlington County Police Department is a Virginia Law Enforcement Professional S Commission (VLEPSC) Accredited Agency*

## KEY POLICE CONTACTS

- **Emergency:** 911
- **Non-Emergency:** 703-558-2222 (tel:+17035582222)
- Telephone Reporting Unit: 703-228-4300 (tel:+17032284300)
- Arlington County Crime Solvers (http://www.arlingtonvacrimesolvers.org/): 1-866-4 (8477) (tel:+18664118477)
- File an Online Police Report (https://www.arlingtonva.us/Government/Departments Department/Online-Police-Reporting-System) | Español (https://www.arlingtonva.us/Government/Departments/Police-Department/Online-Pol Reporting-System-en-Espanol)
- Report Ongoing Traffic and Parking Complaints (https://www.arlingtonva.us/Government/Departments/Police-Department/Traffic-Enforcement-Request)
- Parking Inquiries (https://www.arlingtonva.us/Government/Departments/Police-Department/Parking-Inquiry-Form)

- All police non-emergency contacts (https://www.arlingtonva.us/Government/Departments/Police-Department/About-ACPD/Contact-Us)

(https://facebook.com/ArlingtonCountyPolice)    (https://twitter.com/arlington (https://instagram.com/arlingtonvapd)    (https://nextdoor.com/)    (https://www.youtube.com/channel/UCN2trnUuYHi1RC0ZCURpdtw)

# EXHIBIT 5

EXCLUSIVE

# Video shows 5 officers tackling mentally ill man. Experts question why.

The Arlington police oicers took down Delgardo Franklin II after he refused to surrender. It defied their training, a Post investigation found.

By Salvador Rizzo and Nilo Tabrizy

Updated July 26, 2023 at 5:35 p.m. EDT  |  Published July 25, 2023 at 6:00 a.m. EDT

Dashboard-camera video obtained by The Washington Post shows the moment Arlington police oicers tackled a mentally ill man. (Video: Obtained by The Washington Post)

Delgardo Franklin II had been hearing voices in his head but refusing mental health treatment for weeks. So his father took matters into his own hands, calling Arlington police while his son sat at a bus stop on a summer day in 2019.

Four years later, the father, also named Delgardo Franklin, still chokes up describing the anger and regret he feels over what happened next.

As one officer pointed a Taser device at the younger Franklin, another ordered him to kneel so he could be handcuffed, video of the encounter obtained by The Washington Post shows. When Franklin refused, five officers circled him and moved in on cue, wrestling him to the ground.

Police then jailed Franklin and charged him with assaulting three officers. All of it while his father stood by, watching in disbelief as police overpowered an unarmed man he told them was in mental distress.

"He's noncombative. He's nonaggressive," the father recalled in an interview. "He's dropping a couple of F-bombs. How would you expect someone to not be upset and agitated when you're approaching them? Yes, I called them. But, again, I called them for help."

Three policing experts who reviewed the dashboard-camera video and documents in the case told The Post the encounter was an example of how not to respond to a mental health crisis. Although all five officers who tackled Franklin had crisis intervention training that called for them to de-escalate the situation, they decided within minutes to forcibly take him into custody, the experts noted.

"Taking him down was not the answer," said T.T. Williams Jr., a use-of-force expert who worked at the Los Angeles Police Department for 29 years. "The man needed help."

Franklin's mental health deteriorated after the encounter, his father said. He was prosecuted for a year and a half, even after a Virginia judge found him incompetent to stand trial. Another judge found that his competence had been restored months later, but the charges were ultimately dropped in May 2021, after the case was docketed for hearings 17 times.

Police video of the encounter is now the central piece of evidence in a lawsuit Franklin filed in Alexandria federal court in May, alleging wrongful arrest, excessive force, false imprisonment, malicious prosecution and emotional distress. Arlington County officials and the five officers, who are all White, face an Aug. 8 deadline to respond in court. Franklin's attorneys, Tyler Christians and Jeffrey Danzig, declined to say how much money he is seeking in damages.

A spokesperson for the Arlington County Police Department declined to comment on the lawsuit. In a statement, the department said that it "remains committed to treating all individuals with dignity and respect and protecting the constitutional rights of its constituents," and that officers "strive to resolve all incidents through voluntary compliance while ensuring the safety of Arlington's community members, homes, and businesses." In a written report, one of the officers claimed to have made a "multitude of attempts to deescalate the situation" and asserted that Franklin "needed" to be taken into custody.

Franklin, who is Black and disabled, was 24 at the time of the Aug. 28, 2019, incident. His father said he had noticed Franklin "laughing to himself" and behaving strangely in the weeks leading up to it. After Franklin twice stormed out of places where his parents tried to get him medical attention, his father requested help from the police. If officers could observe Franklin behaving erratically, they could get an emergency custody order and take him in for a mental health evaluation, the father said.

Video of the encounter shows that Franklin removed his hands from his pockets after officers asked him to do so and that he was not carrying weapons. Police encountered him sitting alone in a bus shelter at the intersection of North Oakland Street and Wilson Boulevard, speaking by cellphone to his father, who arrived at the scene just as police did.

"From the perspective of Delgardo, he's not doing anything wrong," said Peter A. Joy, director of the Criminal Justice Clinic at Washington University in St. Louis's School of Law. "But he's not complying with the police orders. ... Above all, the police want individuals to comply with their orders. And if a person is not compliant, then oftentimes the police will escalate the situation."

In their written narratives describing the encounter, the two lead officers at the scene, Tyler W. Duncan and Alex Freiert, said they feared Franklin was about to attack them because he clenched his jaw, flared his nostrils, balled his fists and "bladed his body." Franklin's father told police at the time that he thought his son possibly had "taken something synthetic," but Franklin's attorneys said there was no evidence of drug use. The video does not show Franklin assuming a fighting stance or raising his fists, and his attorneys argued he posed no threat to the officers. Franklin appears agitated in the video, pacing next to a bus stop and raising his voice at the police.

"Imagine being surrounded by five police officers who are going to tackle you to the ground," Christians said.

The video shows that Freiert pointed a Taser at Franklin moments before Duncan told Franklin to kneel so he could be handcuffed. "Keep your hands out of your pockets and go to your knees for me, okay? We're just going to put you in cuffs so we can calm everything down," Duncan says in the video.

Franklin and three of the officers suffered injuries in the ensuing scuffle, but Franklin's were the only ones to break skin, according to a written report from an officer who arrived after the incident to take photographs of the scene.

The Post requested copies of the photographs showing the officers' injuries. The police department denied the request, citing an exemption in Virginia's Freedom of Information Act that covers records of criminal investigations.

Police officers and other officials in Arlington have been getting Crisis Intervention Team (CIT) training since 2018. The program was designed to provide help and resources to mentally ill individuals, with a goal of diverting them from jail, and teach police officers de-escalation techniques. The Memphis Police Department developed CIT training in 1988, after police there killed a 27-year-old man in a mental health crisis, and its methodology has since been replicated by departments across the country.

More than half of Arlington's patrol officers had completed the 40-hour CIT training course as of March, according to the county's website. All five officers who tackled Franklin had received the training as of August 2019, according to records provided by the Arlington County Police Department.

In one CIT role-playing exercise that was being taught at the time of the 2019 incident, Arlington police officers would encounter a schizophrenic individual causing a disturbance, and the goal was "to persuade the individual to leave and enter treatment," according to materials The Post obtained under Virginia's Freedom of Information Act. "Any use of force by the officer(s) will cause the scenario to stop and require re-training," the worksheet says.

A separate PowerPoint presentation used for Arlington's CIT training in 2019 says officers should "avoid physical confrontation" with individuals displaying signs of "psychotic disorders." Five pages of community resources were attached, including contacts for a mental health magistrate and the Arlington County forensic jail diversion team.

Duncan wrote in his police report that after Franklin refused to kneel and surrender, "it was established that Delgardo needed to be taken into custody in order to further assess his possible mental health concerns or drug intoxication."

"Despite a multitude of attempts to de-escalate the situation using CIT techniques, I was unable to get Delgardo to comply with surrendering," Duncan wrote. "As officers moved in to take him into custody, Delgardo immediately showed that he would not be taken into custody without resistance; Delgardo recognized our approach and braced his hands and arms tightly in front of his body."

After reviewing the CIT training materials Arlington used in 2019 and police accounts of the incident, Joy said that "it was like the officers never attended the training" or "didn't believe what they were being told, because they didn't follow any of the protocols."

Franklin was charged with three felony counts of assaulting police — based on injuries suffered by Duncan and Officers Joel M. Davis and Harley L. Guenther. Freiert and the fifth officer involved in restraining Franklin, Jason Pardee, did not claim injuries.

Alphonse Gerhardstein, a civil rights attorney who has represented victims of police misconduct and helped overhaul the Cincinnati police use-of-force policies, said he questioned why prosecutors pursued the case. Gerhardstein said there was no need to "lay hands on" Franklin to resolve the situation and "certainly no basis to charge with a crime since all the physical contact was initiated by police."

Arlington General District Court Judge R. Frances O'Brien found that Franklin was incompetent to stand trial in January 2020. Another judge, Daniel T. Lopez, found in June of that year that Franklin's competence had been restored after some treatment and medication. An assistant commonwealth's attorney in Arlington, Elizabeth Tuomey, offered a deal in July 2020 that required Franklin to plead guilty to misdemeanor counts in exchange for no jail time. He refused.

In an email to Franklin's attorney that month, Tuomey wrote that the video showed Franklin "essentially assaulted (as in, an impending battery) the officers and/or committed disorderly conduct when he balled his fists and appeared to the officers that he wanted to fight." She added that "the mental health component is a mitigating factor to me, and I will heavily consider it in making an offer, but I am not willing to dismiss the charges." The prosecutor downgraded the charges from felonies to misdemeanors in August 2020, then agreed to drop all charges in May 2021 after asking that Franklin maintain good behavior and provide a letter from a doctor or therapist attesting that he was getting medical treatment. Tuomey declined to comment.

Arlington Commonwealth's Attorney Parisa Dehghani-Tafti (D) said in an interview that she could not comment on pending litigation but that she was looking into why Franklin's case took about 21 months to resolve.

"We amended the charges to what we thought were more accurate to the facts," Dehghani-Tafti said. "It was ultimately dismissed as part of a general continuance, where there were conditions that had to be met."

> ## "We hope this case will be used to illustrate what not to do when a father calls for help."
> — Delgardo Franklin II

Franklin declined to be interviewed for this article. His father and attorneys said that his mental health had improved since the charges were dropped but that the experience had scarred his family.

"Thankfully, the evidence speaks for itself," Franklin and his attorneys said in a joint statement. "We hope this case will be used to illustrate what not to do when a father calls for help."

Duncan wrote in his police report that he spoke to Franklin's father after the incident. When told his son was being booked in the Arlington County jail, "he seemed to indicate it was in his best interest and that he thought he needed to be here," Duncan wrote. In the interview with The Post, which was conducted at Christians's law office, Franklin's father disputed that he told police his son needed to be in jail or that it was in his best interest.

In his report, Duncan wrote that Prince William County police had been called to a hospital and "witnessed Delgardo attack Mr. Franklin" during an earlier incident. Franklin's father said police were already at that hospital, Sentara Northern Virginia Medical Center in Woodbridge, when he took his son there for an evaluation that he angrily refused in mid-August 2019, days before the Arlington incident. Franklin's father disputed that his son attacked him. A spokesman for the Prince William County Police Department said that court records did not show someone named Delgardo Franklin had been arrested or charged during those dates and that, without a court order, police records identifying victims or "other parties" are exempt from disclosure.

"There's still no way any sensible human being that saw that video could even begin to remotely think that my son was either about to attack those officers or that they were in any kind of danger," Delgardo Franklin said.

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| THOMAS JONES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BETH ARTHUR, | ) | |
| Arlington County Sheriff, | ) | |
| *In her individual and official capacity*, | ) | CIVIL ACTION NO. 1:230cv099620 |
| | ) | |
| DEPUTY CARMARDIE, | ) | JURY TRIAL DEMAND |
| Arlington County Sheriff's Deputy, | ) | |
| *In his individual capacity*, | ) | |
| | ) | |
| ALEXANDER VARAKLIS, | ) | |
| Arlington County Police Department Officer, | ) | |
| *In his individual capacity*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNNAMED DOE DEPUTIES AND | ) | |
| EMPLOYEES 1 through 10,[1] | ) | |
| *In their individual capacities*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, THOMAS JONES ("Mr. Jones"), by counsel, and

alleges as follows:

---

[1] The parties are engaging in discussions regarding a protective order which will allow limited discovery into the Defendants' identities, as contemplated by the Court at the hearing on Defendants' Motion to Dismiss Mr. Jones' Amended Complaint held on August 25, 2023.

**I. Preliminary Statement**

1.      On June 15, 2021, Mr. Jones walked into the Arlington County Detention Facility ("ACDF") under his own power. He left in a wheelchair.

2.      He brings this action against the Sheriff and the Sheriff's deputies who tackled him, those deputies and the Arlington County Police Officer who failed to intervene, and the supervisory staff who failed to make sure the jail was constitutionally safe.

**II.  Nature of Action**

**3.**      This is an action for damages under 42 U.S.C. § 1983 ("Section 1983") and Virginia common law for violations of Mr. Jones' constitutional rights and injuries sustained by Mr. Jones during his intake and booking into ACDF. Mr. Jones seeks damages as well as reasonable attorneys' fees under 42 U.S.C. § 1988 ("Section 1988").

**III. Jurisdiction and Venue**

4.      This Court has federal question jurisdiction over the subject matter of this complaint under 28 U.S.C. § 1331, because this action asserts a deprivation of one or more federal constitutional rights under Section 1983.

5.      This Court has supplemental jurisdiction over Mr. Jones' state law claims against Defendants under 28 U.S.C. § 1367(a) because the facts of the federal and state claims both occurred in this judicial district and form part of the same case or controversy.

6.      Venue is proper in the judicial district under 28 U.S.C. § 1391 because a substantial part of the acts or commissions giving rise to this action occurred in Arlington, Virginia.

## IV. Parties

7.      Plaintiff Thomas Jones is a resident of the District of Columbia. During the time of the acts complained of herein, Mr. Jones was at the Arlington County Detention Facility ("ACDF"). Mr. Jones has since been released from custody.

8.      Defendant Beth Arthur ("Arthur") was, at the time of the acts complained of herein, Sheriff of Arlington County. In her position, she was responsible for the operation of ACDF and all training, supervision, and conduct of the staff of the jail. Arthur is a constitutional officer independent of Arlington County who is responsible for the care and custody of the detainees and inmates at ACDF. Arthur is vested with the responsibility to hire, train, and supervise employees, to set ACDF policies and procedures, and to provide for the safety, protection, and health of those confined at ACDF.

9.      Arlington County Sheriff's Deputy Cpl. Matthew Carmardie ("Carmardie") works in the Warrants and Civil Process section of the Judicial Services Division of the Arlington County Sheriff's Office. Carmardie bore responsibility for supervising Mr. Jones' booking into ACDF. Upon information and belief, Carmardie, in his position as Corporal, bore supervisory responsibility over the other ACSO staff assigned to the Warrants and Civil Process section while on duty, including on the date of Mr. Jones' booking.

10.     Arlington County Police Department Officer Corporal Alexander Varaklis ("Varaklis") is a law enforcement officer present at Mr. Jones' booking into ACDF who remained present to assist with Mr. Jones' intake into the facility.

11.     Unnamed Doe Deputies and Employees 1 to 10 were employed at ACDF and involved in the booking process in which Mr. Jones was injured. Plaintiff's claims against Arthur include the actions/inactions of these Deputies and Employees. Doe Deputies and Employees 1-8 were line staff; Doe Deputies and Employees 9-10 and Carmardie had supervisory authority over other Deputies and Employees.

12.     Under the doctrine of *respondeat superior* liability, Arthur is legally responsible for the actions and inactions of these Deputies and Employees performed in the scope of their employment/duties with the Arlington County Sheriff's Office.

13.     Carmardie, Varaklis, and Unnamed Doe Deputies and Employees 1 to 10 were on duty, in uniform, and displayed their badge of authority at all times relevant to the events alleged herein. As such, all Defendants personally acted under color of state law.

### V. Factual Allegations

#### Background to Mr. Jones' Arlington Incarceration

14.     In May 2021, Mr. Jones was both on parole under the authority of D.C. Superior Court and on probation in Arlington County.

15.     On May 10, 2021, the United States Parole Commission issued a warrant for his arrest for violating the terms of his parole by "failing to contact his supervision officer as directed."

16.     The United States Marshals Service ("USMS") arrested Mr. Jones on June 15, 2021 on that warrant and transported him to ACDF because of an outstanding Arlington County warrant for a probation violation.

17.     At the time of his arrest, Mr. Jones was able to stand and walk normally.

18.     In accordance with standard Marshals Service polices, Mr. Jones was searched, cuffed with a belly chain, and shackled when he was taken into USMS custody.

### Background on ACDF and ACSO Policies and Procedures

19.     The Arlington County Sheriff sets policy for the ACDF.

20.     In addition to general polices, there are standard post orders maintained at each post to guide staff operations and ensure consistency among shifts in performing daily activities.

21.     These post orders are approved and adopted by the Arlington County Sheriff.

22.     Supervisor at ACDF are responsible for providing supporting and guidance where possible and practical, as well as when necessary to ensure line staff complies with post orders and any other constitutional or statutory requirements.

23.     Staff failures to meet the requirements of their position are documented and reviewed by higher level supervisors, including the Sheriff, to determine where more training or other employment action is necessary.

24.     On information and belief, the policies Arthur put in effect at ACDF reflected the standards mandated in the regulations promulgated by the Virginia Board of Local and Regional Jails and published in the Virginia Administrative Code.

25.     Policies at ACDF restricted the use of force to justifiable protection of self or others, protection of property, orderly operation of the jail, and prevention of escapes.

26.     Policies at ACDF specified how a search of an incoming individual and his or her possessions was to be performed. These policies, on paper, do not permit excessive force.

27.     For context, an overview of the intake search procedure area can be seen in a promotional video made for the public and posted on the Arlington County Sheriff's website, https://www.arlingtonva.us/Government/Departments/Sheriffs-Office, which is stored and available at https://drive.google.com/file/d/1r0lbg7aIHlzl0T1rNwpE2baFaYDCymzF/view.

28.     The intake processing section of ACDF is pictured in these screengrabs:



---

[2] This screengrab is from time marker [4:41] of the aforementioned video.



29.     When a person is first committed to the ACDF, they are put through a full body scanner, pictured here:



30.     The purpose of the full body scan is to detect metallic and non-metallic weapons, explosives, and narcotics on detainees being booked into the facility, whether concealed on their person or inside of their body.

31.     In the video, the representative of the Sheriff's Office praises the scanner's ability to detect narcotics such as fentanyl.

32.     After the electronic body scan, a detainee is brought to "the mats" to be physically searched, as shown in these screengrabs:

---

[3] This screengrab is from time marker [4:51] of the aforementioned video.

[4] This screengrab is from time marker [5:15] of the aforementioned video.





33.     As seen in the screengrabs, this area is triangle shaped. Based on

extrapolations based on the standard width of a commercial door as 36 inches, the width

of the area referred to as "the mats" is about 6 feet its most narrow and 14 feet at its

widest.

34.     While policies are in place to prevent the introduction of contraband,

force was not permitted to be used as punishment, as that would be a violation of the

Constitution.

35.     Staff at ACDF are required to be trained on all policies, and such training

is supposed to be documented and reviewed by supervisory staff.

---

[5] This screengrab is from time marker [5:42].

[6] This screengrab is from time marker [5:48].

## Background on ACPD Policies and Procedures

36.      Arlington County Police Officers have a duty to intervene to stop excessive force they witness being used by any other law enforcement officer, whether in their own department or another.

37.      Section 401.05 of ACPD's Department Directive Manual titled "Duty to Intervene" provides, in relevant part:

> Sworn officers have a duty to intervene and restore appropriate order during any police action where the amount of force being used is beyond what is objectively reasonable. Officers shall render aid, as circumstances objectively permit, to any person injured as the result of such use of force.

Arlington County Police Department Directive Manual, Chapter 4: Rules & Regulations, § 401.04 ("Duty to Intervene").

38.      Section 538.04 of ACPD's Department Directive Manual titled "Use of Force" similarly provides that "Sworn officers have a duty to intervene and restore appropriate order during any police action where the amount of force being used is beyond what is objectively reasonable."

39.      ACPD's Use of Force directive defines "objective reasonableness" in the following manner:

> A standard of caution wherein officers must determine the necessity for force, as well as the appropriate level of force, by evaluating the circumstances known to the officer at the time the decision to use force is made. The circumstances to be considered include, but are not limited to: (1) The severity of the crime. (2) The immediate threat posed by a suspect to the officer orr others. (3) The level of resistance presented by a suspect. (4) The potential danger to the community posed by a suspect. (5) Rapidly evolving circumstances and/or rapidly changing dynamics of a situation.

Arlington County Police Department Directive Manual, Chapter 5: Procedures, § 538.04 ("Use of Force").

40.     ACPD's Use of Force directive further provides that "[u]se of physical force should be discontinued when resistance ceases or when the incident is under control."

### The Events which Put Mr. Jones in a Wheelchair

41.     As described above, Mr. Jones walked into the ACDF in handcuffs, a belly chain, and shackles.

42.     He was in the custody of the U.S. Marshals Service. Carmardie bore responsibility for supervising Mr. Jones' booking into ACDF.

43.     Upon information and belief, Carmardie bore supervisory responsibility over the ACSO staff on duty and working in the Civil and Warrants Section as they carried out the intake process on the day of Mr. Jones' booking into ACDF.

44.     Arlington County Police Department Officer Alexander Varaklis assisted with Mr. Jones' booking into ACDF and remained in the booking area during Mr. Jones' intake into ACDF.

45.     Varaklis, Carmardie, and Does 1-10 were spread throughout the booking area—some lining the walls near the mats, some farther away.

46.     Mr. Jones was first put through the body scanner. After that point, all law enforcement officers present knew he had no weapons on his person.

47.     Then, Mr. Jones was led to the mats to be physically searched.

48.     The ACDF Booking Deputy removed the shackles and cuffs from Mr. Jones, searched him, and ordered him to take his shoes and socks off.

49.     Mr. Jones followed the ACDF Booking Deputy's commands.

50. Mr. Jones braced himself against the mats with one hand and reached down to pull off his socks with the other.

51. As he did so, a sandwich bag with a white rock came out of his sock.

52. Mr. Jones made no aggressive or furtive movements.

53. Written policy would not have countenanced the use of any physical force by Arlington County Sheriff's deputies at this point.

54. However, without any discussion, the group of Sheriff's deputies disregarded official written policy and reacted with constitutionally excessive force.

55. A large group of Sheriff's deputies, names presently unknown, rushed forward from around the booking area and tackled him to the ground.

56. The way that the deputies acted in unison, contrary to written policy, suggests that there was an unwritten custom permitting and even encouraging this sort of force.

57. It took several seconds for the deputies to reach Mr. Jones.

58. In that time, both Carmardie and Varaklis had time to react, either by using verbal commands or physically intervening to stop the use of excess force by Does.

59. However, neither Carmardie nor Varaklis attempted to verbally intervene or otherwise stop the attack by Does on Mr. Jones.

60. In tackling Mr. Jones, the Sheriff's deputies caused Mr. Jones' head to strike the floor with enough force to cause Mr. Jones to become disoriented.

61. While on the ground, he was placed in handcuffs. He was then brought to a holding cell, where the handcuffs were removed.

62. Mr. Jones then lost consciousness.

63.    Officer Varaklis' arrest report described that Mr. Jones "became unresponsive."

64.    A nurse was called, and upon evaluating Mr. Jones determined that he needed to go to the hospital.

65.    He was transported by ambulance to the Virginia Hospital Center, which is where Mr. Jones woke up hours later.

### Mr. Jones' Condition Worsened and Continued

66.    The next day, he was unable to walk due to extreme muscle spasms. He was transported back to the ACDF in a wheelchair.

67.    Mr. Jones continued to need the wheelchair for the three months he spent in the ACDF.

68.    He continued to need the wheelchair for an additional twelve months while he was in the custody of the D.C. Department of Corrections.

69.    While in the custody of the D.C. Department of Corrections of Corrections, the medical provider, Unity Healthcare, documented Mr. Jones' continued muscle spasms and the need for a wheelchair to ambulate.

70.    Only upon release from the D.C. Department of Corrections in the fall of 2022, was Mr. Jones able to seek the medical care he needed.

71.    He was diagnosed with intervertebral disc disorders with radiculopathy, segmental and somatic dysfunction of the spine, and spinal instabilities.

72.     With over 6 months of intensive chiropractic care, including therapeutic exercises, mechanical traction, neuromuscular re-education, and electric therapies, Mr. Jones was able to recover his pre-assault mobility and reduce his pain levels.

## COUNT ONE
### Civil Rights Violation of 42 U.S.C. § 1983:
### Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution
### (Against Unnamed Doe Deputies and Employees 1 to 8)

73.     The preceding paragraphs are incorporated by reference as if fully restated herein.

74.     As a pre-trial detainee, Mr. Jones was protected by the Fifth and Fourteenth Amendments against objectively unreasonable uses of force.

75.     Doe Deputies and Employees 1-8, in reaction to the discovery of a sandwich bag in Mr. Jones' sock, failed to limit the amount of force to that which would have been proportional to the nonviolent threat at hand.

76.     Instead, they overreacted with force so extreme, Mr. Jones had to be hospitalized and use a wheelchair for over a year.

77.     Such extreme force amounted to unconstitutional punishment of Mr. Jones, a pre-trial detainee.

78.     At all times, these Defendants acted under color of state law.

79.     The actions of Doe Deputies and Employees 1-8 were the direct and proximate cause of the violations of Mr. Jones' Constitutional rights and of the damages sustained by Mr. Jones including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

**COUNT TWO**
**Civil Rights Violation of 42 U.S.C. § 1983:**
**Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution:**
**Failure to Supervise**
**(Against Unnamed Doe Deputies and Employees 9-10, Camardie, and**
**Arthur)**

80.     The preceding paragraphs are incorporated by reference as if fully re-

stated herein.

81.     The specter of law enforcement improperly using force against the

public, especially in correctional settings, is a common and clearly foreseeable concern

for all jail supervisory staff.

82.     Doe Deputies and Employees 9-10 and Arthur were responsible for

supervising the staff of the ACDF and ensuring they did not use excessive, illegal, or

unconstitutional force.

83.     Carmardie, in his position as Corporal, was responsible for supervising

the staff in booking on that day.

84.     Part of Carmardie's responsibilities as the supervisor of the deputies

performing Mr. Jones' intake included ensuring they did not use excessive, illegal, or

unconstitutional force.

85.     On information and belief, ACSO Warrants and Civil Process section

staff were – on any given shift – subject to the supervisory authority of either Carmardie

and/or Unnamed Doe Deputies and Employees 9-10.

86.     By virtue of their supervisory position, Carmardie and Unnamed Doe

Deputies and Employees 9-10 had actual or constructive knowledge of the propensity of

Warrants and Civil Process section staff to engage in conduct that posed a pervasive and

unreasonable risk of injury to pre-trial detainees undergoing the intake process into ACDF.

87.     On information and belief, Carmardie and Unnamed Doe Deputies 9-10 gained this knowledge from having witnessed the use of excessive force against pre-trial detainees during the intake process at ACDF in the past.

88.     On information and belief, Carmardie and Unnamed Doe Deputies 9-10 failed to respond to such prior conduct by Warrant and Civil Process Section staff in a manner adequate to prevent its future reoccurrence.

89.     The fact that numerous staff reacted to the discovery of contraband in a nonviolent situation with overwhelming and injurious force plausibly suggests that Warrant and Civil Process Section staff had come to believe Carmardie and Unnamed Doe Deputies 9-10 were either indifferent to, or tacitly approved of, their continued use of excessive force against pre-trial detainees.

90.     Arthur is the policy maker in charge of the ACSO and bore responsibility for the operation of ACDF and the training, supervision, and conduct of all of its staff on the date of Mr. Jones' booking and intake into the facility.

91.     The fact that numerous staff reacted to the discovery of contraband in a nonviolent situation with overwhelming and injuries force plausibly suggests that Arthur failed to supervise and train employees on ACSO policy related to the use of excessive force, such that it became the official custom or policy of the deputies at ACDF to use excessive force in furtherance of the booking and intake of pre-trial detainees.

92.     At all times, these Defendants acted under color of state law.

93.     The actions of Doe Deputies and Employees 9-10, Carmardie and Defendant Arthur were the direct and proximate cause of the violations of Mr. Jones' Constitutional rights and of the damages sustained by Mr. Jones including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

**COUNT THREE**
**Civil Rights Violation of 42 U.S.C. § 1983:**
**Failure to Intervene**
**(Against Carmardie and Varaklis)**

94.     The preceding paragraphs are incorporated by reference as if fully restated herein.

95.     Defendants Carmardie and Varaklis had an affirmative duty to intervene on Mr. Jones' behalf to prevent the violation of his constitutional rights.

96.     They failed to intervene on Mr. Jones' behalf to prevent the violation of Mr. Jones' constitutional rights resulting from the use of excessive force by Defendant Carmardie and Doe Deputies and Employees 1-8, despite having a realistic opportunity to do so.

97.     As a result of the aforementioned conduct of Defendants Carmardie and Varaklis, Mr. Jones' constitutional rights were violated.

98.     As the direct and proximate cause of Defendants Carmardie and Varaklis' failure to intervene, Mr. Jones sustained damages including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

**COUNT FOUR**
**Assault and Battery**
**In Violation of Virginia Common Law**
**(Against Unnamed Doe Deputies and Employees 1-8)**

99.    The preceding paragraphs are incorporated by reference as if fully re-stated herein.

100.    At all times, these Defendants acted within the scope of their employment duties.

101.    In performing the acts herein, they willfully placed Mr. Jones in reasonable apprehension and fear of imminent harmful and offensive bodily contact.

102.    In performing the acts herein, they willfully touched Mr. Jones' person.

103.    They willfully inflicted bodily harm upon Mr. Jones.

104.    Mr. Jones did not consent to these willing and harmful acts.

105.    These described actions constitute the torts of assault and battery under the laws of the Commonwealth of Virginia.

106.    As the direct and proximate cause of these actions, Mr. Jones sustained damages including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for relief and a judgment against Defendants:

1.    Ordering Defendants to pay, jointly and severally, compensatory damages to Mr. Jones in an amount to be determined at trial;

2.      Ordering Defendants to pay punitive damages to the extent permitted by law;

3.      Awarding Plaintiff pre- and post-judgment interest;

4.      Awarding Plaintiff costs, attorneys' fees, and other disbursements for this action; and

5.      Granting Plaintiff such other and further relief as this Court deems just and proper.

## Jury Demand

Plaintiff demands a trial by jury for all issues triable by jury as of right.

DATED:          September 29, 2023              Respectfully submitted,

/s/Joshua Erlich
Joshua Erlich (VSB No. 81298)
Katherine L. Herrmann (VSB No. 83203)
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd. #700
Arlington, VA 22201
Tel: (703) 791-9087
Fax: (703) 722-8114
jerlich@erlichlawofice.com
kherrmann@erlichlawoffice.com

/s/Deborah M. Golden
Deborah M. Golden
Pro Hac Vice
THE LAW OFFICE OF
DEBORAH M. GOLDEN
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
 (202) 630-0332
Fax: (202) 217-3653
dgolden@debgoldenlaw.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September 2023, I filed the foregoing Amended Complaint with the Clerk of the Court via CM/ECF which notifies all parties electronically:

Alexander Francuzenko, VA Bar #36510
Philip C. Krone, VA Bar #87723
Cook, Craig & Francuzenko, PLLC
3050 Chain Bridge Road Suite 200
Fairfax, Virginia 22030
T: (703) 865-7480
F: (703) 434-3510
alex@cookcraig.com
pkrone@cookcraig.com

*Counsel for Deputy Carmardie & Beth Arthur*


MinhChau N. Corr, County Attorney
Virginia Bar #78877
Arlington County Attorney's Office
2100 Clarendon Blvd. Suite 403
Arlington, Virginia 22201
(703) 228-3100 (voice)
(703) 228-7106 (fax)
mcorr@arlingtonva.us

*Counsel for Alexander Varaklis*


                                        _____/s/_____
                                        Katherine L. Herrmann
                                        kherrmann@erlichlawoffice.com